# EXHIBIT 5O

JAMES COPPAGE &ast;  IN THE
7 White Spruce Court &ast;
Baltimore, Maryland 21234 &ast;  CIRCUIT COURT
&ast;
Plaintiff, &ast;  FOR
&ast;
v. &ast;  BALTIMORE CITY
&ast;
UNITED STATES STEEL CORPORATION &ast;
600 Grant Street, Room 1500 &ast;
Pittsburgh, PA 15219-2800 &ast;  Case No. _____
Serve on:    CSC-Lawyers Incorporating &ast;
         Service Company &ast;
         Suite 820, 7 St. Paul Street &ast;
         Baltimore, MD 21202 &ast;
&ast;
BASF CORPORATION, Individually and as &ast;
Successor in Interest to Inmont Corporation &ast;
100 Park Avenue &ast;
Florham Park, NJ 07932 &ast;
Serve on:    The Corporation Trust, &ast;
         Incorporate &ast;
         2405 York Road, Suite 201 &ast;
         Lutherville Timonium, MD 21093 &ast;
&ast;
RYCOLINE PRODUCTS, INC., a Division of &ast;
Sun Chemical Commercial Group a/k/a &ast;
Rycoline Products, LLC, and Successor to &ast;
Rogersol, Inc. &ast;
5540 Northwest Highway &ast;
Chicago, IL 60630 &ast;
Serve on:    The Corporation Trust Company &ast;
         Corporation Trust Center &ast;
         1209 Orange Street &ast;
         Wilmington, DE 19801 &ast;
&ast;
SUN CHEMICAL CORPORATION, &ast;
Individually and as Parent and Successor &ast;
to Rycoline Products, LLC, a/k/a Rycoline &ast;
Products, Inc. and Successor to Rogersol, Inc., &ast;

RECEIVED
CIRCUIT COURT FOR
BALTIMORE CITY
18 NOV -5  PM 1: 40
CIVIL DIVISION

as Successor in Interest to Handschy                    *
Industries, LLC, as Successor in Interest to           *
BASF Corporation and as Successor in Interest          *
to United States Printing Inks                         *
35 Waterview Boulevard                                 *
Parsippany, NJ 07054                                   *
 Serve on: The Corporation Trust,            *
    Incorporated                   *
    2405 York Road, Suite 201      *
    Lutherville Timonium, MD 21093 *
           *

VARN INTERNATIONAL, INC.                               *
d/b/a Varn Products Co.                                 *
130 W. 2nd Street, Suite 1700                          *
Dayton, OH 45402                                       *
 Serve on: Corporation Service Company       *
    50 West Broad Street           *
    Suite 1330                     *
    Columbus, OH 43215             *
           *

HANDSCHY INDUSTRIES, LLC                               *
814 Livingston Court                                   *
Marietta, GA 30067                                     *
 Serve on: Corporation Service Company       *
    251 Little Falls Drive         *
    Wilmington, DE 19808           *
           *

UNION OIL COMPANY OF CALIFORNIA,                       *
Individually and as Successor In Interest to           *
American Mineral Spirits Company                       *
P.O. Box 6028                                          *
San Ramon CA 94583                                     *
 Serve on: The Corporation Trust            *
    32 South Street               *
    Baltimore, MD 21202           *
           *

HARCROS CHEMICALS, INC. f/k/a and/or                   *
Successor In Interest to Thompson-Hayward              *
Chemical Company                                       *
5200 Speaker Road                                      *

1

Kansas City, KS 66106                                *
Serve on:      The Corporation Trust,                *
               Incorporate                           *
               2405 York Road, Suite 201             *
               Lutherville Timonium, MD 21093        *
                                                     *
T.H. AGRICULTURE AND NUTRITION, LLC                  *
f/k/a and/or Successor In Interest to                *
T.H. Agriculture and Nutrition, Inc. and             *
Thompson-Hayward Chemical Company                    *
250 W. 57th Street, Suite 901                        *
New York, NY 10107                                   *
Serve on:      Corporation Service Company           *
               251 Little Falls Drive                *
               Wilmington, DE 19808                  *
                                                     *
PHILLIPS NORTH AMERICA LLC f/k/a                     *
PHILIPS ELECTRONICS NORTH AMERICA                    *
CORPORATION d/b/a and as Parent and                  *
Successor In Interest to T.H. Agriculture and        *
Nutrition, LLC, T.H. Agriculture and Nutrition,      *
Inc. and Thompson-Hayward Chemical                   *
Company                                              *
200 Franklin Square Dr.                              *
Somerset, NJ 08875                                   *
Serve on:      CSC-Lawyers Incorporating             *
               Service Company                       *
               7 St. Paul Street, Suite 820          *
               Baltimore, MD 21202                   *
                                                     *
EMCO CHEMICAL DISTRIBUTORS, INC.                     *
2100 Commonwealth Ave.                               *
North Chicago, IL 60064                              *
Serve on:      Bernard A. Schlifke                   *
               330 N. Wabash, # 1700                 *
               Chicago, IL 60611                     *
                                                     *
SHELL OIL COMPANY                                    *
One Shell Plaza                                      *
910 Louisiana                                        *

2

Houston, TX 77022                                    *
Serve on:      The Corporation Trust,               *
               Incorporate                           *
               2405 York Road, Suite 201             *
               Lutherville Timonium, MD 21093        *
                                                     *
SHELL OIL PRODUCTS US, INC.                          *
One Shell Plaza                                      *
910 Louisiana                                        *
Houston, TX 77022                                    *
Serve on:      The Corporation Trust,               *
               Incorporate                           *
               2405 York Road, Suite 201             *
               Lutherville Timonium, MD 21093        *
                                                     *
GRAPHIC PACKAGING INTERNATIONAL,                     *
LLC f/k/f GRAPHIC PACKAGING                          *
INTERNATIONAL, INC., Individually and as            *
Successor-in-Interest to Handschy Industries,       *
LLC.                                                 *
814 Livingston Court                                 *
Marietta, GA 30067                                   *
Serve on:      CSC-Lawyers Incorporating            *
               Service                               *
               7 St. Paul Street, Suite 820          *
               Baltimore, MD 21202                   *
                                                     *
FUJIFILM HUNT CHEMICALS USA, INC.                    *
d/b/a and Parent and Successor to                   *
Anchor/Lith-Kem-Ko, Inc.                            *
40 Boroline Road                                    *
Allendale, NJ 07401                                 *
Serve on:      Corporation Service Company          *
               251 Little Falls Drive                *
               Wilmington, DE 19808                  *
                                                     *
ASHLAND, LLC, Individually and as                    *
Successor in Interest to Inland Leidy               *
50 E. Rivercenter Boulevard                          *
Covington, KY 41012                                 *

3

| | | |
|---|---|---|
| Serve on: | Adam Shpritz | * |
| | 920 S. Conkling Street | * |
| | Baltimore, MD 21224 | * |

JHB, INC. f/k/a JOHN H. BURKE & CO., INC. *
1201 Haubert Street                        *
Baltimore, MD 21230                        *
Serve on:  Donald J. Boehl, Secretary      *
           230 Dodson Avenue               *
           Saint Michaels, MD 21663-2126   *
                                           *
           J. Douglas Boehl, President and *
           Treasurer                       *
           3145 Walker Road                *
           Glen Rock, PA 17327-8501        *
                                           *
           Defendants.                     *
                                           *

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

## COMPLAINT

Plaintiff James Coppage, by and through undersigned counsel, hereby brings this action against the Defendants set forth herein and states as follows:

1.      Jurisdiction is conferred upon this Court pursuant to Md. Code Ann, Cts & Jud. Proc. § 6-103, since every Defendant continuously and systematically conducts and/or transacts a part of its general business within the State of Maryland, and/or the causes of action asserted by the Plaintiff arise out of the Defendants' acts, omissions and/or other tortious conduct which caused the Plaintiff injury in Maryland. Defendants purposefully availed themselves of the privilege of conducting business in Maryland because they (1) each sold their products into Maryland directly or indirectly through manufacturers and distributors which were located in Maryland or which they knew and reasonably foresaw would place their products into Maryland, (2) advertised their products in Maryland, (3) communicated with the Plaintiff's employers in

4

Maryland, and (4) established channels for providing regular advised to customers in Maryland. Plaintiff sustained injurious exposures to benzene from the Defendants' products in Maryland which caused, in whole or in part, the Plaintiff's cancer.

2.      Venue in this Court is proper pursuant to Md. Code Ann, Cts & Jud. Proc. § 6-201, since at least one Defendant, JHB, Inc. f/k/a John H. Burke & Co., Inc., is and/or was located in the City of Baltimore, every Defendant regularly conducts business within the City of Baltimore, and transactions and occurrences out of which the cause of action arose occurred in the City of Baltimore, including the Plaintiff's injurious exposures to the Defendants' benzene-containing products.

## FACTS COMMON TO ALL COUNTS

3.      James Coppage ("Plaintiff") resides at the above stated address.

4.      At all times material hereto, Plaintiff was employed as follows:

   a.   Junior Pressman Baltimore Sun September 1960 - September 1965

   b.   Apprentice rotating between the Baltimore Sun, News American and Alco-Gravure September 1965 - June 1969

   c.   Journeyman Pressman: Alco-Gravure l/k/a Quebecor June 1969 - 1998

   d.   Journeyman Pressman: Baltimore Sun 1999 - 2006

        (hereinafter referred to as "employer" or collectively as "employers"),

        whereat he was exposed to the Defendants' Benzene Containing Products.

5.      As a condition of his employment as a press operator, Plaintiff worked directly and indirectly with and was directly and indirectly exposed to, on a daily or almost daily basis, various benzene-containing products, including but not limited to, press washes, blanket washes, de-glazers, roller washes, rubber rejuvenators, metering roller cleaners, varnish, varnish removers,

cleaners, solvents, parts-washing machines and parts-washing solvents, additives, fixers, varnishes, drying agents, fountain solutions, penetrating oils, inks, ink dyes, ink keepers, and ink thinners (hereinafter or "benzene-containing products") which products and/or their ingredients, were manufactured, refined, designed, produced, processed, compounded, converted, packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce by the Defendants.

6.      Plaintiff was exposed to the Defendants' benzene-containing products, and to the vapors, aerosols, mists and fogs from said products, by means of inhalation and dermal absorption (from direct dermal contact with said products, dermal contact with clothes contaminated by said products and/or dermal contact with benzene vapors in the air.).

7.      As a direct and proximate result of his exposure to the Defendants' benzene-containing products and the Defendants' wrongful conduct, Plaintiff contracted Myelodysplastic (MDS) which diagnosis he did not learn of until on or about December 5, 2016. Plaintiff did not learn of any connection between his condition and exposure to benzene or the Defendants' wrongful acts and omissions until approximately April, 2017.

## DEFENDANTS

8.      At all times material hereto, Defendants acted through their agents, ostensible agents, servants or employees, who were acting within the scope of their employment on the business of the Defendants. The Defendants' agents and ostensible agents included their employees and other persons and entities, since the Defendants are all corporations that must act through their employees and others, that the Plaintiff is not able to identify by name without conducting discovery.

9.      The Defendants are all corporations, companies or other business entities which, during all times material hereto and for a time prior thereto, manufactured, produced, processed, compounded, converted, sold, distributed, marketed and/or otherwise placed into the stream of commerce, benzene-containing products and/or raw material ingredients used in benzene-containing products, all of which were used by and around Plaintiff and Plaintiff's employers, or are the successors to and/or otherwise liable for companies which engaged in said conduct.

10.     The Defendants are:

   a.   Defendant, UNITED STATES STEEL CORPORATION (hereinafter "US Steel" or "Defendant") is believed to be a Delaware corporation or other business entity having its principal place of business at the above-stated address, which continuously, regularly and systematically conducts business in the State of Maryland and the City of Baltimore. US Steel manufactured, refined, designed, produced, processed, compounded, converted, packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce benzene-containing solvents which were used as component chemicals to manufacture co-Defendants' products, including Liquid Wrench, to which the Plaintiff was exposed and which directly and proximately caused the Plaintiff's injuries and damages, as more fully set forth herein.

   b.   Defendant, BASF CORPORATION, Individually and as Successor in Interest to Inmont Corporation (hereinafter "BASF" or "Defendant"), is believed to be a Delaware corporation or other business entity having its principal place of business at the above-stated address, which continuously, regularly and systematically conducts business in the State of Maryland and the City of Baltimore. Defendant,

7

BASF and its predecessor Inmont Corporation manufactured, refined, designed, produced, processed, compounded, converted, packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce benzene-containing products, including but not limited to printing inks, gravure printing inks, solvents for gravure printing inks, driers for gravure printing inks, toluene, xylene and naphthas, to which the Plaintiff was exposed and which directly and proximately caused his MDS.

c. Defendant, RYCOLINE PRODUCTS, INC., a Division of Sun Chemical Commercial Group a/k/a Rycoline Products, LLC, and Successor to Rogersol, Inc. (hereinafter "Rycoline" or "Defendant") is a Delaware corporation with a principal place of business at the above address, yet which continuously, regularly and systematically conducts business in the State of Maryland and the City of Baltimore. Rycoline manufactured, refined, designed, produced, processed, compounded, converted, packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce benzene-containing printing products and benzene-containing products, including but not limited to blanket washes, roller washes, ink keepers, and UV Wash, that Plaintiff was exposed to and which were a direct and proximate cause of his MDS.

d. Defendant, SUN CHEMICAL CORPORATION, Individually and as Parent and Successor to Rycoline Products, Inc. a/k/a Rycoline Products, LLC, Rogersol, Inc., United States Printing Inks, BASF Corporation and Handschy Industries, LLC (hereinafter "Sun Chemical" or "Defendant"), is a corporation or other business entity organized and existing under the laws of the State of Delaware, having its

8

principal place of business at the above-stated address, yet which continuously, regularly and systematically conducts business in the State of Maryland and the City of Baltimore. Sun Chemical manufactured, refined, designed, produced, processed, compounded, converted, packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce benzene-containing printing products, including but not limited to inks, that Plaintiff was exposed to and which were a direct and proximate cause of his MDS.

    a.  Upon information and belief, Sun Chemical acquired Rycoline Products, Inc. in or about 2004, at which time it assumed the liabilities of Rycoline Products, Inc. and Rogersol, Inc., including liabilities for personal injuries caused to Plaintiff.

    b.  Upon information and belief Sun Chemical acquired certain assets and liabilities of Handschy Industries, LLC, and Sun Chemical continued to manufacture and sell Handschy Industries, LLC product lines.

    c.  Upon information and belief Sun Chemical acquired United States Printing Ink Company in 1993, at which time it assumed the liabilities of United States Printing Inks.

    d.  Upon information and belief Sun Chemical acquired the BASF packaging and commercial inks business in 1991, at which time it assumed certain liabilities of BASF.

9

e. Defendant, VARN INTERNATIONAL, INC. d/b/a Varn Products Co. (hereinafter "Varn International" or "Defendant") is a Delaware corporation with the above principal place of business, yet which continuously, regularly and systematically conducts business in the State of Maryland and the City of Baltimore. Varn International manufactured, refined, designed, produced, processed, compounded, converted, packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce benzene-containing printing products and benzene-containing products, including but not limited to Revitol Blanket Fix, Revitol Blanket Rejuvenator, Revitol De-Glazer, Blanket Wash, Press Wash, rejuvenator and ink keeper, that Plaintiff was exposed to and which were a direct and proximate cause of his MDS.

f. Defendant, HANDSCHY INDUSTRIES, LLC. (hereinafter "Handschy" or "Defendant") is a Delaware corporation, with a principal place of business at the above address, yet which continuously, regularly and systematically conducts business in the State of Maryland Commonwealth and the City of Baltimore. HANDSCHY manufactured, refined, designed, produced, processed, compounded, converted, packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce benzene-containing printing solvents, including but not limited to Hancolite Glaze Cleaner, Plasaver, Type Cleaner, Special Type Wash, and Steel Roller Deoxidizer, that the Plaintiff was exposed to and which were a direct and proximate cause of his MDS.

g. Defendant, UNION OIL COMPANY OF CALIFORNIA a/k/a Unocal, individually and as Successor in Interest to American Mineral Spirits Company

10

a/k/a AMSCO (hereinafter "Unocal" or "Defendant"), is a Pennsylvania corporation or other business entity having a principal place of business at the above address, which continuously, regularly and systematically conducts business in the State of Maryland and the City of Baltimore. Upon information and belief, Unocal succeeded to the assets and liabilities of AMSCO, and its subsidiaries. Upon information and belief, Unocal manufactured, refined, designed, produced, processed, compounded and converted benzene-containing solvents, which were used as ingredients by Defendant Handschy, and/or which were packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce by Defendant Handschy, that the Plaintiff was exposed to and which were a direct and proximate cause of his MDS.

h.  Defendant, HARCROS CHEMICALS, INC. f/k/a and/or Successor In Interest to Thompson-Hayward Chemical Company, (hereinafter "Harcos" or "Defendant") is a Delaware corporation or other business entity having a principal place of business at the above address, which continuously, regularly and systematically conducts business in the State of Maryland and the City of Baltimore. Upon information and belief, Harcos was formerly known as and/or succeeded to the assets and liabilities of Thompson-Hayward Chemical Company and its division, Commerce Industrial Chemicals. Upon information and belief, Thompson-Hayward Chemical Company and its division, Commerce Industrial Chemicals manufactured, refined, designed, produced, processed, compounded and converted benzene-containing solvents, which were used as ingredients by Defendant Handschy, and/or which were packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed

11

into the stream of commerce by Defendant Handschy, that the Plaintiff was exposed to and which were a direct and proximate cause of his MDS.

