Page 1

```
                                                1
 1        IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MARYLAND
 2                    - - -
 3   JAMES COPPAGE              :
              Plaintiff,        : Civil Action
 4       vs.                    : No.
                                : 1-18-cv-03823-
 5   UNITED STATES STEEL        : GLR
     CORPORATION, et al.,       :
 6                              :
              Defendants.       :
 7
 8                    - - -
 9            November 21, 2019
10                    - - -
11            Oral Deposition of ROBERT F.
12   HERRICK, Sc.D., CIH, FAIHA, taken pursuant
13   to Notice at Veritext-Boston, 101 Arch
14   Street, Suite 650, Boston, Massachusetts
15   02110, beginning at 9:09 a.m. before
16   Brigitte A. Strain, a Federally Approved
17   Registered Professional Reporter and Notary
18   Public.
19                    - - -
20
21
22
             VERITEXT LEGAL SOLUTIONS
23              NEW ENGLAND REGION
24
```

DEFENDANT'S EXHIBIT 3

Page 6

```
            6
 1       I N D E X
           - - -
 2
   Testimony of: ROBERT F. HERRICK, Sc.D, CIH,
 3     FAIHA
 4 By Mr. Cairone............. 8, 260
   By Ms. Prosser............. 72, 302
 5 By Mr. Roberts.............133
   By Mr. Fishkin.............141
 6 By Mr. Weiss...............178
   By Mr. Fitzpatrick.........184
 7 By Mr. Perry...............185
   BY Mr. Rising..............194, 273
 8 By Ms. Downie..............214, 297
   By Mr. DuPont..............235, 297, 309
 9
           - - -
10
       E X H I B I T S
11
           - - -
12
   EXHIBIT NUMBER   DESCRIPTION   PAGE MARKED
13
   Herrick 1   Expert Report of
14         Dr. Herrick         20
15 Herrick 2   Handwritten Notes
            Re conversation with
16          Mr. Southwarth      37
17 Herrick 3   Document headed,
            "Evidence of 50 percent
18          Benzene Solvent"    67
19 Herrick 4   Curriculum Vitae   75
20 Herrick 5   Dropbox documents  110
21
22
23
24
```

Page 7

```
            7
 1    DEPOSITION SUPPORT INDEX
 2 INSTRUCTION NOT TO ANSWER:
 3 Page Line
 4 None
 5
   REQUEST FOR PRODUCTION OF DOCUMENTS:
 6
   Page Line   Description
 7
   None
 8
 9 STIPULATIONS:
10 Page Line
11  8    1
12
   QUESTIONS MARKED:
13
   Page Line
14
   None
15
16
17
...
24
```

Page 8

ROBERT F. HERRICK, Sc.D., CIH, FAIH 8
1    (It is hereby stipulated and
2 agreed by and among counsel for the
3 respective parties that an objection
4 by one defendant shall inure to the
5 benefit of all defendants.)
6        - - -
7    ROBERT F. HERRICK, Sc.D., CIH,
8 FAIHA, after having been first duly
9 sworn, was examined and testified as
10 follows:
11       - - -
12       EXAMINATION
13       - - -
14 BY MR. CAIRONE:
15    Q.   Good morning, Dr. Herrick. How
16 are you?
17    A.   Fine, thank you.
18    Q.   I'm Matt Cairone. I represent
19 United States Steel Corporation.
20       Did you bring anything with
21 you today?
22    A.   Yeah, I have a couple of
23 documents, which we can -- Should I get them
24 right now?

Page 9

ROBERT F. HERRICK, Sc.D., CIH, FAIH 9
1    Q.   Well, let me ask you. What
2 are those documents?
3    A.   Well, one -- the main thing is
4 notes from a phone call I had with Mr.
5 Southworth, who was one of the co-workers.
6 And he answered some questions I had about
7 the solvent use.
8    Q.   Is that in your report?
9    A.   No.
10    Q.   Why not?
11    A.   Well, I just talked to him
12 yesterday.
13    Q.   And so we're here to depose
14 you today and you're now giving us new
15 information that we've not had any access
16 to?
17    A.   Well, it's actually -- He
18 confirmed things that are largely reflected
19 in the report. So it isn't as if there was
20 anything brand fresh and new that --
21    Q.   So, there are no new
22 underlying facts that you got from Mr.
23 Southworth?
24       MR. DuPONT: Objection, form.

3 (Pages 6 - 9)

**Page 10**
ROBERT F. HERRICK, Sc.D., CIH, FAIH

1 THE WITNESS: Well, he
2 confirmed some things that are in
3 there. I was trying to think -- It's
4 not exactly brand new. It really had
5 to do with -- He gave me some
6 information about the quantities of
7 some of the solvents that came in,
8 number of tank trucks per week and
9 things like that. So, there is a
10 little bit of new stuff in that
11 sense.
12 BY MR. CAIRONE:
13   Q.   Can we see those notes,
14 please?
15   A.   Sure.
16   Q.   We're going to have to get
17 copies of this made, and we'll have to
18 probably ask you about this after a break.
19 Okay?
20   A.   Sure.
21   Q.   Is there anything in addition
22 to these notes that you brought today that
23 we haven't already been provided?
24   A.   This is information -- I was

**Page 11**
ROBERT F. HERRICK, Sc.D., CIH, FAIH

1 just trying to kind of harvest information
2 from Stallings where he talked about the --
3 his recollection of different solvents that
4 were used, in line of trying to see what the
5 evidence was about this issue of how much
6 benzene was in the materials.
7   Q.   So why are you doing these
8 things now, between the time of your report
9 and this deposition?
10   A.   Well, I just -- you know, as
11 I've been trying to prepare for it, you
12 know, it occurred to me that, you know,
13 these are the kinds of questions that were
14 very likely to come into play. So I was
15 trying to come up with, you know -- so I had
16 better answers because I didn't directly
17 address them in my report.
18   Q.   Well, the benzene content of
19 any product Mr. Coppage allegedly used was
20 critical to your report. Right?
21       MR. DuPONT: Objection, form.
22       THE WITNESS: Well, it was,
23 Yeah.
24 BY MR. CAIRONE:

**Page 12**
ROBERT F. HERRICK, Sc.D., CIH, FAIH

1   Q.   And you didn't bother to do
2 this work until after you wrote your report?
3       MR. DuPONT: Objection, form.
4       THE WITNESS: Well, I was
5 trying to clarify. You know, as I'm
6 sitting, trying to get ready for
7 questions like I expect to hear from
8 you guys today, you know, there were
9 some things that I didn't anticipate
10 when I wrote the report back last
11 May, I guess it was.
12 BY MR. CAIRONE:
13   Q.   And what caused you to
14 anticipate them after you wrote your report?
15   A.   Well, part of it is, I've had
16 a couple of these depositions already. You
17 know, at the time I wrote the report, I
18 hadn't had any depositions on any of the
19 benzene cases. And so I really couldn't
20 anticipate, you know, what some of the
21 questions might be. But since I've been
22 through a couple of these, I have a better
23 sense of what you're interested in asking
24 about.

**Page 13**
ROBERT F. HERRICK, Sc.D., CIH, FAIH

1   Q.   What questions did you
2 anticipate being asked today that you
3 thought you needed to cover with this
4 additional work?
5   A.   Well, part of it had to do
6 with -- you know, obviously, as you
7 mentioned, the benzene content is pretty
8 critical. And so in terms of, you know,
9 Coppage not really remembering anything
10 about the brands, or the names, or the
11 labels, or anything on the products, you
12 know, I turned more to Stallings to see, you
13 know, what sort of information he had
14 provided.
15       And so, you know, along these
16 lines, I tried to harvest this information
17 that might shed some light on, you know,
18 especially the product that he identified as
19 Hanco, what the likelihood was that it
20 actually was a benzene-containing material.
21   Q.   But see, I'm confused. So
22 just help me with this. You've relied on Mr.
23 Stallings when you wrote your original
24 report, and you relied on him for the

Page 14
ROBERT F. HERRICK, Sc.D., CIH, FAIH
1 benzene content of all solvents used prior
2 to 1977. Right?
3        MR. DuPONT: Objection, form.
4    It misstates what's in his report.
5        MR. CAIRONE: Well, we can
6    look at his report. I think it states
7    it perfectly.
8        MR. DuPONT: Your opinion of
9    what it does or does not state
10   perfectly is irrelevant to these
11   proceedings.
12       MR. CAIRONE: The report will
13   speak for itself.
14 BY MR. CAIRONE:
15   Q.   You can answer my question.
16   A.   Well, just to try to speak
17 directly to the question, it's something I
18 was trying to anticipate when questions like
19 this came, what's the best answer I could
20 provide. And then there was information that
21 I didn't incorporate in the report that I
22 think, you know, is relevant to giving you
23 guys the best possible answer.
24   Q.   Well, what new information did

Page 15
ROBERT F. HERRICK, Sc.D., CIH, FAIH
1 you harvest?
2    A.   Well, some of it had to do
3 with things like, you know, in looking at
4 the product called Hanco, you know, which he
5 had in the 55-gallon drum, which of the
6 Hanco products, you know, are actually in
7 55-gallon drums and what are they actually
8 used for. Because, as he, you know,
9 recalled, this was kind of a general purpose
10 solvent that they used for all kinds of
11 applications. And as I was looking at the
12 range of Hanco products, you know, it's
13 pretty clear that there are a lot of things
14 that are much more specialized for very
15 particular uses, which would lead me to
16 believe that those other products were
17 likely not to be the material that he was
18 recalling use.
19   Q.   Do you have these notes?
20   A.   Yeah, they're right here.
21   Q.   Can I have those, please?
22   A.   Sure. Also, you'll see on
23 here, the other thing I tried to do was --
24 You'll see one of my tables from the report.

