**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **LORENE G. BROCIOUS, as** | * | |
| **Personal Representative of the Estate of** | * | |
| **JAMES A. COPPAGE,** | * | |
| | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Case No. 1: 18-cv-003823-SAG** |
| | * | |
| **UNITED STATES STEEL CORPORATION,** | * | |
| **ET AL.,** | * | |
| **Defendants** | * | |

\*    \*    \*    \*    \*    \*    \*

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER OPPOSITION TO**
**DEFENDANT U.S. STEEL'S MOTION TO EXCLUDE PLAINTIFF'S**
**EXPERT DR. ROBERT HERRICK**

      Plaintiff, by and through her counsel of record, hereby submits this Memorandum of Law in Support of Her Opposition to Defendant United States Steel's Motion to Exclude Plaintiff's Expert Dr. Herrick and in support thereof avers as follows[1]:

## I.      STATEMENT OF QUESTIONS INVOLVED

      1.      Should this Court Deny Defendant US Steel's Motion to Exclude Plaintiff's expert Dr. Herrick where the evidence shows that Mr. Coppage used Handschy's Hancolite product while employed at the Baltimore Sun and News American as a junior pressman and apprentice?

      **Suggested Answer:   Yes.**

      2.      Should this Court Deny Defendant US Steel's Motion to Exclude Dr. Herrick where Dr. Herrick relied upon the facts and evidence to determine the benzene content of the cleaning solutions as a basis for expert exposure analysis opinions?

---

[1] Plaintiff respectfully requests that this Court first decide Plaitinff's pending Motion to Remand, as Maryland State Courts utilize the *Frye-Reed* standard rather than the *Daubert* standard. *See Reed v. State*, 391 A2d 364 at 372. Therefore, depending on the status of remand, Defendant's Motion would be mooted by remand, if granted by this Court.

**Suggested Answer:   Yes.**

## II.   <u>Legal Standard</u>

The determination of whether expert testimony is admissible "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 592 (1993). Federal Rule of Evidence 702 provides that opinions relating to "scientific, technical, or other specialized knowledge" may be admitted if they will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Pursuant to Rule 702, experts must be qualified "by knowledge, skill, experience, training or education." *Id.* Expert opinions are admissible if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.*; *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999) (citing *Daubert, supra,* 509 U.S. at 589). The district court's inquiry is a "flexible one," whose focus "must be solely on principles and methodology, not on the conclusions that they generate." Id. at 594–95, 113 S.Ct. 2786.

"[T]he district court [is] a gatekeeper, not a fact finder." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 653-54 (9th Cir. 2006); *see also DSU Med. Corp.*, 296 F. Supp. 2d at 1147 ("[A] district court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury.") (citations omitted). When the threshold of reliability is met, "[v]igorous cross-examination, presentation of contrary evidence [by the opposing party], and careful instruction on burden of proof are the traditional and appropriate means" of challenging the accuracy of an expert's testimony." *Daubert, supra*, 509 U.S. at 596; *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010). Under *Daubert,* a trial court's focus is generally "limited to

considering the methodologies relied upon by the expert," and the court should not "transform a *Daubert* hearing into a trial on the merits." *DSU Med. Corp.,* 296 F.Supp.2d at 1147.

III.     **PERTINENT FACTS AND APPLICATION**

James Coppage was born on August 3, 1942, and grew up in Baltimore, Maryland. Mr. Coppage started working for the newspaper printing industry in September 1960 and worked at various newspapers until 2006 when he retired. Mr. Coppage testified that he began his career working as a Junior Pressman at the Baltimore Sun from 1960 to 1965. *See* Exhibit A, at 13:23-14:7.Then he became an apprentice journeyman who rotated between postings at various printing press locations. There were three printing locations between which journeyman apprentices were rotated, including the Baltimore Sun, The News America, and Alco-Gravure. Apprentices were rotated between the three locations every four months. Mr. Coppage was an apprentice for the next four years until he became a fulltime journeyman at Alco-Gravure, where he stayed from 1969 to 1998, when that printing facility closed.