i.  Defendant, T.H. AGRICULTURE AND NUTRITION, LLC f/k/a and/or Successor In Interest to T.H. Agriculture and Nutrition, Inc. and Thompson-Hayward Chemical Company (hereinafter "THAN" or "Defendant") is a Delaware limited liability company or other business entity having a principal place of business at the above address, which continuously, regularly and systematically conducts business in the State of Maryland and the City of Baltimore. Upon information and belief, THAN was formerly known as and/or succeeded to the assets and liabilities of Thompson-Hayward Chemical Company and its division, Commerce Industrial Chemicals. Upon information and belief, Thompson-Hayward Chemical Company and its division, Commerce Industrial Chemicals manufactured, refined, designed, produced, processed, compounded and converted benzene-containing solvents, which were used as ingredients by Defendant Handschy, and/or which were packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce by Defendant Handschy, that the Plaintiff was exposed to and which were a direct and proximate cause of his MDS.

j.  Defendant, PHILIPS NORTH AMERICA, LLC f/k/a PHILIPS ELECTRONICS NORTH AMERICA CORPORATION d/b/a and as Parent and Successor In Interest to T.H. Agriculture and Nutrition, LLC, T.H. Agriculture and Nutrition, Inc. and Thompson-Hayward Chemical Company (hereinafter "Philips" or "Defendant") is a Delaware corporation or other business entity having a principal place of business at the above address, which continuously, regularly and

12

systematically conducts business in the State of Maryland and the City of Baltimore. Upon information and belief, Philips was the Parent of and/or succeeded to the assets and liabilities of Thompson-Hayward Chemical Company, T.H. Agriculture and Nutrition, Inc. and THAN. Upon information and belief, Thompson-Hayward Chemical Company and its division, Commerce Industrial Chemicals manufactured, refined, designed, produced, processed, compounded and converted benzene-containing solvents, which were used as ingredients by Defendant Handschy, and/or which were packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce by Defendant Handschy, that the Plaintiff was exposed to and which were a direct and proximate cause of his MDS.

k.  Defendant, EMCO CHEMICAL DISTRIBUTORS, INC. (hereinafter "EMCO" or "Defendant") is a Delaware corporation or other business entity having a principal place of business at the above address, which continuously, regularly and systematically conducts business in the State of Maryland and the City of Baltimore. Upon information and belief, EMCO manufactured, refined, designed, produced, processed, compounded and converted benzene-containing solvents, which were used as ingredients by Defendant Handschy, and/or which were packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce by Defendant Handschy, that the Plaintiff was exposed to and which were a direct and proximate cause of his MDS.

l.  Defendant, SHELL OIL COMPANY (hereinafter "Shell Oil" or "Defendant") upon information and belief is a Delaware corporation or other business entity having its

13

principal place of business at the above-stated address, and which continuously, regularly and systematically conducts business in the State of Maryland and the City of Baltimore. Defendant Shell Oil manufactured, produced, processed, compounded, converted, sold, marketed, distributed, supplied, re-labeled and/or otherwise placed into the stream of commerce products containing benzene, as a known ingredient and/or as a contaminant and/or component of which it knew or should have known. Plaintiff was directly and/or indirectly exposed, in the manner described herein, to this Defendant's benzene containing products, including but not limited to quench oils and benzene containing petroleum solvents used in co-defendants' products, and which directly and proximately caused the Plaintiff's injuries and damages, as more fully set forth herein.

m. Defendant, SHELL OIL PRODUCTS US, INC. (hereinafter "SOPUS" or "Defendant") upon information and belief is a Delaware corporation or other business entity having its principal place of business at the above-stated address, and which continuously, regularly and systematically conducts business in the State of Maryland and the City of Baltimore. Defendant SOPUS, manufactured, produced, processed, compounded, converted, sold, marketed, distributed, supplied, re-labeled and/or otherwise placed into the stream of commerce products containing benzene, as a known ingredient and/or as a contaminant and/or component of which it knew or should have known. Plaintiff was directly and/or indirectly exposed, in the manner described herein, to this Defendant's benzene containing products, including but not limited to quench oils and benzene containing petroleum solvents used in co-defendants' products, and which directly

14

and proximately caused the Plaintiff's injuries and damages, as more fully set forth herein.

n. Defendant, GRAPHIC PACKAGING INTERNATIONAL, LLC f/k/a GRAPHIC PACKAGING INTERNATIONAL, INC., Individually and as Successor-in-Interest to Handschy Industries, LLC (hereinafter "Graphic" or "Defendant") upon information and belief is a Delaware corporation or other business entity having its principal place of business at the above-stated address, and which continuously, regularly and systematically conducts business in the State of Maryland and the City of Baltimore. Upon information and belief, Defendant succeeded to the liabilities of Handschy Industries, LLC. Graphic manufactured, refined, designed, produced, processed, compounded, converted, packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce benzene-containing printing products, that the Plaintiff was exposed to and which were a direct and proximate cause of his MDS.

o. Defendant FUJIFILM HUNT CHEMICALS USA, INC. d/b/a, Parent and Successor to Anchor Lith-Kem-Ko, Inc. (hereinafter "FujiFilm" or "Defendant") is a Delaware corporation or other business entity having a principal place of business at the above address, which continuously, regularly and systematically conducts business in the State of Maryland and the City of Baltimore. Upon information and belief, FujiFilm operated as Anchor manufactured, refined, designed, produced, processed, compounded, converted, packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce benzene-

15

containing printing products, that the Plaintiff was exposed to and which were a direct and proximate cause of his MDS.

p.  Defendant, ASHLAND LLC, Individually and as Successor in Interest to Inland Leidy (hereinafter "ASHLAND" or "Defendant") is a Delaware limited liability company with the above principal place of business, yet which continuously, regularly and systematically conducts business in the State of Maryland and City of Baltimore. ASHLAND manufactured, refined, designed, produced, processed, compounded, converted, packaged, sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce benzene-containing printing products and benzene-containing products, including but not limited to gravure inks and solvents, that Plaintiff was exposed to and which were a direct and proximate cause of his MDS.

q.  Defendant, JHB, INC. f/k/a JOHN H. BURKE & CO., INC. (hereinafter "BURKE & CO." or "Defendant") is a Maryland Corporation with the above principal place of business in the City of Baltimore. BURKE & CO. sold, distributed, marketed, re-labeled, supplied and/or otherwise placed into the stream of commerce benzene-containing printing products and benzene-containing products, including the Handschy products identified herein, that Plaintiff was exposed to and which were a direct and proximate cause of his MDS.

16

## COUNT I

## (NEGLIGENCE & GROSS NEGLIGENCE)

11.   Plaintiff hereby adopts and incorporates by reference each and every statement and averment contained in each of the foregoing paragraphs, as if each of said paragraphs were set forth herein with particularity.

12.   Plaintiff used, worked with, around and in close proximity to, handled, inhaled, dermally absorbed, ingested and was otherwise directly and indirectly exposed to Defendants' benzene-containing products and/or vapors therefrom, during the ordinary, foreseeable and intended use of the Defendants' benzene-containing products.

13.   Defendants knew, or in the exercise of reasonable care, could and/or should have known that persons such as Plaintiff would have used, worked with, around and in close proximity to, handled, inhaled, dermally absorbed, ingested and was otherwise directly and indirectly exposed to their benzene-containing products and/or vapors therefrom.

14.   Defendants knew, should and/or reasonably could have known that benzene causes cancer, leukemia and other blood and bone marrow disease and damage, and is otherwise extremely dangerous to human health.

15.   Defendants knew, should and/or could have reasonably known that their benzene-containing products contained benzene.

16.   Defendants knew, should and/or reasonably could have known that their benzene-containing products were carcinogenic, leukemogenic, inherently defective, ultra-hazardous, dangerous, deleterious, poisonous and otherwise highly harmful to the body and health of Plaintiff and persons similarly situated.

17.     Plaintiff, his employers and similarly situated persons did not and could not know of the nature and extent of the danger to their bodies and health, including the risk for cancer and leukemia, caused by exposure to the Defendants' benzene-containing products and/or vapors therefrom.

18.     The Defendants knew, should and/or reasonably could have known that Plaintiff and other persons similarly situated, would come into direct and indirect contact with, handle, inhale, ingest, dermally absorb and otherwise be exposed to benzene during the ordinary and foreseeable use of said benzene-containing products.

19.     The Defendants knew, should and/or reasonably could have known that Plaintiff, his employers and other persons similarly situated did not know, understand or fully appreciate nature and extent of the danger to their bodies and health, including the risk for contracting aplastic anemia, cancer, MDS and leukemia, caused by exposure to the Defendants' benzene-containing products and/or vapors therefrom.

20.     The Defendants had a duty to all consumers, workers and employers to exercise reasonable care in the creation, manufacturing, designing, formulating, refining, producing, processing, packaging, marketing, selling, warning, distributing and otherwise placing their respective benzene-containing products into the stream of commerce, including a duty to assure that the products did not pose a risk of injury, harm, disease and death, including contracting aplastic anemia, cancer, MDS and leukemia.

21.     Defendants breached their duty and were negligent and grossly negligent because, knowing all of the above, they:

    a.  Manufactured, produced, designed, formulated, processed, packaged, compounded, converted, sold, marketed, re-labeled, supplied, distributed and/or otherwise placed in the stream of commerce products that contained benzene, ie the benzene-containing products;

18

b.  Failed to take precautions to warn and/or adequately warn Plaintiff and his
    employers that their benzene-containing products contain benzene;

c.  Failed to take precautions to warn and/or adequately warn Plaintiff and his
    employers of the dangers to their health, including the nature and extent thereof,
    caused by exposure to benzene and the benzene-containing products, including the
    risk for contracting contracting aplastic anemia, cancer, MDS and leukemia;

d.  Failed to take precautions to warn or adequately warn Plaintiff and his employers
    of the reasonably safe, sufficient and necessary safeguards, protective equipment,
    wearing apparel, appliances and engineering controls to protect them from
    exposure to benzene and physical harm, including contracting aplastic anemia,
    cancer, MDS and leukemia, caused by working with and around the benzene-
    containing products;

e.  Failed and omitted to place any warnings or notices, or adequate and sufficient
    warnings and notices, on the containers in which the benzene-containing products
    were sold, contained, delivered and used in conjunction with, or shipping and
    billing documents, regarding the known or potential risks, dangers and harm
    therefrom, including contracting lymphohematopoietic disease, and the precautions
    necessary for use with the benzene-containing products to protect against the risk
    of dangers to health;

f.  Continued to manufacture, produce, process, sell, market, distribute, supply and/or
    otherwise place into the stream of commerce known cancer-causing products, to-
    wit, benzene-containing products;

g.  Failed and omitted to package the said chemical products so that, in the ordinary
    and foreseeable use and handling of them, Plaintiff and other persons similarly
    situated would not come into direct and indirect contact with, handle, inhale,
    dermally absorb and otherwise be exposed to benzene-containing products and/or
    vapors therefrom;

h.  Failed and omitted to take all reasonable, necessary, proper and prudent measures
    to assure that all necessary warnings, notices and instructions as to the products'
    benzene content, leukemogenic, carcinogenic, deleterious, poisonous and
    dangerous nature, and the reasonable and necessary safeguards and procedures for
    use in conjunction with the products, reached the actual end user, and were

19

complied with by Plaintiff's employers and end users including Plaintiff and other persons similarly situated;

i.   Defendants knew, should and/or could have known that the failure to warn and/or adequately warn of the risks, dangers and harm created by exposure to the benzene-containing products, and the reasonably safe and sufficient precautions, practices, personal protective equipment, wearing apparel, appliances and engineering controls to use with the benzene-containing products, would act as an inducement to Plaintiff and other end users similarly situated to come into direct and indirect contact with, handle, inhale, dermally absorb and otherwise be exposed to benzene-containing products and/or vapors therefrom, without proper and adequate protection;

j.   Defendants failed to train and advise the Plaintiff and his employers of how to adopt and implement a safe, sufficient and proper plan and method to safely handle and use their benzene-containing products, resulting in the creation of an atmosphere that the Defendants' benzene-containing products were relatively safe to work with and around, handle, come in direct and indirect contact with, inhale, ingest, dermally absorb and otherwise be exposed to;

k.   Defendants knew, should and/or could have known, but also failed to take reasonable, sufficient and proper precautions reasonably calculated to recommend methods to improve the work environment, such as that of Plaintiff's employer, to which Defendants sold, marketed, distributed, supplied and/or otherwise placed into the stream of commerce, benzene-containing products;

l.   Failed to comply with all federal, state, local and trade statutes, codes, regulations and ordinances relating to the benzene content of their products, actions required to determine and analyze the hazardous nature of their products and the warnings and instructions accompanying same, including but not limited to 29 CFR 1910.1200; 29 CFR 1910.1028; and, 49 CFR Parts 100-199;

m.   Failed to take all reasonable, necessary, proper and prudent measures to test their benzene-containing products to determine the products' benzene content and the quantity of benzene released into the breathing zone of the end user, and dermally absorbed by the end user, during the ordinary, intended and foreseeable use thereof;

n.   Failed to test their benzene-containing products for health hazards, including lymphohematopoietic disease;

o. Failed to test the adequacy of labels, warnings and instructions appearing upon or distributed with their benzene-containing products;

p. Failed to take all reasonable, necessary, proper and prudent measures to make their benzene-containing products safe for their intended and foreseeable use.

q. Failed to properly and adequately manufacture, design, produce and process their products so as to eliminate all benzene content thereof;

r. Failed to research, develop, design, manufacture, produce, market and sell safer alternative products, to wit products which did not contain benzene;

s. Continued to manufacture and sell products containing benzene despite fully knowledge that there were safer alternative products;

t. Continuing to manufacture and sell products containing benzene despite actually manufacturing and selling products that did not contain benzene which were used for the same purposes as their benzene-containing products and which were equally effective; and

u. For these reasons, Defendants grossly deviated from the ordinary standard of care.

22. As the direct and proximate result of the Defendants' acts and omissions, Plaintiff contracted and suffered from MDS, and multiple side effects, conditions, illnesses and symptoms caused by AMDS and the medical treatments necessitated thereby, which caused him pain, suffering, disability, disfigurement, deformity, impairment, mental anguish, anxiety, humiliation, and increased susceptibility to infection.

23. As the direct and proximate result of the Defendants' acts and omissions, Plaintiff was prevented from engaging in those activities from which he derived life's pleasures.

24. As the direct and proximate result of the Defendants' acts and omissions, Plaintiff has in the past, continues to and in the future will lose wages, including benefits, and earnings capacity.

25.     As the direct and proximate result of the Defendants' acts and omissions, Plaintiff was required to spend various sums of money for medical treatments, hospitalizations and medicines, to treat Plaintiff's disease and injuries, which expenses may continue to accrue, and has incurred additional economic expenses and losses, which expenses and loses may continue to accrue.

**WHEREFORE**, for all of the foregoing reasons, Plaintiff prays for judgment from Defendants, individually, jointly and severally, in an amount in excess of fifty thousand dollars ($50,000.00), together with such other and further relief as this Court deems just and appropriate, under the circumstances, including punitive damages, costs, interest, attorney fees and delay damages.

## COUNT II

## (BREACH OF WARRANTY)

26.     Plaintiff hereby adopts and incorporates by reference each and every statement and averment contained in each of the foregoing paragraphs, as if each of said paragraphs were set forth herein with particularity.

27.     Defendants, individually, jointly and severally expressly and/or impliedly warranted, including under the Uniform Commercial Code, to Plaintiff and other end users of their benzene-containing products, who were similarly situated, that the benzene-containing products, were merchantable, reasonably fit and safe for their intended, stated and described purpose and application, when in fact they were not.

28.     Defendants, individually, jointly and severally breached said warranties to Plaintiff, in that their benzene-containing products were inherently defective, ultra hazardous, dangerous, deleterious, poisonous, carcinogenic, unfit for use, not properly merchantable and not safe, as

22

marketed, for their foreseeable use and purpose, in that they contained benzene and caused lymphohematopoietic diseases, including MDS, were defectively designed and lacked warnings, instructions and training, or adequate and sufficient warnings, instructions and training, as more fully set forth in Counts I, III and IV, and including because:

  a. They contained benzene and benzene causes cancer, leukemia and other harm to the blood and bone marrow of humans.

  b. They lacked all elements necessary to make them safe for their intended and foreseeable use;

  c. The Defendants failed to take precautions to warn and/or adequately warn Plaintiff and his employers that their benzene-containing products contained benzene;

  d. They lacked warnings and instructions, and or adequate warnings and instructions, of the dangers to human health, including the nature and extent thereof, caused by exposure to benzene and the benzene-containing products, including the risk for contracting aplastic anemia, cancer, MDS and leukemia;

  e. They did not warn or adequately warn Plaintiff and his employers of the reasonably safe, sufficient and necessary safeguards, protective equipment, wearing apparel, appliances and engineering controls to protect them from exposure to benzene and physical harm, including leukemia, caused by working with and around the benzene-containing products;

  f. There were no warnings or notices, or adequate and sufficient warnings and notices, on the containers in which the benzene-containing products were sold, contained, delivered and used in conjunction with, or shipping and billing documents, regarding the known or potential risks, dangers and harm therefrom, including contracting lymphohematopoietic disease, and the precautions necessary for use with the benzene-containing products to protect against the risk of dangers to health;

  g. Failed to train and advise, or adequately train and advise, the Plaintiff and his employers of how to adopt and implement a safe, sufficient and proper plan and method to safely handle and use their benzene-containing products, resulting in the creation of an atmosphere that the Defendants' benzene-containing products were relatively safe to work with and around, handle, come in direct and indirect contact with, inhale, ingest, dermally absorb and otherwise be exposed to;

23

h.  Failed to train, communicate, publish, adopt and enforce a safety plan and a safe method of handling and working with their benzene-containing products;

i.  They failed to recommend methods to improve the work environment;

j.  The Defendants failed to develop alternative products, including products which did not contain benzene;

k.  The Defendants failed to assure that warnings, instructions, advisements, and training reached Plaintiff's employer, Plaintiff and other end users similarly situated, such that Plaintiff and other end users were adequately warned and protected, against the hazards posed by benzene, as contaminants in, or as ingredients of their benzene-containing products;

l.  The ordinary and foreseeable use of the Defendants' benzene-containing products, or those benzene-containing products of Defendants which were distributed to Plaintiff's employer, is an intrinsically dangerous and ultra hazardous activity;

m. The Defendants' benzene-containing products were also defectively designed in that their hazards outweighed the benefit, if any, of the products' benzene content;

n.  The Defendants' benzene-containing products were defective in that they failed to meet their consumer's expectations for safety;

o.  Were packaged in a manner that increased the risk for exposure to benzene and increased the amount of benzene exposure end users sustained;

p.  Contained directions for use that increased the risk for exposure to benzene and increased the amount of benzene exposure end users sustained;

q.  Continued to manufacture and sell products containing benzene despite fully knowledge that there were safer alternative products; and,

r.  Continuing to manufacture and sell products containing benzene despite actually manufacturing and selling products that did not contain benzene which were used for the same purposes as their benzene-containing products and which were equally effective.