Page 16
ROBERT F. HERRICK, Sc.D., CIH, FAIH
1 And I just tried to match up what we knew
2 about where Stallings had actually worked
3 and during what time periods, so I could
4 track, you know, his recollections in terms
5 of times when he was actually in the same
6 place as Mr. Coppage.
7    Q.   Well, we're going to have to
8 make copies of these because this is all new
9 information. There's some very --
10       MR. DuPONT: Well, it's
11   information that's in the deposition
12   of Mr. Stallings.
13       MR. CAIRONE: Well, we'll get
14   into that. I think there's some
15   information here that's inaccurate
16   characterization of what's in the
17   deposition.
18 BY MR. CAIRONE:
19   Q.   But the fact that you did this
20 between the time of your report and today
21 significantly hampers our ability to ask you
22 questions about a very significant component
23 of your report, the benzene content of the
24 solvents that were used. So that's going to

Page 17
ROBERT F. HERRICK, Sc.D., CIH, FAIH
1 be a real problem. And we may have to
2 reserve the right to depose you again,
3 depending on how this goes. But we have to
4 make copies of this later. Okay?
5    A.   Uh-huh.
6        MR. FISHKIN: Is any of this
7    material contained in the Dropbox
8    that was provided to us a few minutes
9    before the deposition started?
10       MR. DuPONT: No, I don't have
11   it in electronic format.
12       MS. PROSSER: No.
13       MR. FISHKIN: I'm sorry?
14       MR. DuPONT: I said, no, I do
15   not have it in electronic format.
16 BY MR. CAIRONE:
17   Q.   Okay. Let's try to establish
18 --
19       MR. FISHKIN: How many pages
20   of notes are there?
21       MR. CAIRONE: There's three --
22   four, including the handwritten
23   notes.
24       MR. FISHKIN: Okay. Thank

5 (Pages 14 - 17)

Page 22

ROBERT F. HERRICK, Sc.D., CIH, FAIH

1  Q.  I know he worked beyond that,
2  but I'm going to leave that for other folks
3  to ask you about. I think you've already
4  said it in our discussion about the new
5  information that you provided this morning,
6  that Mr. Coppage said he used a solvent for
7  cleaning purposes at all three of the sites
8  that we just mentioned, but he never
9  identified that solvent by name; correct?
10     A.  That is correct. Right.
11     Q.  So, he never identified the
12  solvent that he used by chemical name.
13  Correct?
14     A.  My recollection from his
15  deposition was that he just said he couldn't
16  remember.
17     Q.  So, he didn't remember
18  anything about it, other than it was a
19  solvent?
20         MR. DuPONT: Objection, form.
21         THE WITNESS: Well, I think
22     that's probably fair. Yeah.
23  BY MR. CAIRONE:
24     Q.  Just for the record, he didn't

Page 23

ROBERT F. HERRICK, Sc.D., CIH, FAIH

1  identify it by chemical name. Right?
2     A.  Right.
3     Q.  He didn't identify it by
4  product name. Right?
5     A.  Right.
6     Q.  He didn't identify it by brand
7  name. Right?
8     A.  Right.
9     Q.  Now, what he did say was that
10  it was clear. Do you remember that?
11     A.  I do.
12     Q.  You didn't mention that in
13  your report, did you?
14     A.  It doesn't ring a bell. I
15  don't think I said anything about -- I don't
16  think I addressed that. No.
17     Q.  Now, you relied on the
18  deposition of a Mr. Stallings; right?
19     A.  I did.
20     Q.  Mr. Stallings worked as a
21  junior pressman at the News-American from
22  1956 to 1961; correct?
23     A.  I think that's what I tried to
24  capture in that additional table I just --

Page 24

ROBERT F. HERRICK, Sc.D., CIH, FAIH

1  It's the column I added on the far right
2  side of the table under Stallings.
3     Q.  So, in this document you just
4  gave me, it says that he started in the
5  pressroom at the News-American in 1956, and
6  he became an apprentice in 1961. So, what I
7  just asked you, that's correct. Right?
8     A.  I think that's right. Yeah.
9     Q.  And then Mr. Stallings worked
10  as an apprentice from either 1961 to 1966 or
11  '67, rotating among the Baltimore Sun, the
12  News-American and Alco-Gravure just like Mr.
13  Stallings did during a slightly different
14  time period. Right?
15         MR. DuPONT: Objection, form.
16         THE WITNESS: I think that's
17     right. Yeah.
18  BY MR. CAIRONE:
19     Q.  And then Mr. Stallings worked
20  as a journeyman pressman from 1966 or 1967
21  to about 1986 at the News-American. Right?
22     A.  I think that's right. Yeah.
23     Q.  And then Mr. Stallings worked
24  as a journeyman pressman at the Baltimore

Page 25

ROBERT F. HERRICK, Sc.D., CIH, FAIH

1  Sun from 1986 to 2002; correct?
2     A.  I think that's right. Yeah.
3     Q.  By my calculation, the only
4  overlap where Mr. Coppage and Mr. Stallings
5  actually worked in the same rotation was
6  1965 to either '66 or '67. Is that fair?
7     A.  Is that his rotation as an
8  apprentice? Is that --
9     Q.  Well, I'm asking you. I just
10  want to make sure we --
11     A.  Okay. Can I see my little
12  table?
13     Q.  Yes.
14     A.  That's the way I tried to put
15  this together. Thanks. Yeah, he was at the
16  News-American, but that was before Mr.
17  Coppage was there. And so -- yeah, I think
18  I would agree that most of his direct
19  overlap time was during this time when he
20  was the journeyman on call. He was at the
21  News-American, and he was at the Sun. He was
22  also at Alco-Gravure during that period.
23     Q.  Well, you say direct overlap,
24  but they were both -- During this short time

7 (Pages 22 - 25)

Page 26
ROBERT F. HERRICK, Sc.D., CIH, FAIH26
1 period when they were rotating, they were
2 rotating among three different places;
3 right?
4     A.    Uh-huh. Yes.
5     Q.    Are you aware of any evidence
6 that they were ever in the same location at
7 the same time?
8     A.    Yeah, I don't remember if
9 either one of them were asked that. I guess
10 I don't --
11    Q.    Well, if they weren't asked ,
12 there's no evidence of it. Right?
13         MR. DuPONT: Objection, form.
14 BY MR. CAIRONE:
15    Q.    Let me ask it again.  Do you
16 have any evidence to support that Mr.
17 Coppage and Mr. Stallings were at the same
18 location at any time?
19    A.    Simultaneously.
20    Q.    Working at the same place at
21 the same time?
22    A.    I don't see that directly in
23 the record, no.
24    Q.    And you would agree with me

Page 27
ROBERT F. HERRICK, Sc.D., CIH, FAIH27
1 that in Mr. Stallings' deposition, Mr.
2 Coppage is never mentioned?
3     A.    I don't have an encyclopedic
4 recollection of Stallings' deposition.  I
5 don't remember if he was asked even.
6     Q.    Well, don't you think that if
7 he were mentioned in Mr. Stallings'
8 deposition, you would have put it in your
9 report?
10    A.    I don't know. Possibly.
11    Q.    But, as you sit here today,
12 you don't have any recollection of Mr.
13 Coppage being mentioned by Mr. Stallings?
14    A.    No, I don't.
15    Q.    Now, we'll have to get back to
16 this after I have the time to review the new
17 notes. But, based on the information in
18 your current report, you say that Mr.
19 Stallings identified the use of three
20 different general purpose cleaning solvents
21 at the Baltimore Sun and the News-American.
22 Right?
23    A.    Right.
24    Q.    And he identified three

Page 28
ROBERT F. HERRICK, Sc.D., CIH, FAIH28
1 different companies associated with those
2 solvents; right?
3     A.    That's right. I'm just looking
4 to where I mentioned that in here.
5     Q.    Before we move on with that,
6 let me just make sure I clarify one thing
7 for the record. Can you look at your report
8 on page two?
9     A.    Uh-huh. Yep.
10    Q.    Mr. Coppage did work at two
11 locations in here, the Boone Press, Inc.,
12 and the Twentieth Century Printing Company.
13 Do you see those?
14    A.    I do see those, yes.
15    Q.    But, as you said in your
16 report, the evidence is that he used no
17 solvents or chemicals there; right?
18         MR. DuPONT: Objection, form.
19         THE WITNESS: I don't remember.
20    What I remember was that they -- you
21    know, I tried to see how much time he
22    actually spent there. And there was
23    really very little information.
24         And looking at his IRS