Dr. Robert Herrick has provided expert exposure analysis data to determine Mr. Coppage's exposures to benzene through use of Defendants' products. *See* Dr. Herrick's expert report, attached as Exhibit B. Dr. Herrick is a Certified Industrial Hygienist and Fellow of the American Industrial Hygiene Association. *See* Dr. Herrick CV, attached as Exhibit C. He has more than 45 years' experience as an industrial hygienist. *Id.* He was employed an industrial hygienist by the U.S. Army from 1973 to 1976 and the National Institute for Occupational Safety and Health from 1977 to 1994, where he conducted workplace air monitoring and exposure assessments, including for worker exposure to benzene through use of solvents, and established recommendations for workplace exposure safety. *Id.* He conducted industry wide surveys for benzene exposure and presented on the retrospective exposure assessments used for the NIOSH Pliofilm benzene

4

epidemiology study. *Id.* He held the positions of Chief of Industrial Hygiene for the Industry-Wide Studies Branch of NIOSH, Assistant Chief of the Industry-Wide Studies Branch, Associate Director for Science the Acting Deputy Director. *Id.*

Dr. Herrick taught industrial hygiene at the Harvard University School of Public Health from 1994 - 2018 and the University of Cincinnati from 1989 - 1994. *Id.*  His teaching and academic research at Harvard focused on exposure assessment and its interface with epidemiology. *See*, *Id.*  He was selected as an expert reviewer for a large series of petroleum industry funded benzene exposure assessment and epidemiology studies in order to provide consulting for the design and conduct of the retrospective exposure assessments. *Id.*

Dr. Herrick considered the testimony of product identification witness Robert Stallings, who identified use of Hancolite Glaze Cleaner at the Baltimore Sun and New American during years of Mr. Coppage's employment at each location, the testimony of Mr. Coppage in coming to his opinions as to Mr. Coppage's exposure to benzene, as will be explained in further detail below. Mr. Stallings testified in a prior lawsuit (*Kelley*) concerning another pressman who contracted leukemia from exposure to benzene while working at the same print shops, with the same products, during the same time periods as Mr. Coppage. Specifically, Mr. Stallings described a Hanco solvent from a 55 gallon drum. See Exhibit K, Mr. Stallings Deposition in *Kelley*, at 19. Handschy's Hanco brand Hancolite was supplied in 55 gallon barrels. *See* Graham Deposition, Exhibit K, at 95. Mr. Stallings stated that the solvent evaporated fast, dried out the skin on his hands, felt cool and then hot on his skin, smelled sweet and was used as a general purpose cleaner to clean ink from various surfaces and rollers. Mr. Stalling's specific testimony identifying the Hancolite product will be articulated in full detail below in Section A.

Dr. Herrick opines that Mr. Coppage used and was exposed to various benzene containing products, with one of those products being Handschy's Hancolite Glaze Cleaner product. *See* Exhibit B, at 8, 14, 16, 24; *see also* Deposition of Dr. Herrick, attached as Exhibit D, at 15, 30-31, 49-52.  Dr. Herrick conducted a thorough review of the record evidence in this case, his knowledge of benzene and his knowledge of industry practices with respect to the use of benzene as an ingredient in printing solvents in the 1960's and 1970's in coming to this conclusion. He reviewed Mr. Stalling's deposition testimony describing the Hancolite product. Dr. Herrick opines that benzene has a sweet smell like the Hanco product Mr. Stallings described, evaporates quickly like the Hanco solvent Mr. Stallings described and dries and irritates the skin like the Hanco solvent Mr. Stallings described. *See* Exhibit D, 125-126. He opines that benzene was commonly used in printing solvents in the 1960's. *Id.*, 247-248.

Dr. Herrick reviewed the Handschy catalogs. He compared Mr. Stallings testimony describing the Hancolite product and his testimony reviewing the Handschy catalog. Dr. Herrick prepared notes with his rationale for why the Hanco solvent Mr. Stallings described matches the Hanco solvent following Mr. Stallings' process of elimination of non-similar Hanco solvents in the Handschy catalog. *See*, Herrick deposition Exhibit 3, attached as Exhibit U.

Dr. Herrick also considered Mr. Stallings' testimony that the US Printing Ink and Sun Chemical solvents were identical in their appearance to the Hanco solvent. *See* Exhibit D, at 125-126; *see also* Exhibit 3 to Herrick's Deposition which is his detailed analysis on evidence of 50% benzene in the solvents, attached as Exhibit U. He considers Mr. Stallings testimony that the US Printing Ink and Sun Chemical solvents functioned the same as the Hanco solvent did. Id. He considers Mr. Stallings' testimony that the US Printing Ink and Sun Chemical solvents had the same sweet smell as the Hanco solvent did. Id. He considers that benzene was commonly used as

an ingredient in printing solvents in the 1960's. *See* Herrick Deposition, attached as Exhibit D, at 50:1-8. On this basis Dr. Herrick concludes that the US Printing Ink and Sun Chemical solvents had the same benzene content as the Hancolite solvent, i.e., 50% benzene.