29.     Defendants' warranties were made both orally and in writing, and Plaintiff is no longer in possession of the written materials upon which such warranties were made.

30.     As the direct and proximate result of the Defendants' acts and omissions, Plaintiff contracted and suffered from MDS, and multiple side effects, conditions, illnesses and symptoms caused by MDS and the medical treatments necessitated thereby, which caused him pain, suffering, disability, disfigurement, deformity, impairment, mental anguish, anxiety, humiliation, and increased susceptibility to infection.

31.     As the direct and proximate result of the Defendants' acts and omissions, Plaintiff was prevented from engaging in those activities from which he derived life's pleasures.

32.     As the direct and proximate result of the Defendants' acts and omissions, Plaintiff has in the past, continues to and in the future will lose wages, including benefits, and earnings capacity.

33.     As the direct and proximate result of the Defendants' acts and omissions, Plaintiff was required to spend various sums of money for medical treatments, hospitalizations and medicines, to treat Plaintiff's disease and injuries, which expenses may continue to accrue, and has incurred additional economic expenses and losses, which expenses and loses may continue to accrue.

**WHEREFORE**, for all of the foregoing reasons, Plaintiff prays for judgment from Defendants, individually, jointly and severally in an amount in excess of fifty thousand dollars ($50,000.00), together with such other and further relief as this Court deems just and appropriate, under the circumstances, including punitive damages, costs, interest, attorney fees and delay damages.

25

## COUNT III

## (STRICT LIABILITY)

34.    Plaintiff hereby adopts and incorporates by reference each and every statement and averment contained in each of the foregoing paragraphs, as if each of said paragraphs were set forth herein with particularity.

35.    Defendants are and were, at all times material hereto, in the business of manufacturing, refining, designing, producing, processing, compounding, converting, packaging, selling, distributing, marketing, re-labeling, supplying and/or otherwise placing into the stream of commerce the benzene-containing products.

36.    The benzene-containing products were expected to and did reach the Plaintiff and his employers without substantial change in the condition in which they were sold.

37.    The benzene-containing products were defective when they left the Defendants' possession, custody and control.

38.    Plaintiff and his employers were the intended and foreseeable users of the Defendants' benzene-containing products, and it was intended by and foreseeable to the Defendants that the benzene-containing products would be used in the manner that the Plaintiff and his employers used them in.

39.    The Defendants' benzene-containing products were defective because:

   a.   They contained benzene and benzene causes aplastic anemia, cancer, MDS and leukemia and other harm to the blood and bone marrow of humans.

   b.   They lacked all elements necessary to make them safe for their intended and foreseeable use;

   c.   The Defendants failed to take precautions to warn and/or adequately warn Plaintiff and his employers that their benzene-containing products contained benzene;

26

d.  They lacked warnings and instructions, and or adequate warnings and instructions, of the dangers to human health, including the nature and extent thereof, caused by exposure to benzene and the benzene-containing products, including the risk for contracting aplastic anemia, cancer, MDS and leukemia and other blood and bone marrow disease;

e.  They did not warn or adequately warn Plaintiff and his employers of the reasonably safe, sufficient and necessary safeguards, protective equipment, wearing apparel, appliances and engineering controls to protect them from exposure to benzene and physical harm, including contracting aplastic anemia, cancer, MDS and leukemia, caused by working with and around the benzene-containing products;

f.  There were no warnings or notices, or adequate and sufficient warnings and notices, on the containers in which the benzene-containing products were sold, contained, delivered and used in conjunction with, or shipping and billing documents, regarding the known or potential risks, dangers and harm therefrom, including contracting lymphohematopoietic disease, and the precautions necessary for use with the benzene-containing products to protect against the risk of dangers to health;

g.  Failed to train and advise, or adequately train and advise, the Plaintiff and his employers of how to adopt and implement a safe, sufficient and proper plan and method to safely handle and use their benzene-containing products, resulting in the creation of an atmosphere that the Defendants' benzene-containing products were relatively safe to work with and around, handle, come in direct and indirect contact with, inhale, ingest, dermally absorb and otherwise be exposed to;

h.  Failed to train, communicate, publish, adopt and enforce a safety plan and a safe method of handling and working with their benzene-containing products;

i.  They failed to recommend methods to improve the work environment;

j.  The Defendants failed to develop alternative products, including products which did not contain benzene;

k.  The Defendants failed to assure that warnings, instructions, advisements, and training reached Plaintiff's employer, Plaintiff and other end users similarly situated, such that Plaintiff and other end users were adequately warned and protected, against the hazards posed by benzene, as contaminants in, or as ingredients of their benzene-containing products;

27

l.   The ordinary and foreseeable use of the Defendants' benzene-containing products, or those benzene-containing products of Defendants which were distributed to Plaintiff's employer, is an intrinsically dangerous and ultra hazardous activity;

m.   The Defendants' benzene-containing products were also defectively designed in that their hazards outweighed the benefit, if any, of the products' benzene content;

n.   The Defendants' benzene-containing products were defective in that they failed to meet their consumer's expectations for safety;

o.   Were packaged in a manner that increased the risk for exposure to benzene and increased the amount of benzene exposure end users sustained;

p.   Contained directions for use that increased the risk for exposure to benzene and increased the amount of benzene exposure end users sustained; and

q.   The Defendants' benzene-containing products were defective in that the Defendants manufactured and sold the same products, or substantially similar products, that did not contain benzene which were used for the same purposes as their benzene-containing products and which were equally effective.

40.   As the direct and proximate result of the Defendants' acts and omissions, Plaintiff contracted and suffered from MDS, and multiple side effects, conditions, illnesses and symptoms caused by MDS and the medical treatments necessitated thereby, which caused him pain, suffering, disability, disfigurement, deformity, impairment, mental anguish, anxiety, humiliation, and increased susceptibility to infection.

41.   As the direct and proximate result of the Defendants' acts and omissions, Plaintiff was prevented from engaging in those activities from which he derived life's pleasures.

42.   As the direct and proximate result of the Defendants' acts and omissions, Plaintiff has in the past, continues to and in the future will lose wages, including benefits, and earnings capacity.

28

43.     As the direct and proximate result of the Defendants' acts and omissions, Plaintiff was required to spend various sums of money for medical treatments, hospitalizations and medicines, to treat Plaintiff's disease and injuries, which expenses may continue to accrue, and has incurred additional economic expenses and losses, which expenses and loses may continue to accrue.

WHEREFORE, for all of the foregoing reasons, Plaintiff pray for judgment from Defendants, individually, jointly and severally in an amount in excess of fifty thousand dollars ($50,000.00), together with such other and further relief as this Court deems just and appropriate, under the circumstances, including punitive damages, costs, interest, attorney fees and delay damages.

## COUNT IV

## (INTENTIONAL TORT – BATTERY)

44.     Plaintiff hereby adopt and incorporate by reference each and every statement and averment contained in each of the foregoing paragraphs, as if each of said paragraphs were set forth herein with particularity.

45.     Defendants committed the intentional tort of battery by causing the Plaintiff's exposure to benzene-containing products and benzene knowing that those exposures would cause harm to the Plaintiff.

46.     Defendants knew, foresaw and intended that their benzene-containing products were used in the manner in which Plaintiff and Plaintiff's employers used them, and that benzene and the benzene-containing products would be released into the atmosphere while using the benzene-containing products, and Plaintiff and others similarly situated would work with, inhale, ingest, dermally absorb, handle or directly and indirectly come into contact with, and/or otherwise

29

be exposed to benzene, which created a hazardous and unsafe condition and risk to the health of Plaintiff and others similarly situated.

47.    Defendants knew that their benzene-containing products were inherently defective, ultra-hazardous, dangerous, deleterious, poisonous, carcinogenic, leukemogenic and otherwise highly harmful to the Plaintiff and persons similarly situated.

48.    Defendants knew that their products, identified herein, contained benzene.

49.    Defendants knew that end users, such as the Plaintiff would work with and around, and be exposed to benzene as the result of the use of the Defendants' benzene-containing products in the course of their work related duties and other activities.

50.    Defendants knew, through information in their possession and control, and other information so obvious to them so as to be imputed to them, that benzene was capable of causing aplastic anemia, cancer, MDS and leukemia and other blood and bone marrow disorders, including MDS.

51.    Defendants knew, through information in their possession and control, and other information so obvious to them so as to be imputed to them, that there is no safe level of exposure to benzene.

52.    Defendants were capable of manufacturing, producing and processing the identified products in a manner that eliminated or significantly reduced their benzene content.

53.    Defendants knew, through information in their possession and control, and other information so obvious to them so as to be imputed to them, that their benzene-containing products placed the Plaintiff, and other end users similarly situated, at a significantly increased risk for contracting aplastic anemia, cancer, MDS and leukemia and other blood and bone marrow

disorders, including MDS, as a direct and proximate result of exposure to the benzene-containing products.

54.     Defendants knew that Plaintiff, his employers and coworkers, and other end users similarly situated, did not know of or appreciate that that benzene-containing products' contained benzene content, or that benzene and the benzene-containing products were capability of causing contracting aplastic anemia, cancer, MDS and leukemia and other blood and bone marrow disorders, including MDS.

55.     Defendants knew that Plaintiff, his employers and coworkers, and other end users similarly situated, did not know of the proper and necessary personal protective equipment, appliances, wearing apparel, engineering controls, procedures and practices for use in conjunction with the benzene-containing products to prevent or minimize benzene exposure and the risk for contracting aplastic anemia, cancer, MDS and leukemia and other blood and bone marrow disorders, including MDS.

56.     Defendants knew that their failure to warn, instruct, train and advise the Plaintiff, his employers and coworkers of the identified products' benzene content and capability of causing cancer, leukemia and other blood and bone marrow disorders, including MDS, would act as, and did in fact act as, an inducement for the Plaintiff to continually expose himself to their benzene-containing products without necessary and proper personal protective equipment, practices and procedures in order to reduce or eliminate benzene exposure and risk for injuries and death caused thereby.

57.     Defendants knew that their failures, by intent and omission, to warn, instruct, train and advise the Plaintiff, his employers and coworkers of the identified products' benzene content and capability of causing aplastic anemia, cancer, MDS and leukemia and other blood and bone

marrow disorders, including MDS, would act as, and did in fact act as, an inducement for the Plaintiff to continually expose himself to benzene and place himself at risk for contracting MDS.

58.   Defendants knew that their failures to warn, instruct and train the Plaintiff, his employers and coworkers of the proper and necessary personal protective equipment, work practices and procedure to avoid benzene exposure and the risk of contracting aplastic anemia, cancer, MDS and leukemia and other blood and bone marrow disorders, including MDS, would act as, and did in fact act as, an inducement for the Plaintiff to continually expose himself to benzene and place himself at risk for contracting aplastic anemia, cancer, MDS and leukemia, through the use of their identified products without proper and necessary personal protective equipment, work practices and procedures.

59.   Defendants knew that their failures, by intent and omission, to warn, instruct and train the Plaintiff, his employers and coworkers would cause Plaintiff to aggravate his condition and situation, by preventing him from avoiding further exposure to these benzene-containing products, taking proper precautions to minimize or eliminate any risk from such exposure, seeking medical opinions regarding the true state of his medical condition or changing the nature of his job description or areas of work, so he would have no contact with Defendants' benzene-containing products.

60.   Defendants knew that properly and adequately warning, instructing and training the Plaintiff, his employers, coworkers and the general public of the benzene-containing products' benzene content and capability of causing contracting aplastic anemia, cancer, MDS and leukemia and other blood and bone marrow disorders, including MDS, would be detrimental to their business interests, as such would deter the purchase and use of said products, by the Plaintiff, his employers, coworkers and the general public.

61.   Despite all of this knowledge, Defendants willfully and wantonly, through affirmative acts or omissions:

    a.   Manufactured, produced, processed, marketed, sold and distributed to the Plaintiff, his employers and coworkers, products which contained a known carcinogenic and leukemogenic compound, benzene;

    b.   Did not eliminate or minimize the benzene content of the identified benzene-containing products;

    c.   Did not warn, instruct, train and advise the Plaintiff, his employers and coworkers of the identified products' benzene content;

    d.   Did not warn, instruct, train and advise the Plaintiff, his employers and coworkers of the identified products' ability to cause aplastic anemia, cancer, leukemia and other blood and bone marrow disorders, including MDS;

    e.   Did not warn, instruct, train and advise the Plaintiff, his employers and coworkers of the insidious, highly hazardous and deleterious nature of benzene;

    f.   Did not warn, instruct, train and advise the Plaintiff, his employers and coworkers that there is no safe level of exposure to benzene;

    g.   Did not warn, instruct, train and advise the Plaintiff, his employers and coworkers of the necessary and proper personal protective equipment, practices and procedures to minimize or prevent benzene exposure and risk of contracting aplastic anemia, cancer, MDS and leukemia;

    h.   Did not affix labels or warnings upon the identified products, their containers or shipping documents the warn, instruct, train and advise the Plaintiff, his employers and coworkers of the products' benzene content, and their risk of contracting aplastic anemia, cancer, MDS and leukemia;

    i.   Did not affix labels or warnings upon the identified products, their containers or shipping documents the warn, instruct, train and advise the Plaintiff, his employers and coworkers that there is no safe level of exposure to benzene;

    j.   Did not affix labels or warnings upon the identified products, their containers or shipping documents the warn, instruct, train and advise the Plaintiff, his employers and coworkers of the necessary and proper personal protective equipment, practices

33

and procedures to minimize or prevent benzene exposure and the risk of contracting aplastic anemia, cancer, MDS and leukemia;

k. Did not post signs, warnings or other statements upon the premises of the Plaintiff's employers warn, instruct, train and advise the Plaintiff, his employers and coworkers of the products' benzene content, and their risk of contracting aplastic anemia, cancer, MDS and leukemia;

l. Did not post signs, warnings or other statements upon the premises of the Plaintiff's employers warn, instruct, train and advise the Plaintiff, his employers and coworkers that there is no safe level of exposure to benzene;

m. Did not post signs, warnings or other statements upon the premises of the Plaintiff's employers warn, instruct, train and advise the Plaintiff, his employers and coworkers of the necessary and proper personal protective equipment, practices and procedures to minimize or prevent benzene exposure and their risk of contracting aplastic anemia, cancer, MDS and leukemia;

n. Did not train and advise Plaintiff, his employers and coworkers of how to adopt and implement a safe, sufficient and proper plan and method to properly handle and use their benzene-containing products, resulting in the creation of an atmosphere at Plaintiff's employer, that the Defendants' benzene-containing products were relatively safe to handle, come in direct and indirect contact with, inhale, ingest and dermally absorb;

o. Sacrificed the health and safety of the workers and other end users of their benzene-containing products in order to further the Defendants' economic advantage, convenience and profit;

p. Continued to manufacture and sell products containing benzene despite fully knowledge that there were safer alternative products; and,

q. Continuing to manufacture and sell products containing benzene despite actually manufacturing and selling products that did not contain benzene which were used for the same purposes as their benzene-containing products and which were equally effective.

62.     Defendants acts and omissions were unreasonable in their character, and made in disregard of a risk known to them or so obvious them that they must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.

63.     Defendants acts and omission acts and omissions demonstrated a conscious indifference to their consequences, namely causing the Plaintiff to contract MDS and other injuries identified herein.

64.     Defendants intended to cause harmful conduct to the Plaintiff through causing benzene exposure, and did so with the knowledge, belief and intent that such exposure could cause the Plaintiff to contract MDS.

65.     Defendants' intentional conduct in causing the Plaintiff to be exposed to benzene, did in fact cause physical harm to the Plaintiff by directly and proximately causing him to contract MDS and other injuries and damages as set forth herein

66.     As the direct and proximate of the aforesaid willful, deliberate, wanton, knowing, purposeful and intentional acts and omissions, Plaintiff contracted and suffered from MDS, and multiple side effects, conditions, illnesses and symptoms caused by MDS and the medical treatments necessitated thereby, which caused him pain, suffering, disability, disfigurement, deformity, impairment, mental anguish, anxiety, humiliation, and increased susceptibility to infection.

67.     As the direct and proximate of the aforesaid willful, deliberate, wanton, knowing, purposeful and intentional acts and omissions, Plaintiff was prevented from engaging in those activities from which he derived life's pleasures.