Page 29
ROBERT F. HERRICK, Sc.D., CIH, FAIH29
1    information, you know, he -- he
2    received very small amounts of money
3    from those two. And so I didn't
4    really see anything in the record.
5         Oh, here we go.  So at
6    Twentieth Century, he reported that
7    he didn't use any solvents there. And
8    you're right.  At Boone Press, in his
9    deposition, he didn't recall using
10   solvents there either.
11 BY MR. CAIRONE:
12    Q.    Right. You put that in your
13 report.
14    A.    Yeah, I just needed to find
15 it.
16    Q.    So, he did not use any
17 solvents or chemicals at those two
18 locations.  Correct?
19    A.    That was what he -- Those were
20 his words. Yeah, that's what he stated.
21    Q.    Do you have any other evidence
22 that he did?
23    A.    No. There really wasn't a lot
24 of information, you know, in the record

8 (Pages 26 - 29)

```
                                                              Page 30                                                                Page 32
            ROBERT F. HERRICK, Sc.D., CIH, FAIH30                          ROBERT F. HERRICK, Sc.D., CIH, FAIH32
 1  about what he did in these two places.                       1     A.    Well, he talked a lot about
 2     Q.    When you calculated the                             2  how he used it. Is that kind of what you're
 3  exposure assessment, did you take into                       3  --
 4  account the locations?                                       4     Q.    So, it's your testimony that
 5     A.    No, I didn't.                                       5  Mr. Stallings testified about how he used a
 6     Q.    That's all I was trying to                          6  U.S. Printing ink solvent?
 7  clarify.                                                     7     A.    Well, I'd have to go back and
 8     A.    Okay.                                               8  look more carefully in his deposition. I
 9     Q.    So, getting back to where we                        9  don't remember if he talked about the
10  were, Mr. Stallings identified a general                    10  product use on a product specific basis.
11  purpose cleaning solvent, and he identified                 11     Q.    Now, Mr. Stallings was deposed
12  three companies. Correct?                                   12  in -- not this case. You know that, right?
13     A.    Yeah, I'm just trying to --                        13     A.    I do. Yeah.
14  yes, that's right.                                          14     Q.    Do you know what the product,
15     Q.    And those three companies were                     15  at issue was in the case he was deposed?
16  U.S. Printing Inks, Sun Chemicals and Hanco;                16     A.    I don't.
17  correct?                                                    17     Q.    Do you know whether a U.S.
18     A.    Right. That's what he said.                        18  Printing solvent was at issue in that case?
19     Q.    And he also said that at the                       19     A.    I don't know much about that
20  Baltimore Sun, he used the U.S. Printing and                20  case. No.
21  Sun Chemical solvent about 60 percent of the                21     Q.    Do you know if a Sun Chemical
22  time and the Hanco about 40 percent of the                  22  solvent was at issue in that case?
23  time. Do you remember that?                                 23     A.    I don't.
24     A.    Yeah. I'm just looking at --                       24     Q.    Do you recall, as you sit here

                                                              Page 31                                                                Page 33
            ROBERT F. HERRICK, Sc.D., CIH, FAIH31                          ROBERT F. HERRICK, Sc.D., CIH, FAIH33
 1  Yes, I do remember that. Right.                              1  today, Mr. Stallings ever mentioning a U.S.
 2     Q.    And Mr. Stallings said at                           2  Printing ink product in his deposition?
 3  News-American he used the U.S. Printing and                  3     A.    You know, I have to say, I'm
 4  the Sun Chemical solvent about 70 to 75                      4  not -- I don't recall that much about his
 5  percent of the time, and the Hanco about 25                  5  deposition to give you a really good answer
 6  to 30 percent of the time. Do you remember                   6  to that.
 7  that?                                                        7     Q.    Same question on Sun Chemical.
 8     A.    I do. That sounds familiar.                         8  As you sit here today, do you recall him
 9  Yep.                                                         9  ever mentioning a Sun Chemical solvent in
10     Q.    Now, Mr. Stallings, in his                         10  his deposition?
11  deposition, said he could not identify the                  11     A.    I don't.
12  solvent by name or product number. Is that                  12         MR. DuPONT: Objection, form.
13  correct?                                                    13  BY MR. CAIRONE:
14     A.    I believe that is what he                          14     Q.    Now, on page 16 of your
15  said. Yeah.                                                 15  report -- I'll let you go there -- Mr.
16     Q.    And did Mr. Stallings talk at                      16  Stallings said that the solvents that he
17  all about the U.S. Printing or Sun Chemical                 17  used were always clear.
18  solvent in his deposition?                                  18     A.    I see that. Yep.
19         MR. DuPONT: Objection, form.                         19     Q.    And, as we've already
20         THE WITNESS: Help me                                 20  established, Mr. Coppage also said the
21  understand. When you say talk about,                        21  solvent he used was always clear, but you
22  I mean, he talks about --                                   22  didn't put that in your report. Right?
23  BY MR. CAIRONE:                                             23     A.    Apparently not, no.
24     Q.    Did he say anything about it?                      24     Q.    Now, can we also agree that
```

Page 34
ROBERT F. HERRICK, Sc.D., CIH, FAIH 34

1 even according to Mr. Stallings' deposition,
2 there was no Hanco product used at
3 Alco-Gravure?
4     MR. DuPONT: I think you made
5     a misrepresentation about what's in
6     his report. So I'll make an objection
7     to that for the record.
8     THE WITNESS: Could you repeat
9     that one? I just want to make sure I
10     understood the --
11 BY MR. CAIRONE:
12   Q. Yes. I'm saying there was no
13 Hanco product used at Alco-Gravure. The
14 product that was identified was toluene.
15   A. That was -- I remember that
16 Stallings mentioned toluene; right.
17   Q. Did he mention Hanco at
18 Alco-Gravure?
19   A. Let's see.
20   Q. Take your time.
21   A. Sure.
22     No, I don't remember that he
23 did.
24   Q. And you would agree with me

Page 35
ROBERT F. HERRICK, Sc.D., CIH, FAIH 35

1 that both Mr. Coppage and Mr. Stallings said
2 the printing process at Alco-Gravure was
3 entirely different from the one at the
4 Baltimore Sun or the News-American; right?
5   A. Well, they did say it was
6 different, especially the cleaning processes
7 particularly.
8   Q. And the printing process;
9 right?
10   A. It is different. Sure.
11   Q. One is rotogravure; right?
12   A. Right.
13   Q. Now I want to focus on the
14 1960 to 1969 time period. Okay?
15   A. Okay.
16   Q. Now, Mr. Coppage, during that
17 particular time period, could not identify
18 the solvent he used, but he said it was
19 clear. Correct?
20     MR. DuPONT: Objection, form.
21     THE WITNESS: I just want to
22     double check. So this is before he
23     went to Alco; right?
24 BY MR. CAIRONE:

Page 36
ROBERT F. HERRICK, Sc.D., CIH, FAIH 36

1   Q. Yes.
2   A. Right. Correct.
3   Q. And Mr. Stallings identified
4 three solvents that he says they used at
5 Baltimore Sun and News-American; correct?
6   A. I think that is correct. Yeah.
7   Q. Mr. Stallings did not identify
8 any of those solvents by product name.
9 Correct? Well, I'm sorry, by the exact
10 product name.
11   A. He didn't. He mentioned what
12 he thought was the manufacturer, not the
13 product name.
14   Q. Okay. And he could not, and
15 he did not identify the product number of
16 any Hanco solvent. Right?
17     MR. DuPONT: Compound.
18 BY MR. CAIRONE:
19   Q. Let me address that.
20   A. Sure.
21   Q. Good objection. I'll break it
22 down.
23     He did not identify the
24 product number of any Hanco product.