Dr. Herrick opines that Mr. Coppage used and was exposed to Hancolite while he was working cleaning rollers and presses at The Baltimore Sun and News American. This was not an assumption. It is a conclusion reached on the basis of the evidence from Mr. Stallings' deposition testimony, Mr. Coppage's deposition testimony, the Handschy catalog and Charles Graham's deposition testimony.

**A.** <u>**Dr. Herrick's Conclusions About Mr. Coppage's Use of Handschy's Hancolite Are Grounded In The Facts And Evidence Of The Case**</u>

In addition to Mr. Coppage's own testimony, Plaintiff has adduced the deposition testimony of Mr. Robert Stallings who also worked as a junior pressman and apprentice rotating between the Baltimore Sun, News American, and Alco-Gravure between the years of 1961 and 1967. *See* Deposition of Robert Stallings, attached hereto as Exhibit E, at 17:20-22; 39:12-16; 51:14-21. As stated above, Mr. Coppage was at the Baltimore Sun from 1961 to 1965 and rotated between the Baltimore Sun, the News American and Alco-Gravure between 1965-1969. Mr. Stallings testified that "Hanco" was used as a cleaning solvent product at the Baltimore Sun and News American printing locations for the duration of his time rotating between those facilities from 1961 to 1967. When asked about the manufacturers of the press cleaners at these three location, Mr. Stallings testified as follows:

A.  To clean the Goss press or even any press, they use at the end of the shift to clean the blanket cylinders and the -- your work area, your general work. The -- the porters brought 55-gallon drums to the press and we used the solvents from the drums to -- to clean the blanket cylinders, the plate cylinders and your general work area which you were responsible to do.

Q.  Now, these 55-gallon drums -- do you recall any of the manufacturers of these 55-gallon drums that you all were using at **<u>News America</u>** for the Goss press?

7

A.  There were -- there were three to my knowledge. One was U.S. Printing Inks.

Q.  What was the other?

A.  Sun Chemical Company, and **Hanco**.

*See* Exhibit E, at 19:3-16.

Q.  Now, when you go to the **Baltimore Sun**, what are the -- what do you remember being the manufacturers of the products that you all were using as the cleaning solution at the Baltimore Sun?

A.  The solutions were about the same. They use the same. The only thing, they weren't delivered to the press like they was down at the News American. We had to go to the ink room to get them ourselves.

Q.  Okay. You had identified a company called U.S. Printing Ink, Sun Chemical Company and **Hanco**.

A.  Yes.

Q.  Are those the same three that you saw when you went to Baltimore Sun?

A.  Yes.

*Id*., at 41:10-23

Q.  And the cleaning of the blanket cylinder and plate cylinder occurs after a run?

A.  At the end of the shift.

Q.  And as apprentices, you were always – was always your responsibility was to help clean the blanket and the plate cylinders?

A.  Yes.

*Id*., at 27:9-15

Q.  Did you all -- was there anything distinguishable about the product inside of a U.S. Printing Ink 55-gallon drum versus a Sun Chemical Company versus a Hanco?

A.  They all looked the same to me.

Q.  And how did they look?

A.  They were like a clear liquid, and they had like a sweet smelling odor.

*Id*., at 21:18-25

Q. During the '61 to '66, '67, going back to News American and the Goss press, can you put a percentage on the amount of how much do you remember the product coming out of the 55-gallon drum from U.S. Printing Ink versus Sun Chemical Company versus Hanco? And what would that procedure be?

A.  Well, I -- I observed more drums of U.S. Printing Ink's and Sun Chemical than I did of Hanco.

Q.  Okay. And what percentage would you put on U.S. Printing Ink and Sun Chemical and Hanco, if you could put a percentage on it?