35

68.     As the direct and proximate of the aforesaid willful, deliberate, wanton, knowing, purposeful and intentional acts and omissions, Plaintiff has in the past, continues to and in the future will lose wages, including benefits, and earnings capacity.

69.     As the direct and proximate of the aforesaid willful, deliberate, wanton, knowing, purposeful and intentional acts and omissions, Plaintiff was required to spend various sums of money for medical treatments, hospitalizations and medicines, to treat Plaintiff's disease and injuries, which expenses may continue to accrue, and has incurred additional economic expenses and losses, which expenses and loses may continue to accrue.

**WHEREFORE,** for all of the foregoing reasons, Plaintiff prays for judgment from Defendants, individually, jointly and severally in an amount in excess of fifty thousand dollars, ($50,000), together with such other and further relief as this Court deems just and appropriate, under the circumstances, including punitive damages, costs, interest, attorney fees and delay damages.

<u>**COUNT V**</u>

<u>**(FRAUDULENT MISREPRESENTATION)**</u>

70.     Plaintiff hereby adopts and incorporates by reference each and every statement and averment contained in each of the foregoing paragraphs, as if each of said paragraphs were set forth herein with particularity.

71.     In researching, testing, manufacturing, distributing, labeling, and marketing benzene and the benzene-containing products, and through their membership and affiliation with various industry and trade organizations, Defendants, and each of them, did so with conscious disregard for the safety of the users of said benzene-containing products, in that said defendants had specific prior knowledge that benzene is an insidious blood and bone marrow poison, that

there is no safe level of exposure to benzene and that there was a high risk of injury or death resulting from exposure to benzene and benzene-containing solvents, including, but not limited to, leukemia, MDS aplastic anemia, and other blood and other bone marrow diseases. Said knowledge was obtained, in part, from scientific studies and medical data to which Defendants had access, as well as scientific studies performed by, at the request of, or with the assistance of, said Defendants, and which knowledge was obtained by said defendants on or before Plaintiff's first exposure to their products and even by 1948. Despite this knowledge, the Defendants acted to manipulate public information and knowledge in order to give the impression that benzene and benzene-containing products were safe, or did not present the full scope of danger that they did, and to prevent the disclosure of the information available to the defendants regarding the true and full nature of the health hazards of benzene and benzene-containing products.

72.     At or before the time of the Plaintiff's first exposure to their products, said Defendants were aware that users of benzene and benzene-containing products, as well as members of the general public who would be exposed to benzene and benzene-containing solvents, had no knowledge or information indicating that benzene and benzene-containing solvents could cause injury and said defendants knew that users of benzene and benzene-containing solvents, as well as members of the general public who were exposed to benzene and benzene-containing solvents, would assume, and in fact did assume, that exposure to benzene and benzene-containing solvents was safe, when, in fact, said exposure was extremely hazardous to human life.

73.     Defendant BASF knew by no later than 1964 that benzene causes aplastic anemia and leukemia.

74.     Despite its knowledge of benzene causing cancer and fatal blood disease, BASF did not disclose its knowledge and information that benzene causes cancer and fatal blood disease.

75.     BASF withheld and concealed its knowledge of benzene's health hazards, including its ability to cause cancer and fatal blood disease, with the intent, expectation and foreseeability that Plaintiff, his employers and others similarly situated, as well as its customers, would rely upon its statements and omissions in determining whether to work upon its premises and use its benzene-containing products.

76.     Sun Chemical knew by no later than 1964 that benzene causes leukemia.

77.     Despite its knowledge of benzene causing cancer, Sun Chemical did not disclose its knowledge and information that benzene causes cancer.

78.     Sun Chemical did not disclose the benzene content of its products identified in this Complaint.

79.     Sun Chemical withheld and concealed its knowledge of benzene's health hazards, including its ability to cause cancer, with the intent, expectation and foreseeability that Plaintiff, his employers and others similarly situated, as well as its customers, would rely upon its statements and omissions in determining whether to work upon its premises and use its benzene-containing products.

80.     Defendant Unocal knew by no later than 1948 that benzene causes leukemia by virtue of their membership in the American Petroleum Institute and receipt, or availability to them, of the 1948 Toxicological Review on Benzene.

81.     Despite its knowledge of benzene causing cancer and fatal blood disease, Unocal did not disclose its knowledge and information that benzene causes cancer and fatal blood disease.

82.     Unocal withheld and concealed its knowledge of benzene's health hazards, including its ability to cause cancer and fatal blood disease, with the intent, expectation and foreseeability that Plaintiff, his employers and others similarly situated, as well as its customers,

would rely upon its statements and omissions in determining whether to work upon its premises and use its benzene-containing products.

83.     Shell and SOPUS , knew by no later than 1943 that benzene causes leukemia by virtue of the September 7, 1943 Report to Shell Development Company on Benzenes, Nitrobenzene, Anilines and Xylidines (Their Toxic Effects and Suggested Safeguards in Manufacturing Processes) authored by M.H. Soley, M.D. at the request of Shell.

84.     Shell and SOPUS were members in the American Petroleum Institute and received the 1948 Toxicological Review on Benzene.

85.     By May 2, 1950 Shell and SOPUS were aware that Benzene has "established carcinogenic qualities", by virtue of the April 28, 1950 Internal Memorandum by C.H. Hine, M.D., Consulting Toxicologist titled "Certain Problems of Environmental Cancer in Petroleum Industry."

86.     Shell and SOPUS did not disclose the benzene content of its products identified in this complaint.

87.     Despite its knowledge of benzene causing cancer, Shell and SOPUS did not disclose its knowledge and information that benzene causes cancer.

88.     Shell and SOPUS withheld and concealed its knowledge of benzene's health hazards, including its ability to cause cancer, with the intent, expectation and foreseeability that Plaintiff, his employers and others similarly situated as well as its customers, would rely upon its statements and omissions in determining whether to work upon its premises and use its benzene-containing products.

89.     Shell and SOPUS made affirmative statements about the health hazards of benzene and its ability to cause cancer that were not accurate and which led the user to believe that its

products were safer than they actually were.

90.     United States Steel Corporation has been a member of the National Safety Council ("NSC") since at least 1934.

91.     In the spring of 1923, at a meeting of the NSC's Chemical and Rubber Sections, it was reported that for three years the committee collected proof of at least 15 fatal and 83 nonfatal cases of benzene poisoning immediately preceding 1923.

92.     In October 1924, during the Thirteenth Annual Safety Congress of the NSC, it was reported by the Chemical Section's Industrial Poison Committee that the committee was preparing a proposed bulletin on benzol (also known as benzene) indicating that the characteristic signs of benzene poisoning included a marked decrease in white blood cells, decrease in red blood cells, and aplastic anemia. Further, it was reported that 15 deaths and 83 cases of sickness occurred due to benzol poisoning during the past few years, and that 11 of the deaths and 81 of the sicknesses resulted from habitual exposure to lower concentrations of benzol.

93.     Harry A. Schultz, of US Steel, was on the Executive Committee of the NSC in 1935.  On October 9, 1936, Robert B. Hunt, Medical Adviser, American Mutual Liability Insurance Co. presented the paper The Lesser Known Facts About Common Occupational Diseases to the Occupational Diseases Section. In that paper, Mr. Hunt wrote that, "Benzol is extremely poisonous, entering either the nose or mouth or absorbed through the skin. Its action within the body is varied and may produce a multitude of signs and symptoms. The bone marrow becomes affected which in turn alters the character of the blood; hemorrhages are common; it may cause death."

94.     In 1950, the NSC published that, "Chronic benzene poisoning affects the blood and blood forming organs, producing serious degeneration in the bone marrow. . . When the damage

40

is severe, no known treatment will restore the marrow to normal or make it able to perform its vital functions of furnishing red blood cells, white blood cells, and blood platelets." Further, and with respect to benzene exposure, the NSC published that, "There is no way to determine the sensitivity of an individual beforehand. Causes of fatal poisoning have been recorded from very light exposures."

95.     In 1956, during the Forty Fourth National Safety Congress of the NSC, John H. Foulger, MD, Director of DuPont's Haskell Laboratory, addressed the NSC's Aviation Section and, among his comments, stated that, "[f]or many years, it has been known that chronic exposure to benzol can produce severe injury to bone marrow. It is often incurable."

96.     United States Steel Corporation has been a member of the Manufacturing Chemists Association a/k/a Chemical Manufacturer's Association a/k/a American Chemistry Council ("MCA") since at least 1956. Ashland, Unocal, Shell, SOPUS, BASF and other Defendants were also members of the MCA.

97.     In 1960, the MCA issued a Chemical Safety Data Sheet SD2 Properties and Essential Information for Safe Handling and Use of Benzene 1960 (3rd Edition), in which it was published that, "[t]he principal hazard [of benzene] is from the inhalation of the vapors of benzene. Acute poisoning results from inhalation of high concentrations of vapor (above 3,000 ppm volume in air) usually for short periods of time, often in a matter of minutes. Chronic poisoning results from daily exposure to unsafe concentrations of benzene vapor over a prolonged period of time." Further, it was stated that chronic exposures to benzene can result in "weakness and anemia (reduction in the number of red blood cells and other blood constituents) due to the effects on the blood forming organs."

98.     United States Steel Corporation maintained a copy of the 1948 publication

41

"Occupational Medicine and Industrial Hygiene" by Rutherford T. Johnstone, A.B., M.D. of the University of California, Los Angeles. In this publication, Dr. Johnstone wrote that, "While the use of benzol in industry has considerably reduced in recent years, the incidence of benzol poisoning is still fairly frequent. Too often is benzol hidden under a trade name or is carelessly substituted for less toxic solvents." Dr. Johnstone continued to write that, "Chronic benzol poisoning usually produces severe degrees of injury to the blood forming organs, and often proves fatal." These warnings were not provided by United States Steel Corporation to Radiator Specialty Company and therefore did not appear on the containers or MSDS for Liquid Wrench.

99.     By 1953 US Steel considered its benzol department to be an area of cancer concern.

100.    By 1953 US Steel recognized that issuing United States Public Health Service warnings for benzene resulted in decreased sales of benzene.

101.    In 1956, United States Steel Corporation authored a document entitled "Survey of Potential Toxic Gas Hazards in Coal Chemical Operations" wherein it recommended that pre-employment and periodic physical examinations be given to benzol exposed workers and that such examinations should be centered on the blood forming organs and should include red, white, and differential cell counts. Mechanical ventilation to control benzene vapor exposures, warnings signs, routine air monitoring and safe work procedures were also instituted for benzene exposed workers. No such advices were provided by United States Steel Corporation when it sold benzene.

102.    In 1957, United States Steel Corporation recorded an incident of benzol poisoning suffered by one of its workers at the plant that refined benzene. US Steel maintained a copy of the 1966 Handbook of Organic Industrial Solvents (Third Edition, Revised) of the American Mutual Insurance Alliance, which stated that "BENZENE is implicated as a producer of leukemia, a blood cancer. . . Where exposure occurs, close medical and industrial hygiene supervision is in order."

42

No such advices were provided by US Steel when it sold benzene.

103.    By 1963 US Steel knew that benzene was a suspect carcinogenic agent and that all forms of acute and chronic leukemia were observed after benzene intoxication.

104.    United States Steel Corporation maintained a copy of the Third Edition of N. Irving Sax's authoritative textbook "Dangerous Properties of Industrial Materials," dated 1968. Sax reported that benzene "[p]oisoning occurs most commonly through inhalation of the vapor, though benzene can penetrate the skin, and thus contribute to poisoning" and that "chronic, rather than acute form of benzene poisoning is important in industry; it has toxic action on the blood forming organs." Further, Sax stated that, "cases of myeloid leukemia have been reported" from benzene exposure. No such advices were provided by United States Steel Corporation when it sold benzene.

105.    United States Steel Corporation maintained a copy of Alice Hamilton's Industrial Toxicology, Third Edition, published in 1974. Therein, it is written that, "[i]t is now generally accepted that benzene can produce leukemia of varying forms and that such leukemia can appear with or without an antecedent history of aplastic anemia." United States Steel Corporation and the Liquid Wrench product label did not warn that benzene exposure causes leukemia.

106.    In May of 1977 OSHA issued an Emergency Temporary Standard declaring benzene a known human carcinogen, requiring a cancer warning and a reduction in the benzene content of products and benzene exposure in the workplace.

107.    US Steel delayed an additional five years until 1982 before it provided a benzene cancer warning.

108.    US Steel withheld and concealed its knowledge of benzene's health hazards, including its ability to cause cancer and that benzene should not be used as a solvent, with the intent, expectation and foreseeability that its customers and end users of the benzene would rely

43

upon its statements and omissions in determining whether to use benzene and end products containing benzene.

109.   THCC, Handschy, and Plaintiff, did detrimentally rely upon US Steel's fraudulent statements and omissions in deciding to use benzene and Handschy products, and that reliance was a cause of the Plaintiff's injuries.

110.   Defendant Ashland knew by no later than 1948 that benzene causes leukemia by virtue of their membership in the American Petroleum Institute and receipt, or availability to them, of the 1948 Toxicological Review on Benzene.

111.   Despite its knowledge of benzene causing cancer and fatal blood disease, Ashland did not disclose its knowledge and information that benzene causes cancer and fatal blood disease.

112.   Ashland withheld and concealed its knowledge of benzene's health hazards, including its ability to cause cancer and fatal blood disease, with the intent, expectation and foreseeability that Plaintiff, his employers and others similarly situated, as well as its customers, would rely upon its statements and omissions in determining whether to work upon its premises and use its benzene-containing products.

113.   Defendants, directly and through their membership in trade organizations, hired medical professionals to submit misleading information, statements and opinions to the United States Occupational Safety and Health Administration in order to prevent the reduction of benzene exposure levels in the workplace and the benzene content of products, such as those the Plaintiff was exposed to. Delays in the reduction of the Permissible Exposure Levels for benzene in the workplace resulted in numerous unnecessary deaths from benzene exposure.

114.   Defendants manufactured and sold, or had readily available to them, products and product ingredients which did not contain benzene or any appreciable amounts of benzene, yet

chose to continue to manufacture and sell the benzene-containing versions of their products.

115.   Defendants, have conducted or hired others to conduct studies on the amount of benzene exposure caused by their products that have manipulated the data and circumstances of the studies so as to give the false impression that their products do not present a benzene exposure hazard, knowing that the United States government and others would rely on these studies when making decisions with respect to worker benzene exposures.

116.   Defendants intentionally, and with intent to defraud the Plaintiff and others similarly situated by concealing a material fact known to the defendants, did not disclose that their products would expose the product user and those around the user to a chemical, to wit benzene, which was known to cause MDS, leukemia, cancer, and severe and potentially fatal damage and illness to the blood forming system. By concealing the risk of leukemia and damage to the blood forming system from the Plaintiff, defendants deprived the Plaintiff of his right to know toxic contents of the defendants' products, his right to control his health and his right to protect himself from exposure to toxic chemicals, including by not using the products at all.

117.   Defendants knew that their products would expose the Plaintiff, and others similarly situated, to benzene, and that this exposure would place the Plaintiff at an increased risk of contracting cancer, leukemia, and death. Despite this knowledge, the defendants, acted in conscious disregard of the rights, safety, and health of those working with and around their products, including the Plaintiff.

118.   The conduct of defendants, jointly and severally as described above was willful, wanton, knowing, purposeful and intentional, as were their failures and/or omissions, as it related to Plaintiff, and were of such degree and magnitude that they rose to the level of conduct exhibiting a reckless indifference to the health, safety, rights and welfare of Plaintiff.

119. With this knowledge, Defendants opted to manufacture and distribute said benzene-containing products without attempting to protect users from, or warn users of, the high risk of injury or death resulting from exposure to said benzene and benzene-containing solvents. Rather than attempting to protect users from, or warn users of, the high risk of injury or death resulting from exposure to said benzene and benzene-containing products, said defendants intentionally failed to reveal their knowledge of said risk, and consciously and actively concealed and suppressed said knowledge from members of the general public, thus impliedly representing to members of the general public that said benzene and benzene-containing solvents were safe for all reasonably foreseeable use, with the knowledge of the falsity of said implied representation, and with knowledge, intent and/or reasonable expectation that the product users would rely upon their representations.

120. The above referenced conduct of Defendants was motivated by the financial interest of said defendants in the continuing, uninterrupted distribution and marketing of said benzene and benzene-containing solvents. In pursuance of said financial motivation, said defendants consciously disregarded the safety of the users of said benzene and benzene-containing products, and were, in fact, consciously willing to permit said benzene-containing products to cause injury to users therefore, including Plaintiff.

121. As the above referenced conduct of, was and is willful, malicious, outrageous, and in conscious disregard and indifference to the safety of users of said benzene-containing products, including Plaintiff. Plaintiff therefore, for the sake of example and by way of punishing said defendants, seeks punitive damages, according to proof.

122. Plaintiff and others around him relied upon the fraudulent representations, misrepresentations and omissions made by the Defendants and did so to the Plaintiff's detriment

causing him harmful benzene exposure and injury.

123.    As the direct and proximate of the aforesaid acts and omissions, Plaintiff contracted and suffered from MDS, and multiple side effects, conditions, illnesses and symptoms caused by MDS and the medical treatments necessitated thereby, which caused him pain, suffering, disability, disfigurement, deformity, impairment, mental anguish, anxiety, humiliation, and increased susceptibility to infection.

124.    As the direct and proximate of the aforesaid acts and omissions, Plaintiff is prevented from engaging in those activities from which he derived life's pleasures.

125.    As the direct and proximate of the aforesaid acts and omissions, Plaintiff has in the past, continues to and in the future will suffer economic loss.