Page 37
ROBERT F. HERRICK, Sc.D., CIH, FAIH 37

1 Correct?
2   A. That's correct.
3   Q. And he said he could not
4 identify any product number of any Hanco
5 product, correct?
6   A. That's correct.
7   Q. At this point, I was going to
8 go into your exposure assessment, but why
9 don't we take a break so we can get these
10 copied, and we can all take a look at them.
11 That's probably going to take at least 15
12 minutes. Okay?
13   A. Okay.
14   Q. We're going to take a 15
15 minute break. I guess we could try to e-mail
16 these folks, but I'm not sure how that's
17 going to work.
18     (Discussion held off the
19     record.)
20     (Whereupon there was a recess
21     in the proceeding from 9:34 a.m. to
22     9:43 a.m.)
23     - - -
24     (Whereupon the document was

Page 42

ROBERT F. HERRICK, Sc.D., CIH, FAIH 42

1 to doing this report. And, you know, in my
2 discussions with Andrew, you know, I
3 expressed that, you know, I hadn't really
4 put as much emphasis on identifying these
5 sources as, you know, you guys were going to
6 be asking about.
7      Q.   So, these are your handwritten
8 notes, and I think I can read most of them,
9 but as far as I can see, nothing on this
10 handwritten note says anything about Hanco.
11 Is that right?
12     A.   Hanco's not mentioned, no.
13     Q.   Did you ask Mr. Southworth
14 about Hanco?
15     A.   No. I was really focused more
16 on the source of the toluene and the
17 lactane.
18     Q.   So, did you discuss with Mr.
19 Southworth anything about the period of when
20 Mr. Coppage worked, from 1960 to 1969?
21          MR. DuPONT: Objection, form.
22          THE WITNESS: Let's see.
23          That's when he was --
24 BY MR. CAIRONE:

Page 43

ROBERT F. HERRICK, Sc.D., CIH, FAIH 43

1      Q.   He was at the News-American
2 and the Baltimore Sun.
3      A.   Right. No, this was more
4 focused on his time at the Alco group here.
5      Q.   So, I mean, I don't want to
6 waste time on it. There's nothing in your
7 conversation with Mr. Southworth that gave
8 you any more information about any use of
9 the Hanco solvent at any workplace where Mr.
10 Coppage was; is that right?
11     A.   That's right.
12     Q.   Okay. I'm going to save this
13 one. Let's move on.
14          Now, in the report that you
15 issued in this case, you evaluated your
16 exposure assessment for the solvents used by
17 Mr. Coppage using the near-field/far-field
18 model. Is that right?
19     A.   That's correct. Yep.
20     Q.   And you would agree with me
21 that an important part of the use of that
22 model is the benzene emission rate. Right?
23     A.   It is, yes.
24     Q.   And in order to do the benzene

Page 44

ROBERT F. HERRICK, Sc.D., CIH, FAIH 44

1 emission rate, it's important to know the
2 benzene content of the product. Right?
3      A.   That's correct, yes.
4      Q.   And we've already established,
5 I think -- and you tell me if I'm wrong
6 because I'm not trying to state your
7 testimony. Okay? I'm just trying to ask you
8 questions. You could not have relied on Mr.
9 Coppage's testimony to determine the benzene
10 content of the solvent he used because he
11 never identified it. Is that right?
12     A.   Right. I didn't have that
13 information from Coppage.
14     Q.   So, based on your report, as I
15 understand it, you relied on another
16 deposition taken of a Mr. Graham; is that
17 right?
18     A.   That's correct, yeah.
19     Q.   And you used that deposition
20 to arrive at your assumption that the
21 benzene content of the solvent used at the
22 Baltimore Sun and the News-American for the
23 period 1960 to 1969 contained 50 percent
24 benzene. Right?

Page 45

ROBERT F. HERRICK, Sc.D., CIH, FAIH 45

1      A.   That's right.
2      Q.   And, according to the
3 footnotes in your report -- and I think this
4 is on page 25 if you want to go to it -- you
5 used page 254 of Mr. Graham's deposition for
6 the basis of the assumption that the solvent
7 contained 50 percent benzene. Is that right?
8      A.   That's what I said, yes.
9      Q.   Do you have Mr. Graham's
10 deposition with you?
11     A.   No, I don't.
12     Q.   Well, I've only got one copy,
13 but I'll read it to you and I'll do the best
14 I can to get it right. And if you'd like,
15 you can look at it. Okay?
16          So on page 254 of Mr. Graham's
17 deposition --
18          MR. DuPONT: Which line?
19          MR. CAIRONE: Well, I'm not
20     sure what I'm going to do yet. Do you
21     have it?
22 BY MR. CAIRONE:
23     Q.   Lines 10 through 16. The
24 question is:

Page 50

ROBERT F. HERRICK, Sc.D., CIH, FAIH50

1 your assumption that Mr. Coppage's use of
2 solvents prior to 1977 was solvents that
3 contained 50 percent benzene?
4    A.   Well, it's consistent with
5 what was going on in the practice of
6 printing during that time period, that
7 benzene-containing solvents were used for
8 this general purpose cleaning.
9    Q.   Do you know that Hanco had
10 multiple products for use with printing
11 presses and cleaning?
12   A.   I do.
13   Q.   Why did you choose this one?
14 Mr. Graham was not talking about Mr.
15 Coppage.
16   A.   No, I understand that part. I
17 was using this because I thought this was a
18 good representation of a general purpose
19 product. And I realized that Hanco has a
20 lot of other products, a lot of which have
21 more specialized applications.
22   Q.   What do you think MS-408 is
23 used for?
24   A.   My assumption here was that it

Page 51

ROBERT F. HERRICK, Sc.D., CIH, FAIH51

1 was general purpose cleaning.
2    Q.   And if that assumption is
3 wrong, then the basis for this 50 percent
4 benzene is wrong.
5         MR. DuPONT: Objection, form.
6         THE WITNESS: Well, I'd have
7    to look. I mean, it's possible that
8    if there's a different number, it
9    would have, you know, resulted in a
10   different calculation.
11 BY MR. CAIRONE:
12   Q.   Please answer my question,
13 Doctor. You just said that you assumed this
14 was a general purpose cleaner. Right?
15   A.   Right.
16   Q.   If that assumption is wrong,
17 then your use of this product as the basis
18 of your assumption of the benzene content is
19 wrong.
20   A.   It would require a different
21 value if the benzene content was different,
22 yeah.
23   Q.   And if it requires a different
24 value, it's wrong.

Page 52

ROBERT F. HERRICK, Sc.D., CIH, FAIH52

1         MR. DuPONT: Objection, form.
2         THE WITNESS: Okay. I could
3    recalculate it. It would give us a
4    different answer.
5 BY MR. CAIRONE:
6    Q.   Right. I think that's an
7 answer, although not clear.
8         Now, what I want to show you,
9 though is, just above the passage of this
10 deposition that you use for your assumption,
11 just above it, it says -- I'm sorry, not
12 just above it, but it's on page 244, which
13 isn't far above it.
14        Now, we're talking about
15 MS-408. Okay? Are you with me?
16   A.   Yep.
17   Q.   Line 22, page 244.
18        "In any event, it's your
19 understanding, based on looking at the
20 documents, that Hancolite, which was MS-408,
21 would have been purple in color during the
22 '60s and '70s and early '80s. Correct?"
23        Answer: "Violet, purple.
24 However, yes, it was shaded."

Page 53

ROBERT F. HERRICK, Sc.D., CIH, FAIH53

1    Why didn't you put that in
2 your report?
3    A.   Well, it was mainly focused on
4 the benzene content and I didn't know, you
5 know, that that information really added
6 anything.
7    Q.   We just established that both
8 Mr. Stallings and Mr. Coppage said the
9 solvent they used was always clear.
10        MR. DuPONT: Objection, form.
11 BY MR. CAIRONE:
12   Q.   Didn't we?
13   A.   I remember that conversation,
14 yeah.
15   Q.   Is it your testimony really,
16 Dr. Herrick, that the fact that MS-408 was
17 purple is not relevant?
18   A.   Well, it didn't really factor
19 into my calculations around the benzene
20 content, no.
21   Q.   Okay. Your benzene content
22 was based on an assumption that Mr. Coppage
23 used MS-408. Right?
24   A.   That's correct, yeah.

14 (Pages 50 - 53)

Page 54

ROBERT F. HERRICK, Sc.D., CIH, FAIH 54

1  Q.  Mr. Coppage said he used a
2  clear solvent; right?
3  A.  He did.
4  Q.  According to Mr. Graham, who
5  you rely on, MS-408 was purple.
6  A.  I understand that.
7  Q.  And that's of no consequence
8  to you?
9  A.  Well, no. I mean, the
10 distinction -- I get the distinction.
11 Q.  What's the distinction?
12 A.  Well, there's a discontinuity
13 between Mr. Coppage's recollection and what
14 Mr. Graham testified to. I guess I would
15 just say, you know, in terms of talking to
16 someone like Coppage, asking him about a
17 product he used, what, 40 years ago, I guess
18 I'm not completely shocked that, you know,
19 there could be information that either he
20 didn't recall correctly or he just
21 misstated.
22 Q.  So you just assumed Mr.
23 Coppage was wrong. He got it wrong.
24    MR. DuPONT: Objection.