A.  75/25, 80/20, somewhere around there.

Q. Okay. And what's -- what's the 75 and 80 going to?
A. The -- the 75 would be on the Sun Chemical and U.S. Printing. 25 percent would be Hanco.
Q. And what about when you were at Baltimore Sun, what percentage was the usage do you remember in terms of the 55-gallon drums there?
A. That's a different question to answer. They were all sitting there, and when you went in, you just went up to the first drum and got your cleaning solution and went out and cleaned up. Up there it was probably more of an of 60/40, 50/50.
Q. From the 60 -- 60 percent you're putting on U.S. Printing Ink and Sun Chemical?
A. Yes, exactly, because they were closer to the door as soon as you walked out, I guess. When they were empty, then you went to the third drum.
Q. All right. And the other 50 percent you're putting on Hanco when you were at -
A. Exactly.
Q. -- the Sun -- Baltimore Sun?
A. Yes. Yes. Uh-huh.

*Id*., at 42:1-43:9.

Defendant US Steel's Motion also attempts to argue that Mr. Stallings did not identify the Hancolite product specifically, however, the testimony again belies this argument. Specifically, Mr. Stallings testified regarding the label of the product that he used, and identified the Hancolite label, which was Exhibit 2 to his deposition. *Id*., at 20:11-18; 65:16-66:10; See also Exhibit 2 to Mr. Stallings Deposition, attached hereto as Exhibit F. Using the Handschy Marketing Product Pamphlet and the process of elimination, Mr. Stallings went through each press cleaner and excluded all but the Hancolite cleaner product, in addition to identifying the label. *See* Exhibit E, at 58:19-64:25; *see also*, Exhibit 1 to Mr. Stallings Deposition, attached hereto as Exhibit G, at 19-21. At his deposition, Mr. Stallings was also shown a Handschy catalog identifying the line of Hanschy's Hanco solvents. *Id*. He reviewed the products and their descriptions and eliminated products that did not match the characteristics of the Hanco solvent that he used at the Baltimore Sun and the News American. *Id*. Through a process of elimination he narrowed the list of Hanco products that matched the description of the Hanco solvent he used to the Hancolite product. *Id*. For example, Mr. Stallings testified that certain non-Hancolite solvents in the Hanschy catalog

were described as not irritating to the skin. *Id*. He said this was inconsistent with the Hanco solvent that he used which irritated the skin, drying it out and causing burning sensation. *Id*. Mr. Stallings testified that certain non-Hancolite solvents in the catalog were slow evaporating, which was inconsistent with the Hanco solvent he used that evaporated quickly. *Id*. Mr. Stallings testified that certain Hanco solvents in the Handschy catalog were described as having a specialized use, such as blanket cleaning, but the Hanco solvent he used was not a blanket cleaner and instead was a general purpose cleaner. *Id*. Other non-Hancolite products were described as a three step cleaning process, and Mr. Stallings said the Hanco solvent he used was not a three step cleaning process. *Id*. Other non-Hancolite products were intended for color changes, and Mr. Stallings said the Hanco product was not used for that purpose. *Id*. Mr. Stallings testified that there was also a Sun Chemical and U.S. Printing Ink brand solvent in 55 gallon drums with the same physical characteristics and sweet smell as the Hancolite solvent. *Id*.

Handschy's catalogs from the 1960's and 1970s describe the Hancolite product to be a general purpose cleaner. *See* Exhibit G. The Handschy catalogs describe the Hancolite product to have "so many uses that to not have it available means frustration and loss of time". *Id*. The product's intended use includes to include cleaning dried ink, lacquers and resins. *Id*. It cleans surfaces with deep etches. *Id*. It dries without a residue. *Id*. It cleans rollers. *Id.* The Hancolite was sold in 55 gallon drums. *Id.* This description matches the description of the Hanco solvent given by Mr. Stallings of a 55 gallon drum of a general purpose cleaner that dried fast and was used to clean various surfaces, ink and rollers. That, of course, is in addition to Mr. Stallings identifying the Hancolite label itself. *Id.*, at 20:11-18; 65:16-66:10; see also Exhibit F.

Mr. Coppage himself likewise testified that he used a "pretty clear" solvent to clean the presses, rollers, and plates at The Baltimore Sun and News American. *See* Exhibit A, at 241:21-

242:4. However, at the time of his deposition he was not able to recall the brand names of the cleaners that he used. Mr. Stallings though, testified that the Hanco, US Printing Ink and Sun Chemical solvents were the only solvents available for use at the Baltimore Sun and News American. *See* Exhibit E, at 19, 41.