126.    As the direct and proximate of the aforesaid acts and omissions, Plaintiff has been and in the future will be required to spend various sums of money for medical treatments, hospitalizations and medicines, to treat Plaintiff's disease and injuries, and has incurred additional economic expenses and losses.

**WHEREFORE**, for all of the foregoing reasons, Plaintiff demands judgment against Defendants, individually, jointly and severally in an amount to be determined at trial and in an amount that exceeds jurisdictional limits of all lower courts which would otherwise have jurisdiction in Compensatory Damages and Punitive Damages; and for such other and further relief as this Court deems just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

Dated: 11/2/18

Melanie J. Garner (CPF# 0512140115)
LOCKS LAW FIRM
601 Walnut Street, Suite 720E
Philadelphia, Pennsylvania 19106
(215) 893-0100 (Main)
(215) 893-3433 (Direct Line)
(215) 893-3444 (Facsimile)
Email: mgarner@lockslaw.com
Attorney for Plaintiff

## DEMAND FOR JURY TRIAL

Pursuant to Maryland Rule 2-325, Plaintiff, by and through undersigned counsel, hereby demand to have this case tried before a jury.

Melanie J. Garner (CPF# 0512140115)
LOCKS LAW FIRM
601 Walnut Street, Suite 720E
Philadelphia, Pennsylvania 19106
(215) 893-0100 (Main)
(215) 893-3433 (Direct Line)
(215) 893-3444 (Facsimile)
Email: mgarner@lockslaw.com

48

## CERTIFICATION OF ATTORNEY WITH OUT-OF-STATE OFFICE

Pursuant to the provisions of Maryland Rule 1-313, the undersigned hereby certifies that she is a member in good standing of the Maryland Bar and authorized to practice law in this State.

Melanie J. Garner (CPF# 0512140115)
LOCKS LAW FIRM
601 Walnut Street, Suite 720E
Philadelphia, Pennsylvania 19106
(215) 893-0100 (Main)
(215) 893-3433 (Direct Line)
(215) 893-3444 (Facsimile)
Email: mgarner@lockslaw.com

49

# EXHIBIT B



# James Coppage
Patient Health Summary, generated on Nov. 28, 2018

## Patient Demographics - Male, born

| Patient Address | Communication | Language | Race / Ethnicity |
|---|---|---|---|
| | | English (Preferred) | Unknown / Unknown |
| | (Home) | | |

## Note from Johns Hopkins Medicine

This document contains information that was shared with James Coppage. It may not contain the entire record from Johns Hopkins Medicine.

## Allergies

Lenalidomide (rash)

## Current Medications

**finasteride (PROSCAR) 5 mg tablet** (Started 9/25/2016)
**latanoprost (XALATAN) 0.005 % ophthalmic solution** (Started 10/2/2015)
　Place 1 drop into both eyes.
**timolol (TIMOPTIC) 0.5 % ophthalmic solution** (Started 10/9/2016)
**metFORMIN (GLUCOPHAGE) 500 MG tablet** (Started 11/21/2016)
**amLODIPine (NORVASC) 5 MG tablet** (Started 9/25/2016)
**multivitamin with minerals tablet**
　Take 1 tablet by mouth.
**azaCITIDine (VIDAZA) 10 mg/mL chemo syringe**
　180 mg.
**blood sugar diagnostic (GLUCOSE BLOOD) Strp** (Started 10/31/2017)
　Test 1 time daily contour next test strips, e11.40
**meclizine (ANTIVERT) 25 mg tablet** (Started 2/13/2017)
　Take 25 mg by mouth.
**lancets 33 gauge Misc** (Started 7/3/2017)
　By miscellaneous route.
**sAXagliptin (ONGLYZA) 2.5 mg Tab tablet** (Started 7/3/2017)
　Take 1 tablet by mouth daily

## Active Problems

**Chronic coronary artery disease** (Noted 11/29/2016)
**Encounter for monitoring azacitidine therapy** (Noted 5/19/2017)
**HTN (hypertension)** (Noted 10/18/2018)
**Hyperlipidemia** (Noted 11/29/2016)
**Hypertension** (Noted 11/29/2016)
**MDS/MPN (myelodysplastic/myeloproliferative neoplasms)** (Noted 11/28/2016)
**Sick sinus syndrome** (Noted 10/8/2015)
**Stage 3 chronic kidney disease** (Noted 1/17/2018)
**Type 2 diabetes mellitus** (Noted 11/1/2007)
**Type 2 diabetes mellitus with stage 3 chronic kidney disease, without long-term current use of insulin** (Noted 11/1/2007)

## Procedures

**BONE MARROW ASPIRATE & BIOPSY** (Performed 9/26/2018)
　Performed for MDS (myelodysplastic syndrome)
**SURGICAL PATHOLOGY REPORTN** (Performed 9/26/2018)
**BONE MARROW ASPIRATE & BIOPSY** (Performed 11/28/2017)
　Performed for Myelodysplastic syndrome
**SURGICAL PATHOLOGY REPORTN** (Performed 11/28/2017)
**IRON STAIN FOR ONCOLOGY PATIENTS ONLY** (Performed 12/2/2016)
　Performed for MDS/MPN (myelodysplastic/myeloproliferative neoplasms)
**BONE MARROW ASP DIFF.** (Performed 12/2/2016)
　Performed for MDS/MPN (myelodysplastic/myeloproliferative neoplasms)
**SURGICAL PATHOLOGY REPORTN** (Performed 12/2/2016)
**TYPE & SCREEN** (Performed 6/25/2012)
**SURGICAL PATHOLOGY REPORTN** (Performed 6/4/2012)

## Results

**FLOW CYTOMETRY, BONE MARROW - Final result** (09/26/2018 1:00 PM)

| Component | Value | Ref Range | Performed At |
|---|---|---|---|
| Interpretation | 12% phenotypically abnormal blasts detected Unusual myeloid phenotype, see comment. | | JHH SOFT LABS |
| Comment | The specimen contains a mixture of cell types with a myeloid predominance and | | JHH SOFT LABS |

Patient Health Summary of James Coppage (page 2 of 19)

relatively few nucleated red blood cells.
Blasts, as distinguished by low density
CD45 and low right angle scatter, are
increased to approximately 12% of the
cellularity. The
blasts are positive for CD34 (variable),
CD117, HLADR (variable), and CD33, with
partial loss of CD13 as well as partial
aberrant expression of CD10, CD56 and
CD7. Myeloid cells show a full range of
maturation, though the pattern of myeloid
antigen
acquisition is abnormal with regard to
CD13 and CD16. Normal B cell precursors
(hematogones) are absent. These
findings are consistent with persistence
of the patient's known primary marrow
disorder. Morphologic and clinical
correlation are recommended.

Specimen
Bone marrow

| Performing Organization | Address | City/State/Zipcode | Phone Number |
|---|---|---|---|
| JOHNS HOPKINS MEDICAL LABS (J.H.M.L.) | 600 North Wolfe Street, Carnegie 417 | Baltimore, MD 21287-0005 | |
| JHH SOFT LABS | Johns Hopkins Medical Labs, 600 North Wolfe Street, Carnegie 417 | Baltimore, MD 21287 | |

Differential,WBC, Verified (DIFFERENTIAL,WBC, VERIFIED) - Final result (09/26/2018 11:47 AM)

| Component | Value | Ref Range | Performed At |
|---|---|---|---|
| Myelocyte % | 15 | % | JHH SOFT LABS |
| Band % | 2 | 2 - 6 % | JHH SOFT LABS |
| Neutrophils % | 54 | 31 - 76 % | JHH SOFT LABS |
| Lymphocyte % | 7 | 24 - 44 % | JHH SOFT LABS |
| Monocyte % | 9 | 2 - 11 % | JHH SOFT LABS |
| Eosinophil % | 3 | 1 - 4 % | JHH SOFT LABS |
| Basophil % | 0 | 0 - 2 % | JHH SOFT LABS |
| Blasts % | 10  Comment: Smear reviewed by HAS. | % | JHH SOFT LABS |
| ANC-Absolute Neut Count | 11.09 | 1.50 - 7.80 K/cu mm | JHH SOFT LABS |
| Lymphocytes Absolute,Manual | 1.39 | 1.10 - 4.80 K/cu mm | JHH SOFT LABS |

Specimen
Blood

| Performing Organization | Address | City/State/Zipcode | Phone Number |
|---|---|---|---|
| JOHNS HOPKINS MEDICAL LABS (J.H.M.L.) | 600 North Wolfe Street, Carnegie 417 | Baltimore, MD 21287-0005 | |
| JHH SOFT LABS | Johns Hopkins Medical Labs, 600 North Wolfe Street, Carnegie 417 | Baltimore, MD 21287 | |

CBC W/ AUTO DIFFERENTIAL (COMPLETE BLOOD COUNT (CBC) + AUTO DIFF) - Final result (09/26/2018 11:47 AM)

| Component | Value | Ref Range | Performed At |
|---|---|---|---|
| White Blood Cell Count | 19.80  Comment: WBC has been corrected for NRBCs. | 4.50 - 11.00 K/cu mm | JHH SOFT LABS |
| Red Blood Cell Count | 3.37 | 4.50 - 5.90 M/cu mm | JHH SOFT LABS |
| Hemoglobin | 9.6 | 13.9 - 16.3 g/dL | JHH SOFT LABS |
| Hematocrit | 32.6 | 41.0 - 53.0 % | JHH SOFT LABS |
| Mean Corpuscular Volume | 96.7 | 80.0 - 100.0 fL | JHH SOFT LABS |
| Mean Corpus Hgb | 28.5 | 26.0 - 34.0 pg | JHH SOFT LABS |
| Mean Corpus Hgb Conc | 29.4 | 31.0 - 37.0 g/dL | JHH SOFT LABS |
| RBC Distribution Width | 15.9 | 11.5 - 14.5 % | JHH SOFT LABS |
| Platelet Count | 44  Comment: No clot found in tube. | 150 - 350 K/cu mm | JHH SOFT LABS |
| Mean Platelet Volume | 13.9 | 9.2 - 12.7 fL | JHH SOFT LABS |
| Nucleated RBC Number | 0.11 | 0.00 - 0.01 K/cu mm | JHH SOFT LABS |
| Comment | SEE COMMENT  Comment: Automated differential not reportable, see manual differential. | | JHH SOFT LABS |

| Specimen | | | | |
|---|---|---|---|---|
| Blood | | | | |
| Performing Organization | Address | City/State/Zipcode | | Phone Number |
| JOHNS HOPKINS MEDICAL LABS (J.H.M.L.) | 600 North Wolfe Street, Carnegie 417 | Baltimore, MD 21287-0005 | | |
| JHH SOFT LABS | Johns Hopkins Medical Labs, 600 North Wolfe Street, Carnegie 417 | Baltimore, MD 21287 | | |

**SURGICAL PATHOLOGY REPORTN (SURGICAL PATHOLOGY REPORT) - Final result (09/26/2018)**

| Component | Value | Ref Range | Performed At |
|---|---|---|---|
| Surg Path Report | | | JHH LABS |

```
                THE        Patient: COPPAGE JR,JAMES A    Path# S18-
          60691
              JOHNS HOPKINS
                 HOSPITAL    JHH MR # 4-505-79-27      Accessioned
       09/26/2018

              SURGICAL      Birthdate: 08/03/1942 (Age 76) Loc: JH-379
              PATHOLOGY
          401 N. Broadway   Gender: M            Spec. Taken
       09/26/2018
            Baltimore, Md.
              21231-2410    JHH Physicians:      BRUCE DOUGLAS SMITH,
       M.D.
                                                 HELEN PIERSOL
       BYRNES, CRNP
       =====================================================================

       INTERPRETATION AND DIAGNOSIS:  (asd)   10/03/2018 @ 01:00 pm


       1) BONE MARROW (BIOPSY, CLOT AND ASPIRATE): PERSISTENT
       MYELODYSPLASTIC/MYELOPROLIFERATIVE NEOPLASM WITH INCREASED BLASTS.

       MICROSCOPIC DESCRIPTION: The marrow is hypercellular
       (approximately 90%),
       and there is trilineage hematopoiesis. The myeloid:erythroid ratio
       is
       increased (approximately 8:1), and both lineages show a full range
       of
       maturation. Atypical megakaryocytes are markedly increased in
       number, and
       are small with hypolobated and hyperchromatic nuclei. The clot
       section
       shows a few prominent lymphoid aggregates. A PAS stain was
       reviewed. A
       reticulin stain shows mild reticulin fibrosis with focal moderate
       fibrosis. A panel of immunostains (CD34, CD3, CD20) was reviewed.
       CD34+
       blasts comprise 10-15% of the cellularity. CD3 and CD20 stain T
       and B
       cells, respectively, with T-cells predominating.


       The aspirate is hypercellular. There is progressive maturation of
       the
       myeloid and erythroid lineages with a myeloid predominance. The
       myeloid
       lineage shows mild dysgranulopoiesis, specifically abnormal
       patterns of
       nuclear lobation. The erythroid lineage shows no overt dysplasia.
       Blasts
       with scant cytoplasm and prominent nucleoli are increased to
       approximately
       11% of the cellularity (62 blasts/502 cells). The peripheral smear
       is
       notable for a leukocytosis with left-shifted granulocytes.
       Monocytes
       comprise less than 10% of the circulating leukocytes (8%; 17/209).
       Circulating blasts are increased to approximately 9% of the
       cellularity
       (19 blasts/210 cells).

       ADDITIONAL INFORMATION: Flow cytometry, as reported in detail
```

separately,
shows approximately 12% phenotypically abnormal myeloid blasts.

AMY S. DUFFIELD, M.D., PH.D.   ASD*

*Electronic signature (10/03/2018 @ 01:01 pm) by which I attest
that
the above diagnosis is based upon my personal examination of the
slides (and / or other material indicated in the diagnosis), and
that I have reviewed and approved this report.
==========================================================================

GROSS DESCRIPTION

PART #1: BONE MARROW BX 1ASP/1PBS SLIDES, BM CLOT (krp)
Resident Pathologist: ROBERT KRUSE, M.D.

Submitted by: KELLY PARKS.
Specimen received:          In two containers
Patient's name on label: Coppage JR, James A
Specimen designation:    Bm bx, bm clot and slides 1asp/1pbs
Container 1 (BM BX):     In Hartmann's fixative
Number pieces of tissue: 2 (TWO)
Tissue description:      cylindrical tan - gray
Measurement:            2.3 x 0.5 x 0.3 cm
Extent of sampling:     Specimen submitted in entirety, in lens
paper.
                        Specimen was submitted for decal.
Container 2 (BM CLOT):   In formalin
Number pieces of tissue: M (Multiple)
Tissue description:      Red-brown clot
Measurement:            2.0 x 0.3 x 0.2
Extent of sampling:     Specimen is filtered into a mesh bag and
entirely submitted.

SUMMARY OF SECTIONS:
1 - BM BX   - 2
1 - BM CLOT - M
2 - TOTAL   - M


Other Surgical Pathology Specimens known to the computer:  S12-
36073,
S16-76276, S17-74991


==========================================================================

(End of Report)                        printed 10/03/2018
13:08

Reported by:
The Johns Hopkins Hospital, Surgical Pathology
401 N. Broadway, Baltimore, MD 21231
Tel: 410-955-3580

Final Report Signed on 10/03/2018 at 01:01 pm

| Specimen | | | |
|---|---|---|---|
| Other | | | |
| Performing Organization | Address | City/State/Zipcode | Phone Number |
| JHH LAB ANATOMIC PATHOLOGY | Johns Hopkins Medical Laboratories, 600 North Wolfe Street, Carnegie 417 | Baltimore, MD 21287 | |
| JHH LABS | Johns Hopkins Medical Laboratories, 600 North Wolfe Street, Carnegie 417 | Baltimore, MD 21287 | |

FLOW CYTOMETRY, BONE MARROW - Final result (11/28/2017 9:00 AM)

| Specimen | |
|---|---|
| Bone marrow | |
| Narrative | Performed At |
| Please schedule with BM procedure. | JHH SOFT LABS |
| Primary Suspected Disease-->Myelodysplastic Syndrome (MDS) | |

Patient Health Summary of James Coppage (page 5 of 19)

| Performing Organization | Address | City/State/Zipcode | Phone Number |
|---|---|---|---|
| JOHNS HOPKINS MEDICAL LABS (J.H.M.L) | 600 North Wolfe Street, Carnegie 417 | Baltimore, MD 21287-0005 | |
| JHH SOFT LABS | Johns Hopkins Medical Labs, 600 North Wolfe Street, Carnegie 417 | Baltimore, MD 21287 | |

## CANCER KARYOTYPE, BONE MARROW - Final result (11/28/2017 9:00 AM)

Specimen
Bone marrow

| Narrative | Performed At |
|---|---|
| Please schedule with BM procedure. | JHH SOFT LABS |
| Primary Suspected Disease-->Myelodysplastic Syndrome (MDS) | |
| Previous Chromosome or FISH Report?-->No | |
| Patient Had Sex-Mismatched Transplant?-->No | |

| Performing Organization | Address | City/State/Zipcode | Phone Number |
|---|---|---|---|
| JOHNS HOPKINS MEDICAL LABS (J.H.M.L) | 600 North Wolfe Street, Carnegie 417 | Baltimore, MD 21287-0005 | |
| JHH SOFT LABS | Johns Hopkins Medical Labs, 600 North Wolfe Street, Carnegie 417 | Baltimore, MD 21287 | |