Page 55

ROBERT F. HERRICK, Sc.D., CIH, FAIH 55

1     THE WITNESS: No, I didn't
2     really make any assumption, you know,
3     other than trying to, you know, use
4     the best available information.
5  BY MR. CAIRONE:
6  Q.  What is better available
7  information than the testimony of the
8  plaintiff and his co-worker?
9  A.  I'm not trying to suggest it's
10 not good information. I'm just pointing out,
11 you know, that he's being asked about
12 details of products that he used in the
13 distant past.
14 Q.  Well, then maybe Mr. Stallings
15 doesn't remember what they used either.
16    MR. DuPONT: Objection, form.
17    Misstates testimony.
18 BY MR. CAIRONE:
19 Q.  You can't have it both ways.
20    MR. DuPONT: Now you're
21    arguing.
22    THE WITNESS: You know, I --
23    over the years, when I've, you know,
24    done a lot of these worker

Page 56

ROBERT F. HERRICK, Sc.D., CIH, FAIH 56

1  interviews, you know, my impression
2  has always been that people are much
3  better at recalling what they did
4  than particular details, like, you
5  know, the size of the room they were
6  in, or the height of the ceiling or
7  something like that. And so, you
8  know, when I read these depositions
9  and look at this information, I try
10 to keep that in mind.
11 BY MR. CAIRONE:
12 Q.  And let's be clear. Mr.
13 Stallings also said the solvent was always
14 clear. Right?
15 A.  Yes.
16 Q.  So you have the only two fact
17 witnesses, that I'm aware of, that could
18 identify the color of the solvent, and they
19 both said it was clear. Right?
20 A.  They did.
21 Q.  And we now established that
22 MS-408 Hancolite Glaze Cleaner is purple.
23 Right?
24    MR. DuPONT: Objection, form.

Page 57

ROBERT F. HERRICK, Sc.D., CIH, FAIH 57

1     THE WITNESS: That's what
2     Graham said, yeah.
3  BY MR. CAIRONE:
4  Q.  Okay. Well, in fact, on page
5  210 of Mr. Graham's deposition, he testified
6  specifically, in response to questions asked
7  by MR. DuPONT, that the formula for
8  Hancolite MS-408 called for the addition of
9  a dye. Did you read that?
10 A.  Uh-huh.
11 Q.  No reaction to that?
12 A.  No. I mean, I remember seeing
13 this information and, you know, I recognize
14 that there's some discordance between that
15 information and what Stallings and Coppage
16 recalled.
17 Q.  Tell me what you mean by some
18 discordance.
19 A.  Well, I just -- you know,
20 again, not to be redundant, but that -- you
21 know, I'm not completely surprised that, you
22 know, someone might not necessarily have a,
23 you know, detailed recall of the color of a
24 solvent that he used 40 years ago.

15 (Pages 54 - 57)

Page 58
ROBERT F. HERRICK, Sc.D., CIH, FAIH 58
1   Q. And as an expert witness in
2 this case, do you view it as your job to
3 render your opinion based on the facts of
4 record?
5       MR. DuPONT: Objection, form.
6       THE WITNESS: Yeah.
7 BY MR. CAIRONE:
8   Q. So where is the fact of record
9 that Mr. Coppage used a purple solvent?
10       MR. DuPONT: Objection, form.
11       THE WITNESS: In describing
12   the solvent he used, he didn't
13   mention it as being purple.
14 BY MR. CAIRONE:
15   Q. Where in the record is there
16 any evidence of Mr. Coppage using a purple
17 solvent?
18   A. There isn't any. He didn't
19 bring it up.
20   Q. Not the fact that he didn't
21 bring it up. Where in the record is there
22 any evidence of Mr. Coppage using a purple
23 solvent?
24       MR. DuPONT: Objection, form.

Page 59
ROBERT F. HERRICK, Sc.D., CIH, FAIH 59
1       THE WITNESS: There isn't any.
2 BY MR. CAIRONE:
3   Q. So in your exposure assessment
4 for the solvents, just so we're clear, you
5 did use the assumption that all of the
6 solvents Mr. Coppage used at the Baltimore
7 Sun and the News-American contained 50
8 percent benzene. Right?
9   A. This is in the pre-1977 time
10 period we're talking about?
11   Q. Yes.
12   A. Yeah. Well, particularly the
13 solvent that he used for the press cleaning
14 steps. That's what he was asked about.
15   Q. Well, when you made your
16 exposure assessment for solvent usage prior
17 to 1977, did you always use the assumption
18 that the solvent contains 50 percent
19 benzene?
20   A. For this particular set of
21 cleaning tasks that he did, you know, the
22 cleaning at the end of the day, the cleaning
23 for the ink buckets, and then the
24 semi-annual, you know, sort of general press

Page 60
ROBERT F. HERRICK, Sc.D., CIH, FAIH 60
1 cleaning, that was the assumption they made.
2 Yeah.
3   Q. What's the benzene content of
4 the U.S. Printing Ink solvent that Mr.
5 Coppage used?
6   A. You know, I don't recall
7 seeing that anywhere in the record.
8   Q. So there's no fact in the
9 record to establish what the benzene content
10 was of the U.S. Printing Ink solvent. Is
11 that right?
12   A. I didn't see it and I didn't
13 directly use that information in the
14 exposure assessment.
15   Q. But Mr. Stallings said they
16 used the U.S. Printing Ink solvent and the
17 Sun Chemical solvent more often than they
18 used Hanco.
19   A. I'm sorry. I think I lost the
20 train there. Are we talking about the
21 solvents or the inks?
22   Q. We're only talking about
23 solvents with me. I want to be clear about
24 that. Okay?

Page 61
ROBERT F. HERRICK, Sc.D., CIH, FAIH 61
1   A. Sure. Okay.
2   Q. And I'm only talking about
3 solvents prior to 1977. Okay?
4   A. Got you.
5   Q. Now, you just said you don't
6 know the benzene content of the U.S.
7 Printing Ink solvent. Correct?
8   A. I'm sorry, I misunderstood
9 your question. I thought you were referring
10 to the ink itself, not the solvent.
11   Q. Well, now that you understand
12 the question, what's your answer?
13   A. Could I hear it again?
14   Q. Do you know the benzene
15 content of the U.S. Printing Ink solvent
16 that Mr. Coppage used prior to 1977?
17   A. There wasn't direct
18 information in the record. They, as I
19 recall -- I guess it was Stallings, you
20 know, mentioned that there were those three
21 sources and that they tended to use them
22 interchangeably depending on what was
23 available. So I thought it was reasonable
24 to say, well, since the solvents were all

16 (Pages 58 - 61)

Page 62
ROBERT F. HERRICK, Sc.D., CIH, FAIH 62
1  being used interchangeably, that they have
2  the same composition.
3      Q.   There's not only no direct
4  evidence, there's no evidence of the benzene
5  content of the U.S. Printing Ink solvent
6  that was used; is there?
7           MR. DuPONT: False. Form.
8           THE WITNESS: It's not
9      specified in anyone's deposition, no.
10 BY MR. CAIRONE:
11     Q.   Is it specified anywhere on
12 the record, that you're aware of?
13          MR. DuPONT: Form.
14          THE WITNESS: I don't recall
15     seeing it, no.
16 BY MR. CAIRONE:
17     Q.   Okay. Same question for Sun
18 Chemical solvent. Is there anywhere in the
19 record that shows what the benzene content
20 of the Sun Chemical solvent was?
21          MR. DuPONT: Form.
22          THE WITNESS: I don't remember
23     seeing that in the record, no.
24 BY MR. CAIRONE:

Page 63
ROBERT F. HERRICK, Sc.D., CIH, FAIH 63
1      Q.   Do you mention in your report
2  the benzene content of any product, other
3  than Hanco MS-408?
4      A.   Well, what I tried to do in
5  the report was do the exposure assessment
6  for his cleaning processes using the
7  solvents. And, as it turns out, there were
8  the three possibilities. But I didn't
9  specifically link the exposure or the
10 benzene content to an individual product.
11     Q.   So what you did do was use the
12 benzene content of the purple Hancolite
13 MS-408. Right?
14     A.   Right.
15     Q.   And you just used that for the
16 U.S. Printing Ink and Sun Chemical solvent
17 just because you assumed it would be the
18 same. Right?
19     A.   Well, they were using the
20 solvents interchangeably, so I thought it
21 was a reasonable assumption.
22     Q.   That was your assumption.
23     A.   That was.
24     Q.   Based on nothing in the

Page 64
ROBERT F. HERRICK, Sc.D., CIH, FAIH 64
1  record?
2           MR. DuPONT: Objection to
3      form.
4           THE WITNESS: Well, aside for
5      the fact that they were using the
6      three products.
7  BY MR. CAIRONE:
8      Q.   Okay. So I understand, the
9  only reason that you made that assumption
10 across all three products was, they used all
11 three products the same way. Right?
12          MR. DuPONT: Objection, form.
13          THE WITNESS: They did. Yeah.
14 BY MR. CAIRONE:
15     Q.   Okay. So, just to make the
16 record clear, you made no attempt to account
17 for the fact that Stallings said that over
18 half the time, at both the Baltimore Sun and
19 the News-American, he used a solvent made by
20 two other companies other than Hanco?
21          MR. DuPONT: Objection, form.
22          THE WITNESS: Can you --
23 BY MR. CAIRONE:
24     Q.   You didn't differentiate. I

Page 65
ROBERT F. HERRICK, Sc.D., CIH, FAIH 65
1  mean, you just said you just used it all. 50
2  percent for everybody. Right?
3      A.   Well, I did the exposure
4  assessment across the range of solvents.
5  And I didn't try to, you know, specify which
6  particular material was being used.
7      Q.   Okay. Now, the
8  near-field/far-field model that you used to
9  calculate the exposure assessment for the
10 solvents, that's based on an IH Mod 2.0
11 Mathematical Modeling. Right?
12     A.   That's correct, yes.
13     Q.   And that's basically an Excel
14 spreadsheet. Right?
15     A.   Well, I think the authors
16 would probably view it as, you know,
17 something fancier than that, but --
18     Q.   Well, can we agree, it's a
19 fancy Excel spreadsheet, basically?
20     A.   Sure. I mean, in terms of --
21     Q.   It's complicated. It's not
22 your simple two plus two equals four, but
23 it's a spreadsheet --
24     A.   It is.