Regarding typical tasks on a given day as a Junior Pressman, Mr. Coppage reported, "some days you're on the press, some days you could be the ink boy. You could be extra and be on cleanup." *See* Exhibit A., at 20. According to Mr. Coppage's testimony, Junior Pressmen did the most cleaning; he reported, "they got the worst of it." *Id*., at 114. Mr. Coppage reported that as a Junior Pressman, he always wore gloves when using solvents; he described the gloves as being rubber and reaching halfway between the wrists and elbow. *Id*., at 273-74.

According to Mr. Coppage's testimony, the ink rail would normally skim the ink roller on the press, but if the ink rail wasn't set correctly, there would be a mess and he would have to put on coveralls and go in the press and clean them with rags and solvent. *Id*., at 27-29. This was the same solvent he used to clean the ink buckets in the ink room. *Id*., at 29. On the days he washed the ink rails, he reported spending 5-6 hours washing them; he would have to climb into the press and wear 2 pairs of coveralls. *Id*., at 30. He would wash the ink rails about once a week during this 5-year timeframe as a Junior Pressman. *Id*., at 31. The solvents would come from large 55 gallon barrels, and would be put into a large vat which junior pressman would then use to clean the plates with rags. *Id*., at 22-23, 29.

Apprentices at the Baltimore Sun and News American between 1965 and 1969 were assigned to journeyman pressman to learn the printing craft as well as do all the functions that a journeyman pressman would do. Exhibit E, at 16. Both the News-American and Baltimore Sun utilized a letterpress and Mr. Coppage's job duties were essentially the same at both places. Exhibit

A, 42-43. As an apprentice at the News-American and the Sun, he described his daily duties involving running of the press all day—he would set the press up when he came in the morning, which involved leading sheets of paper through the rollers of the superstructure and then putting the lead plates on a press; Mr. Coppage would also clean the cylinders with a rag that the lead plates with the raised letters would get attached to. *Id*., at 45-46.  At the end of the day, Mr. Coppage reported wiping the units down with the solvent to clean them. *Id*., at 50.

US Steel in it motion posits that Dr. Herrick is incorrect in the premise of his opinions on exposure that Mr. Coppage used Hancolite because it asserts that the colors of the product and the testimony of the Plaintiff and Mr. Stalling's are divergent. *See* Defendant's Motion, at 6-7. In support of its contention that the Plaintiff has identified the wrong color of the Hancolite product by identifying it as "pretty clear" Defendant US Steel cites to its deposition of Dr. Herrick, in which Counsel for Defendant cites to the deposition of Handschy Corporate representative Mr. Graham. *See* Defendant's Motion, at 7. Specifically, at the deposition of Dr. Herrick, counsel for US Steel read into the record a segment of Mr. Graham's testimony which states that "Hancolite, which was MS-408, would have been purple in color during the '60s, '70s, and early '80s. Correct? Answer: Violet, purple, however, yes, it was shaded." *See* Deposition of Robert Herrick, at 52-53. However, when one examines Handschy's own Material Safety Data Sheet for the Hancolite product in 1985, one sees that Handschy itself describes the appearance of its "shaded" Hancolite product as a "***clear***, violet tinged liquid." *See* Handschy 1985 MSDS for Hancolite, attached as Exhibit H; see also Exhibit I, EMCO's blender/manufacturer MSDS for MS-408 attached as Exhibit I. Thus, Mr. Coppage, Mr. Stallings, and Handschy's own MSDS for the appearance of its "tinged" or "shaded" Hancolite are all consistent that the product was indeed "clear." Mr. Stallings was never asked if the product was clear, but with a tint. Mr. Stallings never testified that the

12

solvent had no tint to it.  Further, a 1982 Hancolite MSDS provided by Handschy lists the Hancolite appearance as a **"clear liquid"** and makes no mention of a violet tinge during the purported time period that all Hancolite had a "tinge" according to US Steel's motion. *See* Exhibit V. Regardless, even if the product was not found to be clear, the fact that Mr. Coppage did not testify to a violet tinge of the solvent is a matter for cross examination and not a basis for a trial on the merits in the form of a *Daubert* motion.

Thus, Dr. Herrick's opinions related to Mr. Coppage's and Mr. Stallings' use of Handschy's Hancolite solvent cleaner while employed at The Baltimore Sun and the News American are based upon the facts of the case and are supported by the testimony of the witnesses and the evidence. The Defendant seeks to turn this Court into the finder of fact by attempting to have it rule through exclusion of expert testimony that Mr. Coppage indeed did not use the Hancolite product, despite there being sufficient evidence to allow a jury to conclude that Decedent did use Hancolite. The fact that the Defendant disagrees with Dr. Herrick's opinions are a basis more suited for cross examination rather than exclusion of testimony. Thus, their Motion to exclude Dr. Herrick's testimony must be denied.