## CBC W/ AUTO DIFFERENTIAL (COMPLETE BLOOD COUNT (CBC) + AUTO DIFF) - Final result (11/28/2017 8:09 AM)

| Component | Value | Ref Range | Performed At |
|---|---|---|---|
| White Blood Cell Count | 7.49 | 4.50 - 11.00 K/cu mm | JHH SOFT LABS |
| Red Blood Cell Count | 2.25 | 4.50 - 5.90 M/cu mm | JHH SOFT LABS |
| Hemoglobin | 7.4 | 13.9 - 16.3 g/dL | JHH SOFT LABS |
| Hematocrit | 24.5 | 41.0 - 53.0 % | JHH SOFT LABS |
| Mean Corpuscular Volume | 108.9 | 80.0 - 100.0 fL | JHH SOFT LABS |
| Mean Corpus Hgb | 32.9 | 26.0 - 34.0 pg | JHH SOFT LABS |
| Mean Corpus Hgb Conc | 30.2 | 31.0 - 37.0 g/dL | JHH SOFT LABS |
| RBC Distribution Width | 21.4 | 11.5 - 14.5 % | JHH SOFT LABS |
| Platelet Count | 68 | 150 - 350 K/cu mm | JHH SOFT LABS |
| Mean Platelet Volume | 13.6 | 9.2 - 12.7 fL | JHH SOFT LABS |
| Nucleated RBC Number | 0.00 | 0.00 - 0.01 K/cu mm | JHH SOFT LABS |
| Neutrophil % | 56.3 | 40.0 - 70.0 % | JHH SOFT LABS |
| Lymphocytes % | 18.2 | 24.0 - 44.0 % | JHH SOFT LABS |
| Monocyte % | 13.4 | 2.0 - 11.0 % | JHH SOFT LABS |
| Eosinophil % | 2.1 | 1.0 - 4.0 % | JHH SOFT LABS |
| Basophil % | 0.3 | 0.0 - 1.0 % | JHH SOFT LABS |
| Immature Gran % | 9.7  Comment: Immature Grans = Promyelocytes + Myeleocytes + Metamyelocytes | 0.0 - 1.0 % | JHH SOFT LABS |
| ANC-Neutrophil Absolute | 4.22 | 1.50 - 7.80 K/cu mm | JHH SOFT LABS |
| Lymphcytes Absolute | 1.36 | 1.10 - 4.80 K/cu mm | JHH SOFT LABS |
| Monocyte Absolute | 1.00 | 0.10 - 1.20 K/cu mm | JHH SOFT LABS |
| Eosinophil Absolute | 0.16 | 0.12 - 0.30 K/cu mm | JHH SOFT LABS |
| Immature Granulocytes Abs | 0.73  Comment: Immature Grans = Promyelocytes + Myeleocytes + Metamyelocytes | 0.00 - 0.05 K/cu mm | JHH SOFT LABS |

Specimen
Blood

| Performing Organization | Address | City/State/Zipcode | Phone Number |
|---|---|---|---|
| JOHNS HOPKINS MEDICAL LABS (J.H.M.L) | 600 North Wolfe Street, Carnegie 417 | Baltimore, MD 21287-0005 | |
| JHH SOFT LABS | Johns Hopkins Medical Labs, 600 North Wolfe Street, Carnegie 417 | Baltimore, MD 21287 | |

## COMPREHENSIVE METABOLIC PANEL - Final result (11/28/2017 8:09 AM)

| Component | Value | Ref Range | Performed At |
|---|---|---|---|
| Sodium | 139 | 135 - 148 mmol/L | JHH SOFT LABS |
| Potassium | 4.2 | 3.5 - 5.1 mmol/L | JHH SOFT LABS |
| Chloride | 103 | 96 - 109 mmol/L | JHH SOFT LABS |
| Carbon Dioxide | 24 | 21 - 31 mmol/L | JHH SOFT LABS |
| Urea Nitrogen | 23 | 7 - 22 mg/dL | JHH SOFT LABS |
| Creatinine, Serum | 1.2 | 0.6 - 1.3 mg/dL | JHH SOFT LABS |

| Est GFR Afr-Am(MDRD Eqn) | >60 | >60 mL/min/1.73 sqm | JHH SOFT LABS |
| | Comment: | | |
| | For calculating medication doses in | | |
| | patients age equal | | |
| | to or greater than 70, | | |
| | it is more appropriate to use | | |
| | estimated GFR using the Cockroft-Gault | | |
| | equation rather | | |
| | than the MDRD equation. | | |
| | Reference Range: >60 mL/min/A,(A=1.73 sq | | |
| | m). | | |
| Est GFR NonAfrAm(MDRD Eqn) | 59 | >60 mL/min/1.73 sqm | JHH SOFT LABS |
| | Comment: | | |
| | For calculating medication doses in | | |
| | patients age equal | | |
| | to or greater than 70, | | |
| | it is more appropriate to use | | |
| | estimated GFR using the Cockroft-Gault | | |
| | equation rather | | |
| | than the MDRD equation. | | |
| | Reference Range: >60 mL/min/A,(A=1.73 sq | | |
| | m). | | |
| Glucose | 280 | 60 - 99 mg/dL | JHH SOFT LABS |
| | Comment: | | |
| | Interpretation | | |
| | Fasting glucose 100-125 mg/dL: Impaired | | |
| | Fasting glucose>=126 mg/dL: Diagnostic | | |
| | for diabetes | | |
| | Random glucose>=200 mg/dL: Diagnostic | | |
| | for diabetes when | | |
| | symptomatic | | |
| Calcium | 8.8 | 8.4 - 10.5 mg/dL | JHH SOFT LABS |
| Total Protein | 7.6 | 6.0 - 8.2 g/dL | JHH SOFT LABS |
| Albumin | 4.1 | 3.5 - 5.3 g/dL | JHH SOFT LABS |
| Bilirubin,Total | 0.3 | 0.0 - 1.2 mg/dL | JHH SOFT LABS |
| Alkaline Phosphatase | 56 | 30 - 120 U/L | JHH SOFT LABS |
| Aspartate Amino Trans | 19 | 0 - 37 U/L | JHH SOFT LABS |
| Alanine Amino Trans | 18 | 0 - 40 U/L | JHH SOFT LABS |
| Anion Gap | 12 | 7 - 16 mmol/L | JHH SOFT LABS |
| BUN / Creatinine Ratio | 19 | | JHH SOFT LABS |
| AST/ALT Ratio | 1.1 | | JHH SOFT LABS |

Specimen
Blood

| Performing Organization | Address | City/State/Zipcode | Phone Number |
| JOHNS HOPKINS MEDICAL LABS (J.H.M.L.) | 600 North Wolfe Street, Carnegie 417 | Baltimore, MD 21287-0005 | |
| JHH SOFT LABS | Johns Hopkins Medical Labs, 600 North Wolfe Street, Carnegie 417 | Baltimore, MD 21287 | |

## SURGICAL PATHOLOGY REPORTN (SURGICAL PATHOLOGY REPORT) - Edited Result - FINAL (11/28/2017)

| Component | Value | Ref Range | Performed At |
| Surg Path Report | | | JHH LABS |

THE        Patient: COPPAGE JR,JAMES A   Path# S17-
74991
JOHNS HOPKINS
HOSPITAL   JHH MR # 4-505-79-27    Accessioned
11/28/2017

SURGICAL    Birthdate: 08/03/1942  (Age 75) Loc: JH-379
PATHOLOGY
401 N. Broadway  Gender: M        Spec. Taken
11/28/2017
Baltimore, Md.
21231-2410   JHH Physician:    BRUCE DOUGLAS SMITH,
M.D.

INTERPRETATION AND DIAGNOSIS:  (xxw)   12/01/2017 @ 06:58 pm

1) BONE MARROW (BIOPSY, CLOT, AND ASPIRATE): HYPERCELLULAR MARROW
WITH
PERSISTENT MYELOPROLIFERATIVE/MYELODYSPLASTIC SYNDROME, BLASTS 3-
5%.

MICROSCOPIC DESCRIPTION: The marrow is hypercellular (90%), and
there is
trilineage hematopoiesis. The myeloid:erythroid ratio is markedly
increased (9-10:1), and both lineages show a full range of
maturation.
Megakaryocytes are greatly increased in number, and show abnormal
morphology including small forms with hypolobated/monolobated and
hyperchromatic nuclei. Several benign appearing lymphoid
aggregates are
present. The clot section shows similar findings. A PAS stain was
reviewed.

The aspirate shows myeloid predominance but there is no
significant
dysgranulopoiesis. Blasts are present but comprise 4% of the total
cellularity (500 cell count). The erythroid lineage is decreased
but shows
no evidence of significant dysplasia. Megakaryocytes are increased
in
number and exhibit small and hypolobated/monolobated morphology.

The peripheral smear shows macrocytic, hypochromic anemia with
moderately
poikilocytosis.  Several stomatocytes and tear drops are seen. The
WBCs
are normal in number, composed predominantly of neutrophils with
occasional pelgeroid granulocytes. Immature myeloid precursors are
seen
including rare blasts (1%). The percentage of monocytes are mildy
increased (13%). Platelets are decreased with several giant
platelets seen.

STAIN: CD34 demonstrates immunoreactivity in approximately 5% of
the total
cellularity including mononucleated megakaryocytes. CD34+ blasts
are 3-5%.
Factor VIII highlights megakaryocytes and confirms that they are
significantly increased and morphologically abnormal.

ADDITIONAL INFORMATION: Flow cytometry, as reported in detail
separately,
shows a myeloid predominance and a 3% phenotypically abnormal
population
of myeloid blasts positive for CD34, CD117, variable HLADR, and
CD33, and
with significant loss of CD13.

                    XIAOJUN WU, M.D.  XW*

*Electronic signature (12/01/2017 @ 06:59 pm) by which I attest
that
the above diagnosis is based upon my personal examination of the
slides (and / or other material indicated in the diagnosis), and
that I have reviewed and approved this report.
==================================================================

GROSS DESCRIPTION

PART #1: BONE MARROW BIOPSY & IASP/IPBS SLIDES, (BM CLOT) (krp)
Resident Pathologist: J David Peske, M.D.

Submitted by: KELLY PARKS.
Specimen received:          In two containers
Patient's name on label: Coppage JR, James A
Specimen designation:     Bm bx, bm clot and slides Iasp/1pbs
Container 1 (BM BX):      In Hartmann's fixative
Number pieces of tissue: 2 (Two)

Tissue description:      Cylindrical tan-gray
Measurement:             1.8 x 0.8 x 0.4 cm
Extent of sampling:      Specimen submitted in entirety, in lens
paper.

                         Specimen was submitted for decal.

Container 2 (BM CLOT):   In formalin
Number pieces of tissue: M (Multiple)
Tissue description:      Red-brown clot
Measurement:             1.5 x 1.0 x 0.3
Extent of sampling:      Specimen is filtered into a mesh bag and
entirely submitted.

SUMMARY OF SECTIONS:
1 - BM BX   - 2
1 - BM CLOT - M
2 - TOTAL   - M


Other Surgical Pathology Specimens known to the computer:   S12-
36073,
S16-76276


========================================================

(End of Report)                        printed 12/01/2017
19:15


Reported by:
The Johns Hopkins Hospital, Surgical Pathology
401 N. Broadway, Baltimore, MD 21231
Tel: 410-955-3580

Final Report Signed on 12/01/2017 at 06:59 pm

Specimen
Other

| Performing Organization | Address | City/State/Zipcode | Phone Number |
|---|---|---|---|
| JHH LAB ANATOMIC PATHOLOGY | Johns Hopkins Medical Laboratories, 600 North Wolfe Street, Carnegie 417 | Baltimore, MD 21287 | |
| JHH LABS | Johns Hopkins Medical Laboratories, 600 North Wolfe Street, Carnegie 417 | Baltimore, MD 21287 | |


BCR-ABL p190 Followup, BM (BCR-ABL DIAGNOSTIC, BM) - Final result (12/02/2016 10:35 AM)
Specimen
Bone marrow

| Narrative | Performed At |
|---|---|
| Please schedule with BM procedure. | JOHNS HOPKINS UNIVERSITY |
| Primary Suspected Disease->Myelodysplastic Syndrome (MDS) | LABS |
| Call Back Name and Number if not Ordering Provider->Alex | |
| Ambinder 33482 | |
| *** Please link with bone marrow biopsy procedure | |

| Performing Organization | Address | City/State/Zipcode | Phone Number |
|---|---|---|---|
| JOHNS HOPKINS UNIVERSITY LABS | 600 N. Wolf Street | Baltimore, MD 21287-0005 | |
| JOHNS HOPKINS UNIVERSITY LABS | 600 N. Wolf Street | Baltimore, MD 21287 | |


IRON STAIN FOR ONCOLOGY PATIENTS ONLY - Final result (12/02/2016 10:35 AM)

| Component | Value | Ref Range | Performed At |
|---|---|---|---|
| Iron Stain Oncology | Slide sent to WGB 2300 for SP reporting | | JHH SOFT LABS |

Specimen
Bone marrow

| Narrative | Performed At |
|---|---|
| Please schedule with BM procedure. | JHH SOFT LABS |
| Primary Suspected Disease->Myelodysplastic Syndrome (MDS) | |
| Cytochemical Stains Desired?->Yes | |
| Please schedule with BM procedure. | |
| Primary Suspected Disease->Myelodysplastic Syndrome (MDS) | |
| Clinical History / Physical Findings->74 yr old with MDS/MPN | |
| who has developed transfusion dependent anemia | |
| Call Back Name and Number if not Ordering Provider->Alex | |

Patient Health Summary of James Coppage (page 8 of 19)

Ambinder 33482
*** Please link with bone marrow biopsy procedure

| Performing Organization | Address | City/State/Zipcode | Phone Number |
|---|---|---|---|
| JOHNS HOPKINS MEDICAL LABS (J.H.M.L.) | 600 North Wolfe Street, Carnegie 417 | Baltimore, MD 21287-0005 | |
| JHH SOFT LABS | Johns Hopkins Medical Labs, 600 North Wolfe Street, Carnegie 417 | Baltimore, MD 21287 | |

**BONE MARROW ASP DIFF. (BONE MARROW ASPIRATE DIFFERENTIAL,ADULT) - Final result (12/02/2016 10:35 AM)**

| Component | Value | Ref Range | Performed At |
|---|---|---|---|
| Blast % Bone Marrow | 4.0 | 0.0 - 2.0 % | JHH SOFT LABS |
| Promyelocytes % Bone Marrow | 7.0 | 0.0 - 4.0 % | JHH SOFT LABS |
| Myelocytes % Bone Marrow | 9.0 | 5.0 - 20.0 % | JHH SOFT LABS |
| Metamyelocytes % Bone Marrow | 7.0 | 5.0 - 15.0 % | JHH SOFT LABS |
| Bands % Bone Marrow | 3.0 | 5.0 - 35.0 % | JHH SOFT LABS |
| Neutrophils % Bone Marrow | 40.0 | 5.0 - 15.0 % | JHH SOFT LABS |
| Lymphocytes % Bone Marrow | 7.0 | 10.0 - 20.0 % | JHH SOFT LABS |
| Monocytes % Bone Marrow | 3.0 | 0.0 - 5.0 % | JHH SOFT LABS |
| Eosinophils % Bone Marrow | 2.0 | 0.6 - 4.0 % | JHH SOFT LABS |
| Basophils % Bone Marrow | 1.0 | 0.0 - 0.4 % | JHH SOFT LABS |
| Early Erythroid Precursors % BM | 2.0 | 0.0 - 6.0 % | JHH SOFT LABS |
| Late Erythroid Precursors % BM | 15.0 | 5.0 - 30.0 % | JHH SOFT LABS |
| Plasma Cells % Bone Marrow | 0.0 | 0.0 - 2.0 % | JHH SOFT LABS |
| Histiocytes % Bone Marrow | 0.0 | 1.0 - 2.0 % | JHH SOFT LABS |
| Others %, Bone Marrow | 0.0 | % | JHH SOFT LABS |
| Myeloid Erythroid Ratio, Bone Marrow | N/A | 3:1 (ratio) | JHH SOFT LABS |
| Megakaryocytes, Bone Marrow | Present, Increased | | JHH SOFT LABS |
| Cellularity Bone Marrow | Severely Hypocellular | | JHH SOFT LABS |
| Stromal Elements, Bone Marrow | Present | | JHH SOFT LABS |
| Comments, Bone Marrow | SEE COMMENT  Comment: 200 nucleated cells identified on 2 coverslips scanned. | | JHH SOFT LABS |

Specimen

Bone marrow

| Narrative | | | Performed At |
|---|---|---|---|
| Please schedule with BM procedure. | | | JHH SOFT LABS |

Please schedule with BM procedure.
Primary Suspected Disease->Myelodysplastic Syndrome (MDS)
Cytochemical Stains Desired?->Yes
Please schedule with BM procedure.
Primary Suspected Disease->Myelodysplastic Syndrome (MDS)
Clinical History / Physical Findings->74 yr old with MDS/MPN
who has developed transfusion dependent anemia
Call Back Name and Number if not Ordering Provider->Alex
Ambinder 33482
*** Please link with bone marrow biopsy procedure

| Performing Organization | Address | City/State/Zipcode | Phone Number |
|---|---|---|---|
| JOHNS HOPKINS MEDICAL LABS (J.H.M.L.) | 600 North Wolfe Street, Carnegie 417 | Baltimore, MD 21287-0005 | |
| JHH SOFT LABS | Johns Hopkins Medical Labs, 600 North Wolfe Street, Carnegie 417 | Baltimore, MD 21287 | |

**FLOW CYTOMETRY, BONE MARROW - Final result (12/02/2016 10:35 AM)**

Specimen

Bone marrow

| Narrative | | | Performed At |
|---|---|---|---|
| Please schedule with BM procedure. | | | JHH SOFT LABS |

Please schedule with BM procedure.
Primary Suspected Disease->Myelodysplastic Syndrome (MDS)
Cytochemical Stains Desired?->Yes
Please schedule with BM procedure.
Primary Suspected Disease->Myelodysplastic Syndrome (MDS)
Clinical History / Physical Findings->74 yr old with MDS/MPN
who has developed transfusion dependent anemia
Call Back Name and Number if not Ordering Provider->Alex
Ambinder 33482
*** Please link with bone marrow biopsy procedure

| Performing Organization | Address | City/State/Zipcode | Phone Number |
|---|---|---|---|
| JOHNS HOPKINS MEDICAL LABS (J.H.M.L.) | 600 North Wolfe Street, Carnegie 417 | Baltimore, MD 21287-0005 | |

EXHIBIT C

IN THE CIRCUIT COURT OF MARYLAND FOR BALTIMORE CITY

| | | |
|---|---|---|
| JAMES COPPAGE | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION No. |
| | : | |
| vs. | : | |
| | : | |
| UNITED STATES STEEL CORPORATION, et al. | : | |
| | : | |
| | : | |
| Defendants. | : | |

## NOTICE OF ELECTRONIC AUDIO-VIDEO DEPOSITION
## FOR TRIAL PRESERVATION

Please take notice that pursuant to Rule 2-419(a)(4) the Plaintiff will take the electronic audio-video deposition of Mr. James Coppage for purposes of preserving his testimony for trial at 9:00 a.m. on December 5, 2018. The deposition will take place at Veritext, 102 West Pennsylvania Avenue, Suite 304, Towson, MD 21204. The stenographer and audio-video recording will be provided by Veritext, 102 West Pennsylvania Avenue, Suite 304, Towson, MD 21204. You are invited to attend and participate.