Page 86
ROBERT F. HERRICK, Sc.D., CIH, FAIH 86
1   wasn't engaged in that aspect of the case.
2   Q.   Okay. You have no opinions on
3   the actual precise diagnosis of Mr.
4   Coppage's disease; is that correct?
5   A.   That's correct.
6   Q.   You have no opinions on
7   whether or not the literature supports any
8   increased risk or causal connection between
9   exposure to benzene and Mr. Coppage's
10  precise diagnosis. Is that correct?
11          MR. DuPONT: Compound.
12          THE WITNESS: You know, that's
13      really not my area. I don't really
14      have an opinion on that.
15  BY MR. CAIRONE:
16  Q.   And you have no opinions about
17  the latency of Mr. Coppage's disease. For
18  example, when exposure -- how many years
19  before the time of diagnosis would a benzene
20  exposure be relevant for causation purposes.
21  You have no opinions on that; correct?
22  A.   Correct. That's really
23  outside my area.
24  Q.   Do you know who Dr. David

Page 87
ROBERT F. HERRICK, Sc.D., CIH, FAIH 87
1   Chang is?
2   A.   No, I'm sorry. It doesn't
3   ring a bell.
4   Q.   So you didn't consult with any
5   of the other plaintiff experts in this case
6   before writing your report or before giving
7   this deposition?
8   A.   Correct, I did not.
9   Q.   In terms of the scope of your
10  retention, obviously from your report it
11  would be correct to say that you were
12  retained by MR. DuPONT to come up with a
13  cumulative dose calculation or assessment to
14  benzene for Mr. Coppage for his career as a
15  pressman; correct?
16          MR. DuPONT: Form.
17          THE WITNESS: The only
18      distinction I would draw was that I
19      was really asked to estimate the
20      cumulative exposure. That is,
21      overall dose.
22  BY MS. PROSSER:
23  Q.   Oh, okay. Were you given any
24  other assignments by counsel for this case?

Page 88
ROBERT F. HERRICK, Sc.D., CIH, FAIH 88
1   A.   No. That's been pretty much
2   the scope of my work on this.
3   Q.   So you're certainly not going
4   to come to trial and give us any causation
5   opinions. Correct?
6   A.   Right. That's really not my
7   area.
8   Q.   And you're not going to come
9   to trial and give an opinion about whether
10  or not Mr. Coppage was at an increased risk
11  of developing the bone marrow disorder that
12  he developed because of his work as a
13  pressman. Correct?
14  A.   That's correct.
15  Q.   After you finished and
16  completed your report, did you read any of
17  the reports of the defense expert?
18  A.   I did.
19  Q.   Did you read Robert Adams'
20  report?
21  A.   I did.
22  Q.   And what other reports of the
23  defendants did you review?
24  A.   I read the report from Mr.

Page 89
ROBERT F. HERRICK, Sc.D., CIH, FAIH 89
1   Spencer and from Mr. Cohn, C-O-H-N. There
2   may be one other. I'm not remembering right
3   now. I think there might have been four
4   defense reports that were sent my way, and
5   I'm just blanking on what the fourth one
6   might have been. But definitely those
7   three.
8   Q.   Those three individuals are
9   all industrial hygienists; correct?
10  A.   Correct.
11  Q.   Let me ask you this: Did you
12  read the report of Dr. Gregory Sarnoff?
13  A.   I don't believe I have that
14  one. That doesn't ring a bell.
15  Q.   How about the report of Dr.
16  Robert McKearney?
17  A.   No, I didn't see that.
18  Q.   Going back to Mr. Adams'
19  report. Are you intending to offer any
20  opinions at trial regarding the opinions
21  expressed by Mr. Adams?
22  A.   Well, yeah, if I was asked
23  and, you know, there are some things that I
24  would comment on. Sure.

23 (Pages 86 - 89)

ROBERT F. HERRICK, Sc.D., CIH, FAI

Page 126

1 characteristics he remembered of the
2 solvent. That it was sweet smelling.
3 What he remembered about the
4 evaporation rate, that it evaporated
5 quickly. The fact that it was
6 irritating to the skin. Those, to
7 me, would all suggest that, you know,
8 there is a high likelihood that that
9 material was benzene-containing.
10 BY MS. PROSSER:
11   Q.   And when you say
12 benzene-containing, are you contemplating a
13 solvent where benzene was not an added
14 ingredient, but rather was a trade
15 contaminant as a result of the commercial
16 refinery manufacturing processes for
17 solvents?
18       MR. DuPONT: Objection, form.
19       THE WITNESS: I would say more
20   of the former. That it was, you know
21   -- you know, an ingredient that was,
22   you know, intentionally incorporated.
23   And that would be, you know, partly
24   based on the evaporation rate.

Page 127

1   You know, when you look at
2   some of these other materials, like
3   some of the mineral spirits products
4   that, you know, can contain benzene,
5   but in much lower concentrations, you
6   know, those tend not to evaporate
7   anywhere near as quickly as the way
8   this product was described.
9 BY MS. PROSSER:
10   Q.   Are you aware that there were
11 only four products ever manufactured by
12 Handschy that had benzene as an
13 intentionally added ingredient?
14       MR. DuPONT: Form.
15       THE WITNESS: That does sound
16   familiar. I think that was mentioned
17   in -- what's his -- I forgot the name
18   of the gentleman who was deposed from
19   the company, but that does sound like
20   a familiar value, yeah.
21 BY MS. PROSSER:
22   Q.   And you cannot testify, to a
23 reasonable degree of scientific certainty,
24 that the Hanco solvent identified by Mr.

Page 128

1 Stallings at News-American and at the
2 Baltimore Sun from 1950 to '69 was one of
3 the four that has benzene as an added
4 ingredient among the Handschy products.
5 Correct?
6       MR. DuPONT: Objection, form.
7       THE WITNESS: You know, I
8   don't see enough information in the
9   record to, you know, get to that
10   point.
11 BY MS. PROSSER:
12   Q.   Now, I'm just skipping around
13 in my notes here to try to wrap things up.
14       Are you familiar with the
15 term, state of the art?
16   A.   In a general sense, I think,
17 yeah.
18   Q.   Okay. I just want to make
19 sure I've nailed down what you are and are
20 not going to be testifying to at trial.
21       You have not been retained to
22 provide a state of the art opinion regarding
23 what Defendant Handschy should have known
24 about the dangers of benzene from 1960 to

Page 129

1 1969. Is that a correct statement?
2   A.   Yeah, that really wasn't one
3 of my objectives in preparing this report.
4   Q.   Okay. In 1960 to 1969, OSHA
5 was not in existence, obviously. Right?
6   A.   Right.
7   Q.   So the only really published
8 regulatory information about benzene
9 exposure would have come from the ACGIH at
10 that point and their TLVs; right? In '60 to
11 '69.
12       MR. DuPONT: Counsel, I --
13 BY MS. PROSSER:
14   Q.   And in 1960 to 1969, the TLV
15 for benzene was 25 parts per million. Was it
16 not?
17       MR. DuPONT: I'm going to make
18   a compound objection. We've already
19   established he's not testifying about
20   state of the art. You want to ask him
21   what the TLV was during a particular
22   time period, then you can. But
23   you've kind of snuck another issue
24   into your question, and so it's