**B.      Dr. Herrick's Opinions On The Benzene Content of Hancolite and Other Solvents Are Grounded In The Evidence and The Facts**

With regards to the benzene content of the Hancolite product, the evidence shows that Mr. Coppage and Mr. Stallings used solvents containing at least 50% benzene at The Baltimore Sun and News American, and Dr. Herrick cites to direct evidence that the Hancolite product contained 50 percent benzene. *See* Exhibit B, at 24-26 (citing Graham deposition at 254, attached as Exhibit 7 to Defendant's Motion, at 254; also attached hereto as Exhibit K). As is shown in the citations in Dr. Herrick's report, Dr. Herrick cites to Handschy's own corporate representative who testified at deposition to the benzene content of the Hancolite product. This assertion is not contested by

US Steel, who also cites to Mr. Graham's testimony evidencing that the Hancolite product was formulated with 50 percent benzene between at least 1967 and 1977. *See* Defendant's Motion, at 3, footnote 3.

US Steel's motion to exclude challenges Dr. Herrick's opinions that all three of the cleaning solvents that Mr. Coppage was exposed to, Hanco, Sun Chemical, and U.S. Printing, all contained 50% benzene. USS claims that Dr. Herrick had "no basis" to opine that the other two solvents used by Mr. Coppage contained 50% benzene as well as the Hancolite product. However, US Steel leaves out an important factor of Dr. Herrick's opinion testimony. Dr. Herrick was asked, "Is your assumption that Mr. Coppage's use of solvents prior to 1977 was solvents that contained 50 percent benzene? A: ***Well, it's consistent with what was going on in the practice of printing during that time period,*** that benzene-containing solvents were used for this general purpose cleaning. *See* Herrick Deposition, attached as Exhibit D, at 50:1-8. Further, the Mr. Coppage's and Mr. Stallings' testimony show that the three solvents appeared similar, they all worked the same, and they smelled sweet, a smell consistent with benzene. *See* Exhibit D, at 125-126; *see also* Exhibit 3 to Herrick's Deposition which is his detailed analysis on evidence of 50% benzene in the solvents, attached as Exhibit U.

Therefore, although Defendant may disagree with Dr. Herrick's ***conclusions***, they are clearly based upon sufficient facts or data with relation to the formula for the Hancolite product and the similarity of the other two solvents, and are the product of reliable principles and methods employed by Dr. Herrick, a certified industrial hygienist with knowledge and experience in the history of these types of printing industry solvents and their historical benzene content. *Id*; also see Exhibit C. Indeed, the evidence available to Dr. Herrick is that the Hancolite product contained 50% benzene and that all the products worked and smelled similar. Thus, his opinions are based

upon reliable methods. Defendant's distain for the conclusions reached by Dr. Herrick, as stated above, are more suited for cross examination rather a trial on the merits disguised as a *Daubert* Motion.

Further, by Defendant focusing on the fact that there are two formulations of the Hancolite product, the formula containing 50% benzene and the formula containing 50% toluene, Defendant implies that Dr. Herrick assumed, unfoundedly, that Plaintiff used the 50% benzene version rather that the 50% toluene version. However, the evidence is clear that during the relevant time period only the 50% benzene formulation of the product was available outside of Illinois.

Defendant THAN manufactured and blended the product called Hancolite which was used to clean presses at the Baltimore Sun and which contained benzene. *See* Exhibit I. Mr. Coppage used Hancolite blended with 50% benzene. That benzene was supplied by US Steel. *See* Exhibits J and L. Steven Carter is the corporate representative of THAN. He testified that all Hancolite with 50% benzene in it was blended by THAN for Handschy at THAN's Chicago facility. (Carter Dep in Duttera p. 25:5-26:21, Ex. L). He testified that US Steel supplied benzene to THAN's Chicago facility from at least 1968 through 1974. (See, Carter Dep. in Duttera p. 27:10-28:19, 30:15-31:24, 34:17-38:3, Ex. L). He testified that there is no evidence of any other entity supplying benzene to THAN's Chicago facility during eh years 1968 – 1974. (See, Carter Dep. in Duttera p. 48:14-23, Ex. L). The Hancolite was manufactured at THAN's Chicago facility and there is no evidence that these entities or any entity other than US Steel supplied THAN's Chicago with benzene from 1968 – 1974.