Respectfully submitted,

**LOCKS LAW FIRM**

DATED: 11/8/2018

By: /s/ Melanie Garner
**MELANIE GARNER, ESQUIRE
601 Walnut Street, Suite 720 East
Philadelphia, Pa 19106
T (215) 893-0100
F (215) 893-3444
mgarner@lockslaw.com
Attorneys for Plaintiff**

IN THE CIRCUIT COURT OF MARYLAND FOR BALTIMORE CITY

| | |
|---|---|
| JAMES COPPAGE | : |
| | : |
| Plaintiff, | : CIVIL ACTION No. |
| | : |
| vs. | : |
| | : |
| UNITED STATES STEEL CORPORATION, | : |
| et al. | : |
| | : |
| Defendants. | : |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she has this date he caused a true and correct copy of the foregoing documents to be served on all defendants.


By: /s/ Melanie Garner_____

MELANIE GARNER, ESQUIRE


Date: November 8, 2018.

EXHIBIT D

12/1/2018　　Locks Law Firm Mail - James Coppage v. United States Steel Corp, et al., Circuit Court for Baltimore City, Case No. 24-18-005920

Case 1:18-cv-03823-SAG　Document 1-2　Filed 12/11/18　Page 67 of 92

# L¦ LOCKS LAW FIRM

Andrew DuPont <adupont@lockslaw.com>

## James Coppage v. United States Steel Corp, et al., Circuit Court for Baltimore City, Case No. 24-C-18-005920

Carol Lippmann <clippmann@lockslaw.com>　　　　　　　　　　　Fri, Nov 30, 2018 at 11:40 AM
To: jdecaro@decarodoran.com, ben.schuman@dlapiper.com, Steven Lucks <slucks@fishkinlucks.com>,
"afishkin@FishkinLucks.com" <afishkin@fishkinlucks.com>, tjc@gdldlaw.com, mcc@caironelaw.com,
sperry@reedsmith.com, Joseph.duffy@morganlewis.com, Steven.luxton@morganlewis.com,
john.wellschlager@dlapiper.com, ljacobs@budownoble.com, Kyle.LeClere@btlaw.com, EWeiss@murchisonlaw.com,
tstowe@budownoble.com
Cc: Melanie Garner <mgarner@lockslaw.com>, Andrew DuPont <adupont@lockslaw.com>, Edilaine Telles
<etelles@lockslaw.com>, strainbas <StrainBas@aol.com>, Coppage Clio
<89a159048+matter1143891286@maildrop.clio.com>

Dear Counsel:

Please see the attached letter and Amended Notice to Take Deposition of Plaintiff James Coppage sent on behalf of Melanie J. Garner.


Thank you,

**Carol Lippmann**, Paralegal
e. clippmann@lockslaw.com
p. (215) 893-0100 ext. 3208

## L¦ LOCKS LAW FIRM

www.lockslaw.com

The Curtis Center
601 Walnut St. | Suite 720 East
Philadelphia, PA 19106
(215) 893-0100 (Phone) | (215) 893-3444 (Fax)

801 North Kings Hwy.
Cherry Hill, NJ 08034
(856) 663-8200 (Phone) | (856) 661-8400 (Fax)

800 Third Ave. | 11th Floor
New York, NY 10022
(212) 838-3333 (Phone) | (212) 838-3735 (Fax)

**CONFIDENTIALITY NOTE**

*This transmission and the documents accompanying this transmission contain information from the LOCKS LAW FIRM LLC that is confidential and or privileged. The information is intended only for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited and the documents should be returned to this office immediately. Therefore, if you have received this transmission in error, please notify the sender of the delivery error by replying to this message, and then delete it from your system. Thank you.

2 attachments

12/1/2018       Cooke Law Firm Mail - Sparks v. United States Steel Corp., et al., Circuit Court for Baltimore City Case No 24-C-18-005920

Case 1:16-cv-03023-SAG    Document 12    Filed 12/11/18    Page 68 of 92

2018.11.30 Letter to Counsel encl. Amended Notice of James Coppage Dep.pdf
32K

2018.11.30 Amended Notice of Deposition of James Coppage.pdf
158K

**LOCKS** LAW FIRM

The Curtis Center
601 Walnut Street, Suite 720 East
170 S. Independence Mall West
Philadelphia, Pennsylvania 19106
T  215.893.0100
T  866.LOCKSLAW
F  215.893.3444
lockslaw.com

Melanie J. Garner
Attorney
Admitted in PA, NJ, NY, MD, DC
mgarner@lockslaw.com

Direct Dial: 215-893-3433

November 30, 2018

<u>Via Electronic Mail</u>
Laura Basem Jacobs, Esq.
Budow and Noble, P.C.
12300 Twinbrook Parkway, Suite 540
Rockville, MD 20852

Re:   James Coppage v. United States Steel Corporation, et al.

Dear Ms. Jacobs:

As we previously advised in Andrew DuPont's letter dated November 28, 2018 and during your phone call with Mr. DuPont yesterday, we have agreed to move Mr. Coppage's deposition back to December 13, 2018 which is 30 days after the first defendant, Philips North America, LLC, was served in Maryland in this case. Attached is an Amended Notice to Take Deposition of Plaintiff James Coppage, scheduling Mr. Coppage's deposition for December 13, 2018 at 9:00 a.m. at Veritext;s offices in Towson, MD At the conclusion of Mr. Coppage's direct examination we will make Mr. Coppage available for a discovery deposition and then cross examination.

Very truly yours,

LOCKS LAW FIRM

Melanie Garner, Esquire

Encl.
cc:   Matthew Cairone for US Steel  (via Electronic Mail w/ Encl.)
Laura Basaem Jacobs for US Steel (via Electronic Mail w/ Encl.)
Joseph Duffy for Phillips North America LLC (via Electronic Mail w/ Encl.)
Steven Lucks & Andrew Fishkin for Ashland LLC (via Electronic Mail w/ Encl.)
John Wellschlager & Ben Schuman for BASF Corporation (via Electronic Mail w Encl.)
Jeffrey DeCaro for Harcross Chemicals, Inc., THAN & Phillips North America
Thomas Cullen for Sun Chemical Corporation
Kyle LeClere for Flint Group North America
Eric Weiss, Esquire for FUJIFILM Hunt Chemicals
Stan Perry, Esquire for Shell Oil Company
All Counsel of Record (via First Class Mail w/ Encl)

| | |
|---|---|
| JAMES COPPAGE | *   IN THE |
| | * |
| Plaintiff | *   CIRCUIT COURT |
| | * |
| v. | *   FOR |
| | * |
| U.S. STEEL CORPORATION, *et al.* | *   BALTIMORE CITY |
| | * |
| Defendants | *   Case No. 24-C-18-005920 |
| | * |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## AMENDED NOTICE TO TAKE DEPOSITION OF PLAINTIFF JAMES COPPAGE

Please take notice that, pursuant to Rule 2-412, Plaintiff will take the deposition upon oral examination of Plaintiff Mr. James Coppage beginning at 9:00 a.m. on December 13, 2018. The deposition will take place at Veritext, 102 West Pennsylvania Avenue, Suite 304, Towson, MD 21204. The deposition will be recorded by audio-video means with a stenographic record before a person authorized to administer oaths in the State of Maryland. The stenographer and audio-video recording will be provided by Veritext, 102 West Pennsylvania Avenue, Suite 304, Towson, MD 21204. In accordance with Rule 2-415(b), Mr. Coppage will be available for examination and cross-examination, and you are invited to attend and participate. Plaintiff reserves the right to use Mr. Coppage's deposition for all uses permitted by Rule 2-419.

Respectfully submitted,

Melanie J. Garner (CPF# 0512140115)
**LOCKS LAW FIRM**
601 Walnut Street, Suite 720E
Philadelphia, Pennsylvania 19106
(215) 893-0100 (Main)
215) 893-3433 (Direct Line)
(215) 893-3444 (Facsimile)
Email: mgarner@lockslaw.com

| | | |
|---|---|---|
| JAMES COPPAGE | * | IN THE |
| | * | |
| **Plaintiff** | * | CIRCUIT COURT |
| | * | |
| v. | * | FOR |
| | * | |
| U.S. STEEL CORPORATION, *et al.* | * | BALTIMORE CITY |
| | * | |
| **Defendants** | * | Case No. 24-C-18-005920 |
| | * | |

CERTIFICATE OF SERVICE

The undersigned hereby certifies that he has this date he caused a true and correct copy

of the foregoing documents to be served on all parties by mailing first class mail, postage prepaid

upon all parties on the attached list, and by electronic mail only upon on those parties with

counsel and designated email as indicated and as set forth on the attached list on this 30th day of

November, 2018.

Melanie J. Garner (CPT# 0512140115)
**LOCKS LAW FIRM**
601 Walnut Street, Suite 720E
Philadelphia, Pennsylvania 19106
215) 893-0100 (Main)
215) 893-3433 (Direct Line)
(215) 893-3444 (Facsimile)
Email: mgarner@lockslaw.com

James Coppage v. United States Steel Corporation
In the Circuit Court for Baltimore City
Case No. 24C18005920

Jeffrey R. DeCaro, Esquire
DeCaro Doran Siciliano Gallagher &
DeBlasis LLP
17251 Melford Boulevard, Suite 200
Bowie, Maryland 20715
T: (301) 352-4968
Fax: (301) 352-8691
jdecaro@decarodoran.com

**Counsel for T.H. Agriculture and
Nutrition, LLC and Harcros Chemicals,
Inc.**

Steven Lucks, Esquire
Andrew Fishkin, Esquire
Fishkin Lucks LLP
One Riverfront Plaza, Suite 410
Newark, NJ 07102
T: (973) 679-4429
slucks@fishkinlucks.com

**Counsel for Ashland, LLC**

Matt Cairone, Esquire
The Cairone Law Firm PLLC
PMB 58
1900 Main Street, Suite 107
Cannonsburg, PA 15317
T: (724) 416-3261
mcc@caironelaw.com

and

Laura Basem Jacobs, Esquire
Thomas F. Stowe, Esquire
Law Offices Budow and Noble, P.C.
Twinbrook Metro Plaza
12300 Twinbrook Parkway, Suite 540
Rockville, Maryland 20852
T: (301) 654-0896
ljacobs@budownoble.com
tstowe@budownoble.com

Ben Schuman, Esquire
John Wellschlager, Esquire
DLA Piper LLP
The Marbury Building
6225 Smith Avenue
Baltimore, Maryland 21209
T: (410) 580-4022
Fax: (410) 580-3022
ben.schuman@dlapiper.com

**Counsel for BASF Corporation**

Thomas J. Cullen, Jr. Esquire
Goodell, DeVries, Leech & Dann, LLP
One South Street, 20th Floor
Baltimore, MD 21202
T: (410) 783-4000
Fax: (410) 783-4040
tjc@gdldlaw.com

**Counsel for Sun Chemical Corporation**

Stan Perry, Esquire
Reed Smith
811 Main Street, Suite 1700
Houston, TX 77002
T: (713) 469-3800
Fax: (713) 469-3899
sperry@reedsmith.com

**Counsel for Shell Oil Company and Shell
Oil Products US, Inc.**

Handschy Industries, LLC
% Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

**Counsel for United States Steel Corporation**

Varn International, Inc., d/b/a Varn Products Co.
% Corporation Service Company
50 West Broad Street, Suite 1330
Columbus, Ohio 43215

Union Oil Company of California,
Individually and as Successor in Interest to
American Mineral Spirits Company
6001 Bollinger Canyon Road
San Ramon, CA 94583

EMCO Chemical Distributors, Inc.
% Bernard A. Schlifke
33- N. Wabash, # 1700
Chicago, IL 60611

Eric Weiss, Esquire
Murchison & Cumming LLP
801 South Grand Avenue, 9th Floor
Los Angeles, CA 90017
T: (213) 623-7400
Fax: (213 623-6336
Eweiss@murchisonlaw.com

**Counsel for Fujifilm Hunt Chemicals USA, Inc.**

Kyle LeClere, Esquire
Barnes & Thornburg, LLP
11 South Meridian Street
Indianapolis, IN 46204
T: (317) 231-6475
Fax: (317) 231-7433
Kyle.leclere@btlaw.com

**Counsel for Flint Ink Corporation**

Graphic Packaging International, LLC f/k/a
Graphic Packaging International, Inc.,
Individually and as Successor in Interest to
Handschy Industries, LLC
% CSC-Lawyers Incorporating Service
7 St. Paul Street, Suite 820
Baltimore, MD 21202

Joseph Duffy, Esquire
Morgan Lewis & Bockius LLP
300 South Grand Ave., 22nd Floor
Los Angeles, CA 90071
T: (213) 612-7378
Fax: (213) 612-2501
Joseph.duffy@morganlewis.com

and

Steven A. Luxton, Esquire
Morgan Lewis & Bockius LLP
1111 Pennsylvania Ave. NW
Washington, DC 20004
T: (202) 739-5452
Fax: (202) 739-3001
Steven.luxton@morganlewis.com

**Counsel for Phillips North America LLC f/k/a Philips Electronics North America Corporation**

JHB, Inc. f/k/a John H. Burke & Co., Inc.
1201 Haubert Street
Baltimore, MD 21230
% Donald J. Boehl, Secretary
230 Dodson Avenue
Saint Michaels, MD 21663

and

% J. Douglas Boehl, President and Treasurer
2145 Walker Road
Glen Rock, PA 17327

Rycoline Products, Inc., a Division of Sun
Chemical Commercial Group, a/k/a Rycoline
Products, LLC, and Successor to Rogersol,
Inc.
% The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

# EXHIBIT D.1

# L'I LOCKS LAW FIRM

Andrew DuPont <adupont@lockslaw.com>

---

## Coppage v. United States Steel Corporation, et al., Case No. 24-C-18-005920

---

**Andrew DuPont** <adupont@lockslaw.com>                                    Fri, Nov 30, 2018 at 9:01 AM
To: tstowe@budownoble.com, joseph.duffy@morganlewis.com
Cc: Melanie Garner <mgarner@lockslaw.com>, john.wellschlager@dlapiper.com, Cairone Law Firm
<mcc@caironelawfirm.com>, ben.schuman@dlapiper.com, slucks@fishkinlucks.com, tjc@gdldlaw.com,
ljacobs@budownoble.com, "Perry, Stan" <SPerry@reedsmith.com>, jdecaro@decarodoran.com, "Kyle W. LeClere"
<Kyle.LeClere@btlaw.com>, Eric Weiss <EWeiss@murchisonlaw.com>, pmoon@decarodoran.com,
"afishkin@FishkinLucks.com" <afishkin@fishkinlucks.com>, James Coppage Case
<89a159048+matter1143891286@maildrop.clio.com>

Laura,
Following upon my November 28th letter and our conversation yesterday, we are serving an amended notice of
deposition this morning scheduling Mr. Coppage's deposition for December 13, 2018 which is 30 days after the first
defendant was served in this case.
Andrew

On Thu, Nov 29, 2018 at 12:01 PM Andrew DuPont <adupont@lockslaw.com> wrote:
> Laura,
>
> I left you voice mail messages yesterday and a moment ago in an effort to further discuss issues regarding Mr.
> Coppage's deposition. I understand you are in meetings until this afternoon. I am out of the office but I can be
> reached on my cell phone at 267-334-5098.
>
> Andrew
>
> On Wed, Nov 28, 2018 at 6:07 PM Andrew DuPont <adupont@lockslaw.com> wrote:
>> Counsel,
>>
>> Please see the attached letter.
>>
>> Andrew
>>
>> On Wed, Nov 28, 2018 at 11:47 AM Thomas F. Stowe <tstowe@budownoble.com> wrote:
>>> Dear Ms. Garner & Mr. Dupont:
>>>
>>>
>>> Attached please find correspondence sent on behalf of Laura Basem Jacobs.
>>>
>>>
>>> Thank you,
>>>
>>>
>>> Thomas F. Stowe
>>>
>>> Budow and Noble, P.C.
>>>
>>> 12300 Twinbrook Parkway, Suite 540
>>>
>>> Rockville, MD 20852
>>>
>>> T 301-654-0896 | F 301-907-9591
>>>
>>> tstowe@budownoble.com

11/30/2018                         Locks Law Firm Mail - Coppage v. United States Steel Corporation, et al., Case No. 24-C-18-005920

www.budownoble.com

This electronic mail transmission contains confidential information belonging to Budow and Noble, P.C. (or its clients) that is intended solely for the recipient named above. BUDOW and NOBLE, P.C. PRESERVES AND ASSERTS ALL PRIVILEGES AND IMMUNITIES APPLICABLE TO THIS TRANSMISSION. If you are not either the intended recipient or an agent or employee of the intended recipient, this transmission was sent to you in error. Any review, examination, use, disclosure, reproduction, or distribution of this transmission or the information herein stated by anyone other than the intended recipient is STRICTLY PROHIBITED. If you have received this transmission in error, please notify the sender immediately by email and delete the original message. Thank you.