33 (Pages 126 - 129)

```
                                                Page 130
            ROBERT F. HERRICK, Sc.D., CIH, FAI130
 1    compound, beyond the scope and lacks
 2    foundation.
 3  BY MS. PROSSER:
 4      Q.   Okay. Let me just ask you.
 5  The ACGIH TLV for benzene from 1960 to 1969
 6  was 25 parts per million. Correct?
 7      A.   I think that's correct, yes.
 8      Q.   Now, just as a general rule,
 9  if somebody says to you, I used a general
10  purpose cleaning solvent from 1960 to '69,
11  that doesn't tell you -- by the use of the
12  term general cleaning solvent, that doesn't
13  tell you about the benzene content, if any.
14  Right?
15      A.   Well, I think you'd want to
16  refine the question just a little bit. If
17  you were talking about people working in
18  pressrooms during that time period, you
19  know, I think one could reasonably conclude
20  that there's a good likelihood that that
21  cleaning material was benzene-containing
22  because that was a common practice in the
23  '60s and '70s.
24      Q.   And that would cover both
```

```
                                                Page 131
            ROBERT F. HERRICK, Sc.D., CIH, FAI131
 1  solvents that had benzene as a contaminant
 2  for trade spending as well as solvent where
 3  perhaps there was benzene added. Right?
 4          MR. DuPONT: Form. Compound.
 5      Vague.
 6          THE WITNESS: I wouldn't rule
 7      it out that there could have been a
 8      wide range of benzene contents in
 9      those cleaners. Yeah.
10  BY MS. PROSSER:
11      Q.   So my only point that I was
12  trying to get to in my question was, just
13  the fact of the generic description, general
14  purpose cleaning solvent, that doesn't tell
15  you whether there was benzene as a trace
16  constituent or contaminant versus benzene as
17  an added ingredient. That terminology,
18  general purpose cleaner. That's all I'm
19  trying to get at.
20          MR. DuPONT: Objection, form.
21          THE WITNESS: Yeah, I think in
22      this particular working environment,
23      you know, you would expect there to
24      be benzene present at some level. I
```

```
                                                Page 132
            ROBERT F. HERRICK, Sc.D., CIH, FAI132
 1      mean, if you think about the
 2      technology, a lot of the inks that
 3      were used, you know, were
 4      benzene-containing themselves. So it
 5      makes sense that the material that
 6      was used to clean the inks also was
 7      benzene-containing.
 8  BY MS. PROSSER:
 9      Q.   Right. I guess I'm not being
10  clear, and I apologize. I'm just trying to
11  get to a very simple concept. The term
12  general purpose cleaning solvent doesn't
13  tell you by that term whether benzene was
14  present as a contaminant or whether benzene
15  was present as an added ingredient. You
16  would have to know what the constituents of
17  that solvent were to be able to answer the
18  question as to what percentage, if any, of
19  benzene was in that product. Is that
20  correct?
21          MR. DuPONT: Form. Vague
22      content.
23          THE WITNESS: Yeah, I think
24      that's a fair characterization. Yeah.
```

```
                                                Page 133
            ROBERT F. HERRICK, Sc.D., CIH, FAI133
 1          MS. PROSSER: Thank you.
 2          Just for the record, I want to
 3      join in Mr. Cairone's Motion to
 4      Strike in case that wasn't clear on
 5      the record.
 6  BY MS. PROSSER:
 7      Q.   I'm just going through here. I
 8  think I might be done, but I do reserve the
 9  right to come back and ask you any follow up
10  questions after other counsel have completed
11  their questioning. Thank you so much,
12  Doctor.
13      A.   Okay. Thank you.
14              - - -
15          MR. ROBERTS: This is Ted
16      Roberts for Varn, Mr. DuPont.
17  BY MR. ROBERTS:
18      Q.   Dr. Herrick, nice to meet you.
19      A.   Hello.
20      Q.   Can you hear me okay?
21      A.   Yeah, you're fine.
22      Q.   Very good. Have you asked
23  plaintiff's counsel for any information that
24  you have yet to receive regarding the
```

Page 134
ROBERT F. HERRICK, Sc.D., CIH, FAI 134
1  Coppage case?
2    A.   I have not, no.
3    Q.   Good. Has plaintiff's counsel
4  offered you any information that you have
5  yet to receive regarding the Coppage case?
6    A.   I don't think so.
7    Q.   Have you produced all the
8  documents and testimony that you have
9  reviewed in connection with your
10 investigation in the Coppage case?
11        MR. DuPONT: Objection to
12   form.
13        THE WITNESS: Yeah. The
14   answer is yeah.
15 BY MR. ROBERTS:
16   Q.   Okay. Do you consider your
17 fact finding and investigation into Mr.
18 Coppage's case complete?
19        MR. DuPONT: Form.
20        THE WITNESS: I think so,
21   yeah.
22 BY MR. ROBERTS:
23   Q.   With respect to your August
24 9th, 2019 report -- and you can have that

Page 135
ROBERT F. HERRICK, Sc.D., CIH, FAI 135
1  out. I just want to ask you a few questions
2  about that.
3    A.   Okay.
4    Q.   Your report of August 9th,
5  2019 does not mention Varn International by
6  name. Is that correct?
7    A.   I'm sorry, could you repeat
8  the question?
9    Q.   Sure. Your report of August
10 9th, 2019 does not mention Varn
11 International by name. Correct?
12   A.   No, I don't believe it does.
13   Q.   I'm sorry, that's going to
14 read a little bit funny. I think we're on
15 the same page. Let me ask it a different
16 way.
17        Does your report mention Varn
18 at all?
19   A.   No.
20   Q.   Does your report of August,
21 2019 mention a Varn International product by
22 name at all?
23   A.   I don't think so. No, I don't
24 think so.

Page 136
ROBERT F. HERRICK, Sc.D., CIH, FAI 136
1    Q.   Is it fair to say that you
2  have not quantified Mr. Coppage's dose level
3  of benzene exposure to any specific Varn
4  International product?
5        MR. DuPONT: Objection, form.
6        THE WITNESS: That's correct,
7    right.
8  BY MR. ROBERTS:
9    Q.   In the Dropbox production that
10 I received this morning, I noticed a folder
11 labeled Varn International, and it contained
12 two depositions of Varn representatives. One
13 Paul Peterson, dated 12/3/14, and the other
14 one Kevin Fenneweld, dated 11/23/2010.
15 Neither of those depositions were referenced
16 in your August 9th, 2019 report. Is that
17 fair?
18   A.   I don't -- yeah, I don't
19 recall mentioning those in the report.
20   Q.   When did you receive those
21 deposition transcripts?
22   A.   You know, I'm not recalling
23 when I would have gotten those. You know,
24 I've got a lot of information in the Box,

Page 137
ROBERT F. HERRICK, Sc.D., CIH, FAI 137
1  and I can't tell you I've got a good
2  recollection of those.
3    Q.   Sure. Maybe if I can narrow it
4  for you. Can you tell me whether or not you
5  received those deposition transcripts before
6  or after you wrote your August 9, 2019
7  report?
8    A.   I don't remember when -- you
9  know, I really don't remember those
10 depositions, to tell you the truth. And so
11 I would have to say, if I have them, it's
12 probably after.
13   Q.   And that's my next question.
14 Have you reviewed those depositions
15 completely?
16   A.   You know, I'm not recalling
17 those depositions.
18   Q.   Okay. Is it fair to say you
19 attach no significance to that deposition
20 testimony with respect to your opinions in
21 this case?
22        MR. DuPONT: Objection, form.
23        THE WITNESS: Oh, well, I'm
24   sorry. I don't remember having seen

35 (Pages 134 - 137)

Page 142
ROBERT F. HERRICK, Sc.D., CIH, FAI142
1 least to your knowledge, that doesn't have
2 anything to do with this case?
3         MR. DuPONT: Objection, form.
4         THE WITNESS: I don't remember
5     that being mentioned in any of the
6     depositions or anywhere in the
7     record, no.
8 BY MR. FISHKIN:
9    Q.   Do you know what Tower
10 Products, Inc. is?
11   A.   No, I'm afraid I don't.
12   Q.   Do you know what Tiger Quick
13 Wash is?
14   A.   No, I don't.
15   Q.   There's a section in your
16 Dropbox called, "Defendant Specific
17 Products." Or, excuse me, the Dropbox that
18 Mr. DuPont sent to us before the deposition.
19 Are you familiar with that section of the
20 Dropbox?
21   A.   I haven't seen what Andrew
22 sent this morning, so I'd have to -- I mean,
23 I guess we can pull it up right now. Do you
24 want us to look at it?

Page 143
ROBERT F. HERRICK, Sc.D., CIH, FAI143
1         MR. DuPONT: Are you saying
2     the specific products or documents?
3         MR. FISHKIN: I'm sorry,
4     Andrew. Say it again.
5         MR. DuPONT: Did you say it
6     says defendant specific products or
7     defendant specific documents?
8         MR. FISHKIN: Excuse me.
9     Defendant specific documents.
10        MR. DuPONT: Okay.
11 BY MR. FISHKIN:
12   Q.   So there's a folder, Mr.
13 Herrick -- or excuse me, Dr. Herrick, in the
14 Dropbox that Mr. DuPont sent. The folder is
15 entitled, "Defendant Specific Documents." Do
16 you have that in front of you?
17   A.   Andrew has it on his laptop,
18 yeah.
19   Q.   All right. You see that?
20   A.   I do.
21   Q.   Okay. So behind that folder,
22 there are separate folders with titles, with
23 different defendants' names. One of them is
24 Ashland. Do you see that one?