THAN relied upon US Steel to provide warnings so that it could in turn pass those warning onto its customers, including Handschy. (See, Carter Dep. in Duttera p 54:4-58:13, Ex. L). US Steel did not warn THAN of the cancer hazards of benzene. See Exhibit J. Significantly, THAN

15

passed US Steel's warnings directly on to Handschy, as evidenced by the presence of a US Steel benzene MSDS with the Thompson Hayward Chemical Company stamp on it in Handschy's records. *Id.; see also* Exhibit J.  US Steel never provided THAN with the information from US Steel's library and knowledge on benzene's ability to cause leukemia and aplastic anemia or that benzene containing mixture should not be used for cleaning purposes. (See, Carter Dep. in Duttera p. 58:20-85:5, Ex. L).

Handschy had two versions of Hancolite, and only the 50% benzene containing version was sold outside of Illinois before 1978. In 1967 Handschy was inspected by the Illinois Department of Labor which discovered Handschy's use of benzene in Hancolite and advised Handschy in a May 16, 1967 letter that this was against Illinois law. As the result, Handschy developed an "Illinois Hancolite" which was for sale in Illinois. *Id.* It continued to sell the 50% benzene containing version of Hancolite outside of Illinois through at least 1977. Mr. Coppage used Hancolite in Maryland. Therefore he used the 50% benzene version of Hancolite.

After receiving the May 16, 1967 letter from the State of Illinois, Handschy developed the MS-3695 formula for Hancolite and called it "Illinois Hancolite" and "Hancolite (Less Toxic-Illinois Type)". (See, Handschy Chemical Co. Technical Bulletin Number 145, bates number H-D000969-970 at H-D000970, "Exhibit M"; MS-3695 Illinois Hancolite bates number H-D000971, "Exhibit N"; Graham Dep. p. 171:9-13, "Exhibit O"). The evidence shows that the MS-3695 Hancolite Glaze Cleaner was "specifically designed" for sales of Hancolite in Illinois. (See, Graham Dep. at p. 172:3-9, "Exhibit O"). Handschy listed MS-3695 under a separate price than MS-408. (See, H-D000574, "Exhibit P"). Handschy marketed the MS-3695 formula under the MS-3695 number in the State of Illinois prior to May 17, 1977. (See, November 13, 1974 letter to McGraw Edison Company bates number HD-001020- H-D001021, "Exhibit Q"). For example,

when McGraw Edison Company, an Illinois company, requested that Handschy complete an OSHA data sheet for Hancolite Glaze Cleaner sold to McGraw Edison Company, Handschy completed an OSHA data sheet for Hancolite using the product number MS-3695. (See, H-D000414-415, "Exhibit R").

On May 17, 1977, Handschy issued Technical Bulletin Number 177 wherein it stated "starting **as soon as possible** Handschy Chemical Co. will cease the production and selling of products containing benzol. This step is taken to anticipate OSHA requirements. The products in question . . . are: **Hancolite MS-408 . . . The substitute for MS-408** is Hancolite MS-3695". (See, H-D000139 "Exhibit S").(Emphasis supplied).

Handschy produced numerous letters between it and its customers during the 1970's, relating to customer requests for information regarding the chemical ingredients of Handschy products, including Hancolite. Handschy's letters to customers with facilities within the State of Illinois refer to Hancolite with the MS-3695 product number. (See, e.g., November 13, 1974 letter to McGraw Edison Company bates numbered H-D001021 and H-D001020, February 19, 1973 letter to Physician Record Co. bates numbered H-D001014, "Exhibit Q"). Letters to customers located outside the State of Illinois for the period up to May 15, 2977, and shortly thereafter, refer to Hancolite with the MS-408 product number and most specifically state that the product contains 50% Benzene. (See, January 5, 1977 letter to Hughes Aircraft Company (Arizona) bates number H-D000606-608, April 23, 1973 letter to Imperial Printing Company (Missouri) bates number H-D001013, February 15, 1974 letter to Cooper Tire & Rubber Company (Ohio) bates number H-D001018-1019, MSDS prepared on September 20, 1976 for Cummins Engine Company (Indiana) bates number H-D000582-587, January 5, 1977 letter to Environmental Health Service (Texas) bates number 546, May 23, 1977 letter to Monk Brothers (Texas) bates number H-D000541, May