--

**Andrew DuPont**
e. adupont@lockslaw.com
t. 215.893.3425
Admitted to Practice in NJ, PA

## L: I LOCKS LAW FIRM

www.lockslaw.com

The Curtis Center
601 Walnut St. | Suite 720 East
Philadelphia, PA 19106
(215) 893-0100 (Phone) | (215) 893-3444 (Fax)

801 North Kings Hwy.
Cherry Hill, NJ 08034
(856) 663-8200 (Phone) | (856) 661-8400 (Fax)

800 Third Ave. | 11th Floor
New York, NY 10022
(212) 838-3333 (Phone) | (212) 838-3735 (Fax)

**CONFIDENTIALITY NOTE**

*This transmission and the documents accompanying this transmission contain information from the LOCKS LAW FIRM that is confidential and or privileged. The information is intended only for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited and the documents should be returned to this office immediately. Therefore, if you have received this transmission in error, please notify the sender of the delivery error by replying to this message, and then delete it from your system. Thank you.

--

**Andrew DuPont**
e. adupont@lockslaw.com
t. 215.893.3425
Admitted to Practice in NJ, PA

## L: I LOCKS LAW FIRM

www.lockslaw.com

The Curtis Center
601 Walnut St. | Suite 720 East
Philadelphia, PA 19106
(215) 893-0100 (Phone) | (215) 893-3444 (Fax)

801 North Kings Hwy.

Cherry Hill, NJ 08034
(856) 663-8200 (Phone) | (856) 661-8400 (Fax)

800 Third Ave. | 11th Floor
New York, NY 10022
(212) 838-3333 (Phone) | (212) 838-3735 (Fax)

**CONFIDENTIALITY NOTE**

*This transmission and the documents accompanying this transmission contain information from the LOCKS LAW FIRM that is confidential and or privileged. The information is intended only for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited and the documents should be returned to this office immediately. Therefore, if you have received this transmission in error, please notify the sender of the delivery error by replying to this message, and then delete it from your system. Thank you.

--

**Andrew DuPont**
e. adupont@lockslaw.com
t. 215.893.3425
Admitted to Practice in NJ, PA

**⊔² | LOCKS LAW FIRM**

www.lockslaw.com

The Curtis Center
601 Walnut St. | Suite 720 East
Philadelphia, PA 19106
(215) 893-0100 (Phone) | (215) 893-3444 (Fax)

801 North Kings Hwy.
Cherry Hill, NJ 08034
(856) 663-8200 (Phone) | (856) 661-8400 (Fax)

800 Third Ave. | 11th Floor
New York, NY 10022
(212) 838-3333 (Phone) | (212) 838-3735 (Fax)

**CONFIDENTIALITY NOTE**

*This transmission and the documents accompanying this transmission contain information from the LOCKS LAW FIRM that is confidential and or privileged. The information is intended only for the use of the individual or entity named on this transmission sheet. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this information is strictly prohibited and the documents should be returned to this office immediately. Therefore, if you have received this transmission in error, please notify the sender of the delivery error by replying to this message, and then delete it from your system. Thank you.

EXHIBIT D.2

Case 1:18-cv-03823-SAG   Document 1-2   Filed 12/11/18   Page 80 of 92

11/30/2018          Locks Law Firm Mail - James Coppage v. United States Steel Corp, et al., Circuit Court for Baltimore City, Case No. 24-C-18-005920

**LOCKS LAW FIRM**                                          Melanie Garner <mgarner@lockslaw.com>

## James Coppage v. United States Steel Corp, et al., Circuit Court for Baltimore City, Case No. 24-C-18-005920

**Laura Jacobs** <ljacobs@budownoble.com>                          Fri, Nov 30, 2018 at 2:25 PM
To: Carol Lippmann <clippmann@lockslaw.com>, "EWeiss@murchisonlaw.com" <EWeiss@murchisonlaw.com>,
"adupont@lockslaw.com" <adupont@lockslaw.com>
Cc: "jdecaro@decarodoran.com" <jdecaro@decarodoran.com>, "ben.schuman@dlapiper.com"
<ben.schuman@dlapiper.com>, Steven Lucks <slucks@fishkinlucks.com>, "afishkin@FishkinLucks.com"
<afishkin@fishkinlucks.com>, "tjc@gdldlaw.com" <tjc@gdldlaw.com>, "mcc@caironelaw.com" <mcc@caironelaw.com>,
"sperry@reedsmith.com" <sperry@reedsmith.com>, "Joseph.duffy@morganlewis.com" <Joseph.duffy@morganlewis.com>,
"Steven.luxton@morganlewis.com" <Steven.luxton@morganlewis.com>, "john.wellschlager@dlapiper.com"
<john.wellschlager@dlapiper.com>, "Kyle.LeClere@btlaw.com" <Kyle.LeClere@btlaw.com>, "Thomas F. Stowe"
<tstowe@budownoble.com>, Melanie Garner <mgarner@lockslaw.com>, Edilaine Telles <etelles@lockslaw.com>, strainbas
<StrainBas@aol.com>, Coppage Clio <89a159048+matter1143891286@malldrop.clio.com>, "jon.singer@nelsonmullins.com"
<jon.singer@nelsonmullins.com>, "Matt Cairone (mcc@caironelawfirm.com)" <mcc@caironelawfirm.com>

Attached please find the Emergency Motion for Protective Order and Motion to Shorten Time, which are being
walked through to the duty judge in Baltimore City this afternoon.


Budow and
Noble, P.C.

Laura Basem Jacobs, Partner

Budow and Noble, P.C.

12300 Twinbrook Parkway, Suite 540

Rockville, MD 20852

T 301-654-0896 | F 301-907-9591

LJacobs@budownoble.com

www.budownoble.com

This electronic mail transmission contains confidential information belonging to Budow and Noble, P.C. (or its clients) that is intended solely for the recipient
named above. BUDOW and NOBLE, P.C. PRESERVES AND ASSERTS ALL PRIVILEGES AND IMMUNITIES APPLICABLE TO THIS TRANSMISSION. If you are not either the
intended recipient or an agent or employee of the intended recipient, this transmission was sent to you in error. Any review, examination, use, disclosure,
reproduction, or distribution of this transmission or the information herein stated by anyone other than the intended recipient is STRICTLY PROHIBITED. If you
have received this transmission in error, please notify the sender immediately by email and delete the original message. Thank you.

**From:** Laura Jacobs
**Sent:** Friday, November 30, 2018 1:25 PM
**To:** Carol Lippmann; EWeiss@murchisonlaw.com; adupont@lockslaw.com
**Cc:** jdecaro@decarodoran.com; ben.schuman@dlapiper.com; Steven Lucks; afishkin@FishkinLucks.com;
tjc@gdldlaw.com; mcc@caironelaw.com; sperry@reedsmith.com; Joseph.duffy@morganlewis.com;
Steven.luxton@morganlewis.com; john.wellschlager@dlapiper.com; Kyle.LeClere@btlaw.com; Thomas F. Stowe;
Melanie Garner; Edilaine Telles; strainbas; Coppage Clio; jon.singer@nelsonmullins.com; Matt Cairone
**Subject:** RE: James Coppage v. United States Steel Corp, et al., Circuit Court for Baltimore City, Case No. 24-C-18-
005920

11/30/2018                Locks Law Firm Mail - James Coppage v. United States Steel Corp, et al., Circuit Court for Baltimore City, Case No. 24-C-18-005920

Case 1:18-cv-03823-SAG   Document 1-2   Filed 12/11/18   Page 81 of 92

[Quoted text hidden]

**2 attachments**

MotiontoShortenTime(11-30-18).pdf
316K

EmergencyMotionforProtectiveOrder(11-30-18).pdf
2247K

EXHIBIT E

In the

CIRCUIT COURT FOR BALTIMORE CITY

JAMES COPPAGE
Plaintiff

vs.

Case Number: 24-C-18-005920 OT

PHILLIPS NORTH AMERICA, ET AL.
Defendant

## Affidavit of Service

The undersigned hereby certifies as follows:

1. That I am a competent individual over eighteen (18) years of age and not a party to the above action.

2. That on **11/13/18 12:14 PM**, I served *Writ, Complaint, Notice, Interrogatories* upon **Phillips North America** by sub-serving **CSC-Lawyers Incorporating Service. Erin Richardson** accepted on behalf of **CSC-Lawyers Incorporating Service**, description as follows:

| Race | Sex | Age | Hair | Height | Weight |
|------|-----|-----|------|--------|--------|
| Black | Female | 28 - 33 | Mixed | 5ft 3in - 5ft 5in | 151 - 165 lbs |

3. That service was effected at 7 St. Paul Street Suite 820 Baltimore, MD 21202.

4. That the facts upon which I concluded that the individual served is of suitable age and discretion are: personal observation and the recipient's statement.

I do solemnly declare and affirm under the penalties of perjury that the matters and facts set forth herein are true to the best of my knowledge, information and belief.

**Quratulain Shoukat**, Agent For
Monumental Process Servers Inc
823 MLK Jr Blvd
Baltimore, MD 21201
410-523-4980

Subscribed and sworn to before me this ___30th___ day of ___November___ 2018.

Notary Name:
My Comm. Expires: 9-21-22
1811120135046

DAWN L. BROWN
Notary Public
Baltimore County
Maryland
My Commission Expires Sept. 21, 2022

EXHIBIT F

**LOCKS** LAW FIRM

The Curtis Center
601 Walnut Street, Suite 720 East
170 S. Independence Mall West
Philadelphia, Pennsylvania 19106
T 215.893.0100
T 866.LOCKSLAW
F 215.893.3444
lockslaw.com

Andrew J. DuPont
Partner
Direct Dial: 215-893-3425
Fax: 215-893-3444
adupont@lockslaw.com
www.lockslaw.com

November 13, 2018

**VIA CERTIFIED MAIL-RETURN RECEIPT REQUESTED**
CM Tracking 70181130000143947540
T.H. Agriculture and Nutrition, LLC
f/k/a and/or Successor in Interest to
T.H. Agriculture and Nutrition, Inc. and
Thompson-Hayward Chemical Company
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

Re:    **James Coppage v. United States Steel Corporation, et al.**
        **Circuit Court for Baltimore City, State of Maryland**
        **Case No.**

Dear Sir/Madam:

Please be advised that T.H. Agriculture and Nutrition, LLC f/k/a and/or Successor in Interest to T.H. Agriculture and Nutrition, Inc. and Thompson-Hayward Chemical Company have been named as a Defendant in the above-captioned toxic exposure lawsuit. Enclosed for service upon you is the Civil Action Complaint, the Civil Action Amended Complaint, Plaintiff's Answers to Interrogatories Served in Advance of the Trial Preservation Deposition of James Coppage, and the Notice of Electronic Audio-Video Deposition for Trial Preservation.

An Answer to this Complaint must be filed within the time specified in the Writ of Summons. Kindly forward same immediately to your insurance carrier in order that an Answer may be filed on your behalf. If you fail to file an Answer within that period of time, a default judgment may be entered against you without further notice.

Very truly yours,

LOCKS LAW FIRM

Carol Lippmann
Paralegal to Andrew J. DuPont

AJD/cl
Enclosures

PHILADELPHIA, PA    NEW YORK, NY    CHERRY HILL, NJ    MEDIA, PA    ENGLEWOOD CLIFFS, NJ

CIRCUIT COURT FOR BALTIMORE CITY
Marilyn Bentley
Clerk of the Circuit Court
Courthouse East
111 North Calvert Street
Room 462
Baltimore, MD 21202-
(410)-333-3722, TTY for Deaf: (410)-333-4389

W R I T   O F   S U M M O N S   ( P r i v a t e   P r o c e s s )
Case Number: 24-C-18-005920 OT
C I V I L
James Coppage vs United States Steel Corporation, et al

STATE OF MARYLAND, BALTIMORE CITY, TO WIT:

To: T.H. AGRICULTURE AND NUTRITION, LLC
(FKA) T.H. Agriculture And Nutrition Inc.
(FKA) Thompson-Hayward Chemical Company
S/O Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

You are hereby summoned to file a written response by pleading or motion,
within 60  days after service of this summons upon you, in this court, to
the attached Complaint filed by:  James Coppage
7 White Spruce Court
Baltimore, MD 21234

WITNESS the Honorable Chief Judge of the Eighth Judicial Circuit of
Maryland

Date Issued:  11/08/18

Marilyn Bentley
Clerk of the Circuit Court Per

To the person summoned:

FAILURE TO FILE A RESPONSE WITHIN THE TIME ALLOTTED MAY RESULT IN A JUDGMENT
BY DEFAULT OR THE GRANTING OF THE RELIEF SOUGHT AGAINST YOU.

Personal attendance in court on the day named is NOT required.

EXHIBIT G

Robert Stallings
April 14, 2009

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

CAROLYN KELLY,                )
Individually and as          )
Personal Representative      )    08:CV-493
of the Estate of NEIL        )
KELLY, Deceased, and         )
SUSANNE MARIE KELLY and       )
NEIL PATRICK KELLY            )
                             )
VS.                          )
                             )
C&W PRESSROOM PRODUCTS,       )
INC.; CHEVRON USA,           )
INCORPORATED; FLINT INK      )
CORPORATION, HANDSCHY        )
INDUSTRIES, INC., SUN        )
CHEMICAL CORPORATION,        )
UNOCAL CORPORATION, US       )
INK CORPORATION              )
                             )


ORAL AND VIDEOTAPED DEPOSITION
OF ROBERT STALLINGS
APRIL 14, 2009


    ORAL DEPOSITION OF ROBERT STALLINGS, produced as a

witness at the instance of the Plaintiff and duly sworn,

was taken in the above styled and numbered cause on

April 14, 2009, from 8:45 a.m. to 12:27 p.m., before

KATERI A. FLOT-DAVIS, CSR, CCR in and for the State of

Robert Stallings
April 14, 2009

Page 2

1    Texas, reported by machine shorthand, at the offices of

2    Heard, Robins, Cloud & Lubel, LLP, 3800 Buffalo

3    Speedway, 5th Floor, Houston, Texas, pursuant to the

4    Federal Rules of Civil Procedure and the provisions

5    stated on the record herein.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Robert Stallings
April 14, 2009

Page 3

1                    A P P E A R A N C E S

2

   FOR THE PLAINTIFF:
3

4          HECTOR G. LONGORIA
           Heard Robins Cloud & Lubel, LLP
           3800 Buffalo Speedway
5          5th Floor
           Houston, Texas 77098

6

7

8  FOR THE DEFENDANT HANDSCHY INDUSTRIES:

9          RONALD L. LIPINSKI
           Seyfarth Shaw, LLP
10         131 South Dearborn Street
           Ste. 2400
11         Chicago, Illinois 60603-5577

12

   FOR THE DEFENDANT FLINT INK:
13

14         JAMES R. WETWISKA
           Akin Gump, LLP
15         1111 Louisiana Street
           44th Floor
           Houston, Texas 77002
16

17

   FOR THE DEFENDANT CHEVRON USA:
18

19         PATRICK M. PRIMAVERA
           Strong Pipkin Bissell & Ledyard, L.L.P.
20         1301 McKinney
           Ste. 2100
           Houston, Texas 77010
21

22

23

24

25

page_count

Robert Stallings
April 14, 2009

Page 4

```
 1

 2      FOR THE DEFENDANT SUN CHEMICAL CORPORATION:

 3          JAMI MEADOR
            Strasburger, LLP
 4          1401 McKinney Street
            Ste. 2200
 5          Houston, Texas 77010-4035

 6

 7

        FOR THE DEFENDANT C&W PRESSROOM PRODUCTS, INC.:
 8

 9          WILLIAM AKINS
            Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
10          5847 San Felipe
            Ste. 2300
11          Houston, Texas 77057-4033

12

13

14      Also Present:

15          STEVE SCHULLER
            CLS Legal Video
16

17

18

19

20

21

22

23

24

25
```

Robert Stallings
April 14, 2009

Page 5

1                        INDEX

2                                           PAGE

3

  Appearances................................  3
4

5

  ROBERT STALLINGS
6

7        Examination by Mr. Longoria............... 6,149

8        Examination by Ms. Meador................. 67

9        Examination by Mr. Wetwiska............... 94,147

10       Examination by Mr. Akins.................. 118,148

11       Examination by Mr. Primavera............. 136

12       Examination by Mr. Lipiniski............. 144

13

14

15  Signature and Changes......................... 150

16

  Reporter's Certificate........................ 153
17

18

19

20                     EXHIBITS

21  NO.  DESCRIPTION                         PAGE

22

23  1    Hanco Products Buyer's Guide............. 58

24

25  2    Handschy Chemical Corporation Manual...... 65

Stratos Legal Services
800-971-1127