Page 144
ROBERT F. HERRICK, Sc.D., CIH, FAI144
1    A.   I do.
2    Q.   Okay. Have you reviewed the
3 contents of that folder?
4    A.   We're looking at it now. I
5 think so. Let's see. This is an e-mail.
6         MR. DuPONT: Let me make it
7     bigger so you can read it.
8         THE WITNESS: Okay.
9 BY MR. FISHKIN:
10   Q.   So, Dr. Herrick, did you
11 review either of those documents in that
12 folder?
13   A.   Yeah, I'm looking at it again
14 now. You know, I remember having this
15 information. So I do have it here. Right.
16   Q.   When did you receive it?
17   A.   Oh, gee. I'm afraid I don't
18 have a good recollection of that. We had
19 information coming into the Dropbox, you
20 know, pretty much throughout the spring and
21 early summer. I can't say that I remember
22 every particular entry.
23   Q.   Are you able to tell me
24 whether you received it before or after you

Page 145
ROBERT F. HERRICK, Sc.D., CIH, FAI145
1 drafted your report?
2    A.   I actually don't recall. Yeah,
3 I'm afraid I don't know.
4    Q.   Did you rely on either of
5 those documents in preparing your opinions
6 in this case, and reaching your opinions in
7 this case?
8    A.   No, I didn't. I don't -- you
9 know, this particular product, you know, as
10 we've talked about, you know, there really
11 wasn't a lot of product specific information
12 available from either Coppage or Stallings.
13 And so I would say, no, I didn't rely on
14 this.
15   Q.   Do you know what either of
16 these documents have to do with this case?
17   A.   Well, it's --
18        MR. DuPONT: Objection, vague.
19        THE WITNESS: -- clearly a
20    printing-related product. So, you
21    know, in that sense, you know, it's
22    relevant and it does contain benzene,
23    at least at the time.
24        What's the date on this? This

37 (Pages 142 - 145)

Page 162
ROBERT F. HERRICK, Sc.D., CIH, FAI 162
1  BY MR. FISHKIN:
2      Q.   I just want to be sure that
3  we're talking about the same thing. When you
4  say you don't remember that particular one,
5  I'm looking at -- When I click on the
6  folder, I'm looking at -- it looks to be
7  somewhere around 20 documents.
8      A.   I think we're looking at the
9  same files, yeah.
10     Q.   Okay. My understanding of your
11 testimony would be that you're not able to
12 tell me when you received any of the
13 documents within that folder?
14     A.   I think that's fair. I just
15 don't have a particular recollection of it.
16     Q.   Okay. Did you ask for any of
17 these documents?
18     A.   I'm pretty sure I did. We
19 have -- as we've been working on these
20 cases, you know, the toluene question has
21 come up, obviously. And so I think I
22 probably did ask for them, yeah.
23     Q.   All right. Can you tell me
24 then, there is a document, it appears on my

Page 163
ROBERT F. HERRICK, Sc.D., CIH, FAI 163
1  screen in the second row. It's an Equistar,
2  which is a Lyondell Company, an MSDS for
3  commercial grade toluene. Can you tell me
4  why you asked for that document?
5           MR. DuPONT: Objection, form.
6           THE WITNESS: Well, I have a
7      feeling that, you know, in the
8      conversations I probably didn't ask
9      for each one of these documents by
10     name. We were trying to come up with
11     a good overview of what was available
12     on the composition of toluene.
13          I didn't ask Andrew for each
14     one of these, you know, by specific
15     title or name.
16 BY MR. FISHKIN:
17     Q.   Since I started with that
18 MSDS, let me just ask you one follow-up,
19 which is: Does that document have any
20 relevance to this case?
21          MR. DuPONT: Objection, vague.
22          THE WITNESS: Well, in a sense
23     that, as I'm sure you know, there's a
24     lot of information about the benzene

Page 164
ROBERT F. HERRICK, Sc.D., CIH, FAI 164
1  content of toluene. And, you know, I
2  worked on toluene-related projects
3  over time when I was at NIOSH. And
4  so I was aware that there was a fair
5  bit of data out there. That is, I
6  guess, why I thought it was relevant.
7  BY MR. FISHKIN:
8      Q.   Do any of these documents tell
9  you the benzene content of any toluene to
10 which Mr. Coppage was exposed --
11          MR. DuPONT: Objection, vague.
12 BY MR. FISHKIN:
13     Q.   -- at Alco-Gravure.
14     A.   Yeah. Only in the sense that I
15 would not be surprised that the toluene that
16 was used, you know, for this type of
17 cleaning, you know, was not, you know, like
18 a real high grade, you know, reagent grade,
19 or chromatography grade, or something like
20 that. That, you know, it's -- I think it
21 would be likely that it was probably sort of
22 a technical grade toluene, which, you know,
23 could be an indication that it, you know,
24 would have higher benzene levels than some

Page 165
ROBERT F. HERRICK, Sc.D., CIH, FAI 165
1  of the more pure forms.
2      Q.   Is there any record evidence
3  in this case for what you just testified to?
4           MR. DuPONT: Objection, form.
5           THE WITNESS: You mean about
6      the grade of the toluene?
7  BY MR. FISHKIN:
8      Q.   Yes.
9           MR. DuPONT: Form.
10          THE WITNESS: I don't recall
11     any specific conversation, you know,
12     saying the depositions or anything,
13     but I would just say, you know, my
14     experience would suggest to me that
15     toluene, you know, used for cleaning
16     surfaces like this, you know, is
17     likely to be a less pure grade than
18     some of the other toluene that's
19     around.
20 BY MR. FISHKIN:
21     Q.   What's the entirety of your
22 knowledge concerning the toluene use at
23 Alco-Gravure?
24     A.   Well, this was -- it kind of

42 (Pages 162 - 165)

```
                                                    Page 266
           ROBERT F. HERRICK, Sc.D., CIH, FAI266
 1  true?
 2     A.   Sure.
 3     Q.   Well, earlier this morning you
 4  said that you thought Mr. Stallings and Mr.
 5  Coppage might have misremembered that it was
 6  clear.
 7          MR. DuPONT:  Objection, form.
 8          THE WITNESS:  Well, my
 9      observation was that we were talking
10      about their recollection of something
11      they used 40 years ago.  And so I
12      wouldn't, you know, outlaw the -- you
13      know, rule out the possibility that
14      their recollection was incomplete or
15      imperfect.
16  BY MR. CAIRONE:
17     Q.   Well, this morning you didn't
18  say, well, purple might be clear.
19          MR. DuPONT:  Objection, form.
20          THE WITNESS:  Well, I don't
21      think I was asked this morning to try
22      to thread the needle that way, you
23      know.  But in responding to this
24      question this afternoon, you know, I
```

```
                                                    Page 267
           ROBERT F. HERRICK, Sc.D., CIH, FAI267
 1      think there's a way to interpret the
 2      meaning of the term clear that
 3      doesn't rule out the possibility that
 4      there was a tint to the liquid.
 5  BY MR. CAIRONE:
 6     Q.   Why do you have to thread the
 7  needle?
 8     A.   Well, I'm trying to give you a
 9  good answer and not be evasive.  But I'm
10  trying to, you know, to acknowledge that,
11  you know, you could -- you could see the
12  term clear being used more than one way.
13     Q.   Did you read Mr. Graham's
14  entire deposition?
15     A.   When I first got it I'm quite
16  sure I did.  I read it.  This was a while ago.
17     Q.   And my understanding now is
18  that you carefully considered the physical
19  appearance of the product.  So you would have
20  paid attention to anything in that regard;
21  right?
22     A.   Well, sure.  But just in terms
23  of, you know, physical appearance, you know,
24  it isn't just the color.  It's, you know,
```

```
                                                    Page 268
           ROBERT F. HERRICK, Sc.D., CIH, FAI268
 1  the way the material flows, the nature of
 2  the -- you know, sort of the viscosity of
 3  the liquid.  Those are the kinds of things I
 4  was thinking about.
 5     Q.   Well, according to Mr.
 6  Graham's deposition, why did Handschy dye
 7  the Hancolite MS-408?
 8     A.   I'm trying to remember.  Was
 9  it because he felt it was a proprietary, you
10  know, way of designating that that was a
11  proprietary formulation?  I mean, I think I
12  remember that coming up in the conversation.
13     Q.   Well, I think he basically
14  said they did it to distinguish themselves
15  from their competitors.
16     A.   Maybe that was it, yeah.
17     Q.   And so looking back at page 21
18  of the Stallings deposition, which Mr.
19  DuPont was referring to a little bit ago,
20  the question was:  "Was there anything
21  distinguishable about the product inside of
22  a U.S. Printing Ink 55-gallon drum versus a
23  Sun chemical versus a Hanco?"
24          "They all looked the same to
```

```
                                                    Page 269
           ROBERT F. HERRICK, Sc.D., CIH, FAI269
 1  me."
 2          Is that consistent with a
 3  product that is distinguishable because of a
 4  color?
 5          MR. DuPONT:  Objection, form.
 6          THE WITNESS:  I know that's
 7      what he said.  I just -- you know,
 8      again, I'm kind of trying to
 9      reference, you know, the nature of
10      his recall to the amount of time that
11      transpired between the time he used
12      it and the time he was asked the
13      questions.
14  BY MR. CAIRONE:
15     Q.   Let me ask it again.  Is what
16  I just read consistent with a product in one
17  drum that is dyed to distinguish it from
18  another chemical in another drum?  Is that
19  consistent with that?
20          MR. DuPONT:  Objection, form
21      and foundation.
22          THE WITNESS:  You know, I
23      can't speak for him.  You know, I
24      mean, he may have felt that, you
```