25, 1977 letter to L.H. Kelley Company, Inc. (Texas) bates number H-D000542, June 1, 1977 letter to United Gas Pipeline (Texas) bates number H-D000664, June 1, 1977 letter to John H. Burke & Co., Inc. bates number H-D000543, June 14, 1977 letter to Coronet Thermogravers (Rhode Island) bates number H-D000753; September 23, 1977 letter to Mercury Marine Company (Wisconsin) bates number H-D000545; March 27, 1979 letter to Occupational Health Branch Ontario Ministry of Labour (Canada) bates number H-D001165; August 31, 1977 letter to Western Michigan University (Michigan) bates number H-D000992; September 27, 1977 letter to H.G. Bancroft (Pennsylvania) bates number H-D000764; January 8, 1969 letter to O'Rourke & Maroney, Inc. bates number H-D000588-589; October 31, 1974 letter to Resistance Print Shop bates number H-D000739-740; December 13, 1976 letter to Art Hazards Resource Center bates number H-D000747; collectively attached as "Exhibit T"). Many of these letters refer to the fact that after May 17, 1977, the customer would begin to receive MS-3695 because Handschy was phasing out MS-408 due to benzene restrictions. (See, e.g., at May 23, 1977 letter to Monk Brothers H-D000541 "[b]ecause of restriction of the usage of Benzene, we have already phased out of our old formula[] MS-408 . ." and "from now on when you order you will get MS-3695 instead of MS-408". Id.).

The evidence therefore demonstrates that (1) Hancolite was marketed under two different numbers (MS-408 and MS-3695), (2) Handschy sold the MS-408 (50% Benzene) formula of Hancolite Glaze Cleaner outside of Illinois, including Maryland, and (3) the MS-3695 (50% Toluene) Hancolite was **sold in Illinois only** and marketed in Illinois under the MS-3695 product number prior to May 17, 1977. Therefore, it is clear that because the evidence shows that Mr. Coppage used Hancolite in Maryland, outside of Illinois, during the time period of 1960 to 1969, that he was using the Hancolite formula with 50% benzene. Therefore, Dr. Herrick's opinions

about the benzene content of the Handschy product are certainly not "speculative" and are grounded in the facts of the case. Thus, they should not be excluded for the reasons set forth below.

      **WHEREFORE**, Plaintiff respectfully requests that this Honorable Court deny Defendant's Motion to Exclude Dr. Herrick for the reasons stated above, as Dr. Herrick's opinions related to 1) Mr. Coppage's use of the Hancolite product, and 2) the benzene content of the solvents that he used are based upon the facts of the case and utilize reliable methodology.

Respectfully Submitted,

Dated: December 18, 2019      By:   /s/ Timothy A. Burke_____
ANDREW J. DUPONT, ESQUIRE
TIMOTHY A. BURKE, ESQUIRE
THE CURTIS CENTER, SUITE 720E
601 WALNUT STREET
PHILADELPHIA, PA 19106
(215) 893-0100 - T
(215) 893-3444 - F
Attorneys for Plaintiff

 /s/ Stephen J. Nolan_____
Stephen J. Nolan, Bar No. 0578
Smith, Gildea & Schmidt, LLC
600 Washington Avenue, Suite 200
Towson, Maryland 21204
(410) 821-0070/ (410_ 821-0071 fax
snolan@sgs-law.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **LORENE G. BROCIOUS, as** | * |
| **Personal Representative of the Estate of** | * |
| **JAMES A. COPPAGE,** | * |
| | * |
| **Plaintiff,** | * |
| **v.** | *   **Case No. 1: 18-cv-003823-SAG** |
| | * |
| **UNITED STATES STEEL CORPORATION,** | * |
| **ET AL.,** | * |
| **Defendants** | * |
| * * * * * * * | |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, does hereby certify that a true and correct copy of the foregoing was

served upon all parties by Electronic Case Filing on this date.

Respectfully submitted,

Dated: December 18, 2019          By:     /s/ Timothy A. Burke_____
ANDREW J. DUPONT, ESQUIRE
TIMOTHY A. BURKE, ESQUIRE
THE CURTIS CENTER, SUITE 720E
601 WALNUT STREET
PHILADELPHIA, PA 19106
(215) 893-0100 - T
(215) 893-3444 - F
Attorneys for Plaintiffs