# EXHIBIT "1"

Page 1

1

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MARYLAND
2                      - - -
3    JAMES COPPAGE                 :
                Plaintiff,    : Civil Action
4          vs.                     : No.
                                   : 1-18-cv-03823-
5    UNITED STATES STEEL           : GLR
     CORPORATION, et al.,          :
6                                  :
                Defendants.   :
7
8                      - - -
9              November 21, 2019
10                     - - -
11              Oral Deposition of ROBERT F.
12   HERRICK, Sc.D., CIH, FAIHA, taken pursuant
13   to Notice at Veritext-Boston, 101 Arch
14   Street, Suite 650, Boston, Massachusetts
15   02110, beginning at 9:09 a.m. before
16   Brigitte A. Strain, a Federally Approved
17   Registered Professional Reporter and Notary
18   Public.
19                     - - -
20
21
22
            VERITEXT LEGAL SOLUTIONS
23             NEW ENGLAND REGION
24

Page 43

ROBERT F. HERRICK, Sc.D., CIH, FAIH43

1      Q.      He was at the News-American

2  and the Baltimore Sun.

3      A.      Right.  No, this was more

4  focused on his time at the Alco group here.

5      Q.      So, I mean, I don't want to

6  waste time on it.  There's nothing in your

7  conversation with Mr. Southworth that gave

8  you any more information about any use of

9  the Hanco solvent at any workplace where Mr.

10  Coppage was; is that right?

11      A.      That's right.

12      Q.      Okay.  I'm going to save this

13  one.  Let's move on.

14              Now, in the report that you

15  issued in this case, you evaluated your

16  exposure assessment for the solvents used by

17  Mr. Coppage using the near-field/far-field

18  model. Is that right?

19      A.      That's correct. Yep.

20      Q.      And you would agree with me

21  that an important part of the use of that

22  model is the benzene emission rate.  Right?

23      A.      It is, yes.

24      Q.      And in order to do the benzene

Page 44

ROBERT F. HERRICK, Sc.D., CIH, FAIH44

1    emission rate, it's important to know the

2    benzene content of the product.  Right?

3         A.    That's correct, yes.

4         Q.    And we've already established,

5    I think -- and you tell me if I'm wrong

6    because I'm not trying to state your

7    testimony.  Okay? I'm just trying to ask you

8    questions. You could not have relied on Mr.

9    Coppage's testimony to determine the benzene

10   content of the solvent he used because he

11   never identified it. Is that right?

12        A.    Right. I didn't have that

13   information from Coppage.

14        Q.    So, based on your report, as I

15   understand it, you relied on another

16   deposition taken of a Mr. Graham; is that

17   right?

18        A.    That's correct, yeah.

19        Q.    And you used that deposition

20   to arrive at your assumption that the

21   benzene content of the solvent used at the

22   Baltimore Sun and the News-American for the

23   period 1960 to 1969 contained 50 percent

24   benzene.  Right?

Page 51

ROBERT F. HERRICK, Sc.D., CIH, FAIH51

1    was general purpose cleaning.

2         Q.    And if that assumption is

3    wrong, then the basis for this 50 percent

4    benzene is wrong.

5              MR. DuPONT:  Objection, form.

6              THE WITNESS:  Well, I'd have

7         to look.  I mean, it's possible that

8         if there's a different number, it

9         would have, you know, resulted in a

10        different calculation.

11   BY MR. CAIRONE:

12        Q.    Please answer my question,

13   Doctor.  You just said that you assumed this

14   was a general purpose cleaner.  Right?

15        A.    Right.

16        Q.    If that assumption is wrong,

17   then your use of this product as the basis

18   of your assumption of the benzene content is

19   wrong.

20        A.    It would require a different

21   value if the benzene content was different,

22   yeah.

23        Q.    And if it requires a different

24   value, it's wrong.

```
                                    Page 52

          ROBERT F. HERRICK, Sc.D., CIH, FAIH52
 1               MR. DuPONT:  Objection, form.
 2               THE WITNESS:  Okay. I could
 3       recalculate it.  It would give us a
 4       different answer.
 5  BY MR. CAIRONE:
 6       Q.      Right.  I think that's an
 7  answer, although not clear.
 8               Now, what I want to show you,
 9  though is, just above the passage of this
10  deposition that you use for your assumption,
11  just above it, it says -- I'm sorry, not
12  just above it, but it's on page 244, which
13  isn't far above it.
14               Now, we're talking about
15  MS-408.  Okay?  Are you with me?
16       A.      Yep.
17       Q.      Line 22, page 244.
18               "In any event, it's your
19  understanding, based on looking at the
20  documents, that Hancolite, which was MS-408,
21  would have been purple in color during the
22  '60s and '70s and early '80s.  Correct?"
23               Answer:  "Violet, purple.
24  However, yes, it was shaded."
```

Page 87

ROBERT F. HERRICK, Sc.D., CIH, FAIH87

1  Chang is?

2       A.     No, I'm sorry.  It doesn't

3  ring a bell.

4       Q.     So you didn't consult with any

5  of the other plaintiff experts in this case

6  before writing your report or before giving

7  this deposition?

8       A.     Correct, I did not.

9       Q.     In terms of the scope of your

10  retention, obviously from your report it

11  would be correct to say that you were

12  retained by MR. DuPONT to come up with a

13  cumulative dose calculation or assessment to

14  benzene for Mr. Coppage for his career as a

15  pressman; correct?

16             MR. DuPONT:  Form.

17             THE WITNESS:  The only

18       distinction I would draw was that I

19       was really asked to estimate the

20       cumulative exposure.  That is,

21       overall dose.

22  BY MS. PROSSER:

23       Q.     Oh, okay. Were you given any

24  other assignments by counsel for this case?

ROBERT F. HERRICK, Sc.D., CIH, FAIH88

1       A.      No. That's been pretty much
2   the scope of my work on this.
3       Q.      So you're certainly not going
4   to come to trial and give us any causation
5   opinions.  Correct?
6       A.      Right. That's really not my
7   area.
8       Q.      And you're not going to come
9   to trial and give an opinion about whether
10  or not Mr. Coppage was at an increased risk
11  of developing the bone marrow disorder that
12  he developed because of his work as a
13  pressman.  Correct?
14      A.      That's correct.
15      Q.      After you finished and
16  completed your report, did you read any of
17  the reports of the defense expert?
18      A.      I did.
19      Q.      Did you read Robert Adams'
20  report?
21      A.      I did.
22      Q.      And what other reports of the
23  defendants did you review?
24      A.      I read the report from Mr.

```
                                          Page 106

           ROBERT F. HERRICK, Sc.D., CIH, FAI106
 1  call the lower flammable limit, which, in
 2  the case of benzene -- I know this because
 3  it came up before.  In the case of benzene
 4  it's something like 12,000 parts per
 5  million, is the lowest level that's
 6  flammable in air.
 7              And so that's really -- you
 8  know, in terms of thinking about the risk of
 9  fire or explosion, that's really the better
10  metric to apply than the flash point.
11       Q.     Dr. Herrick, would it surprise
12  you that in the MS-408 materials, such as
13  the MSDSs, it states unequivocally that this
14  is a highly flammable and explosive product
15  that has to be stored in a cool, dry place
16  away from any heat sources. Would that
17  surprise you?
18              MR. DuPONT:  Objection, form.
19              THE WITNESS: No.
20  BY MS. PROSSER:
21       Q.     And you know that at
22  News-American, the 55-gallon drums of
23  solvents were stored in the pressroom right
24  next to the presses and were there during
```

```
                                        Page 107

           ROBERT F. HERRICK, Sc.D., CIH, FAI107
```
 1   the press operation.  Correct?

 2                  MR. DuPONT:  Compound, form.

 3                  THE WITNESS:  I remember that

 4           being the recollection.  I can't

 5           recall if it was Coppage or

 6           Stallings, but I do remember that

 7           being mentioned, yeah.

 8   BY MS. PROSSER:

 9           Q.     So would it not have been

10   reckless on the part of the News-American or

11   the Baltimore Sun to store a 55-gallon drum

12   at a flash point of less than 20 degrees

13   Fahrenheit?  A highly flammable, highly

14   explosive product, to store it right next to

15   presses that are in operation, generating

16   heat and potentially sparks?

17                  MR. DuPONT:  Objection.  That

18           calls for a legal conclusion and

19           something that's the province of the

20           jury to determine, the ultimate issue

21           in the case.

22                  MS. PROSSER:  No, I'm not

23           asking a legal -- I'm asking reckless

24           from an IH standpoint.

Page 108

ROBERT F. HERRICK, Sc.D., CIH, FAI108

1              MR. DuPONT:  And it's also the
2       ultimate --
3              MS. PROSSER:  It's a very
4       specific question.
5              MR. DuPONT:  It's the province
6       of the jury to decide an ultimate
7       issue in the case, not the experts.
8  BY MS. PROSSER:
9       Q.     Please answer my question,
10 Doctor.
11      A.     Sure.  I guess I'd be a little
12 reluctant to apply the term reckless, you
13 know, not knowing the real details of
14 exactly where everything was.
15      Q.     Would it be good industrial
16 hygiene practice to store a 55-gallon drum
17 of a solvent that has less than a 20 degree
18 Fahrenheit flash point, and is warned about
19 as being highly explosive and highly
20 flammable, in a pressroom right next to
21 presses that are in operation, generating
22 heat?
23              MR. DuPONT: Form, compound,
24       foundation.

Page 109

                    ROBERT F. HERRICK, Sc.D., CIH, FAI109

1                    THE WITNESS:  Well, with the
2               caveat, you know, as I said before,
3               that the flash point isn't really the
4               most relevant characteristic to
5               consider here, I think in general you
6               could say that it's not best practice
7               to have materials like that in places
8               where there is heat being generated.
9      BY MS. PROSSER:
10          Q.    So that would be another
11     reason that you could consider as to
12     question your identity of the MS-408 as
13     being one of the solvents that was in use at
14     the Baltimore Sun and at News-American from
15     1960 to '69; correct?
16                    MR. DuPONT: Form, compound.
17                    THE WITNESS:  Well, you know,
18               that single thing, you know, not
19               really knowing the details, you know,
20               as I mentioned before, I don't know
21               that I would consider that to be, you
22               know, conclusive evidence one way or
23               the other.
24     BY MS. PROSSER:

Page 115

ROBERT F. HERRICK, Sc.D., CIH, FAI115

1    Q.    Yes.  It's the second product
2  listed on that page. Hancolite Glaze
3  Cleaner.
4    A.    I see it, yes.
5    Q.    All right. Now, you know the
6  difference between offset printing and
7  letterpress printing, I take it, right?
8    A.    In a general sense. Yeah.
9    Q.    Okay. So we know from the
10  deposition of Mr. Coppage and Mr. Stallings
11  that the printing presses at News-American,
12  from 1960 to '69, were letterpress, not
13  offset.  Correct?
14    A.    That's my recollection. Yeah.
15    Q.    And the same is true for the
16  Baltimore Sun from 1960 to '69.  The presses
17  were letterpress, not offset.  Correct?
18    A.    That sounds right. I think I
19  remember that, yeah.
20    Q.    And this document that we
21  opened up, 000127, states that Hancolite
22  Glaze Cleaner is for offset blankets and
23  press rollers.  Do you see that?
24    A.    I do see that, yes.

Page 118

ROBERT F. HERRICK, Sc.D., CIH, FAI118

1      want to take a deposition using

2      documents, it's your responsibility

3      to have the documents prepared for

4      the witness to look at, not mine.

5  BY MS. PROSSER:

6      Q.    Do you understand that offset

7  printing, Dr. Herrick, is, you don't use

8  raised letters like you do on the

9  letterpress, but you use plates that have an

10  image on them?

11      A.    I do understand that, yeah.

12      Q.    Okay. I'm going to read you

13  from the exhibit to Mr. Graham's Affidavit

14  attached to Mr. Adams' report at H-D001996.

15  And it's a brochure about a Handschy

16  product.  This was attached to Mr. Graham's

17  Affidavit.  And it says at the top, MS-408

18  Hancolite.  And it says --

19           MR. DuPONT:  Counsel, you're

20      going to have to hold on for a

21      second.

22           Which Bates number are you

23      referring to?

24           MS. PROSSER:  D001996.  And

Page 123

ROBERT F. HERRICK, Sc.D., CIH, FAI123

1    continue?

2            A.      Let's do it. Yep.

3            Q.      Okay. So there were five

4    products named in the First Amended

5    Complaint filed by Mr. DuPont. One of them

6    was a Hancolite Glaze Cleaner that we've

7    already talked about. Another one was the

8    Steel Roller Deoxidizer, and then there was

9    a special type wash, Plasaver, spelled

10   P-L-A-S-A-V-E-R, And Plabuilder, spelled

11   P-L-A-B-U-I-L-D-E-R. You have no information

12   or opinion that any of these four other

13   products, setting aside the Hancolite Glaze

14   Cleaner, were the solvent that was

15   identified by Mr. Stallings as the Hanco

16   solvent. Is that correct?

17               MR. DuPONT:  Compound.

18               THE WITNESS:  Well, he didn't

19          really provide that level of

20          information.  So, you know, I don't

21          have any indication from him about

22          those particular products, no.

23   BY MS. PROSSER:

24            Q.      Okay. I just want to make sure

Page 124

ROBERT F. HERRICK, Sc.D., CIH, FAI124

1    I understood your answer.  Are you going to

2    be testifying at trial that the Hanco

3    solvent identified by Mr. Stallings was the

4    Steel Roller Deoxidizer?

5         A.     I don't believe he provided

6    any information that would support that.

7         Q.     Are you going to testify at

8    trial that the Hanco solvent identified by

9    Mr. Stallings was the Special Type Wash?

10                MR. DuPONT:  Form.

11                THE WITNESS:  Same answer. I

12          don't think that, you know, he

13          provided that level of specificity.

14    BY MS. PROSSER:

15         Q.     Are you going to testify at

16    trial that the Hanco solvent identified by

17    Mr. Stallings was Plasaver?

18                MR. DuPONT:  Form.

19                THE WITNESS:  Again, same

20          answer. He didn't really specify

21          that.

22    BY MS. PROSSER:

23         Q.     Are you going to testify at

24    trial that the Hanco solvent identified by

```
                                        Page 125

               ROBERT F. HERRICK, Sc.D., CIH, FAI125
 1    Mr. Stallings was Plabuilder?
 2                    MR. DuPONT:  Form.
 3                    THE WITNESS:  Same answer. He
 4          didn't really provide that level of
 5          information.
 6    BY MS. PROSSER:
 7          Q.     Are you going to testify at
 8    trial that the Hanco solvent identified by
 9    Mr. Stallings was Hancolite Glaze Cleaner
10    MS-408?
11          A.     Well, I think what we have in
12    the information is that the material that he
13    was using was a benzene-containing solvent
14    from Hancolite.  You know, that's what I
15    think the evidence that we've been able to
16    pull out of this supports.
17          Q.     Where do you find the facts in
18    the evidence of the record of this case that
19    the Hancolite solvent being used was
20    benzene-containing?
21                    MR. DuPONT:  Objection, form.
22                    THE WITNESS:  Well, I would
23          point to the information that, say,
24          Stallings provided about the
```

                                          Page 126

              ROBERT F. HERRICK, Sc.D., CIH, FAI126

1        characteristics he remembered of the

2        solvent.  That it was sweet smelling.

3        What he remembered about the

4        evaporation rate, that it evaporated

5        quickly.  The fact that it was

6        irritating to the skin.  Those, to

7        me, would all suggest that, you know,

8        there is a high likelihood that that

9        material was benzene-containing.

10  BY MS. PROSSER:

11       Q.     And when you say

12  benzene-containing, are you contemplating a

13  solvent where benzene was not an added

14  ingredient, but rather was a trade

15  contaminant as a result of the commercial

16  refinery manufacturing processes for

17  solvents?

18               MR. DuPONT:  Objection, form.

19               THE WITNESS: I would say more

20        of the former.  That it was, you know

21        -- you know, an ingredient that was,

22        you know, intentionally incorporated.

23        And that would be, you know, partly

24        based on the evaporation rate.

Page 127

ROBERT F. HERRICK, Sc.D., CIH, FAI127

1              You know, when you look at
2        some of these other materials, like
3        some of the mineral spirits products
4        that, you know, can contain benzene,
5        but in much lower concentrations, you
6        know, those tend not to evaporate
7        anywhere near as quickly as the way
8        this product was described.
9   BY MS. PROSSER:
10        Q.    Are you aware that there were
11   only four products ever manufactured by
12   Handschy that had benzene as an
13   intentionally added ingredient?
14                 MR. DuPONT:  Form.
15                 THE WITNESS:  That does sound
16        familiar. I think that was mentioned
17        in -- what's his -- I forgot the name
18        of the gentleman who was deposed from
19        the company, but that does sound like
20        a familiar value, yeah.
21   BY MS. PROSSER:
22        Q.    And you cannot testify, to a
23   reasonable degree of scientific certainty,
24   that the Hanco solvent identified by Mr.

```
                                        Page 128

            ROBERT F. HERRICK, Sc.D., CIH, FAI128
 1   Stallings at News-American and at the
 2   Baltimore Sun from 1950 to '69 was one of
 3   the four that has benzene as an added
 4   ingredient among the Handschy products.
 5   Correct?
 6                    MR. DuPONT:  Objection, form.
 7                    THE WITNESS:  You know, I
 8          don't see enough information in the
 9          record to, you know, get to that
10          point.
11   BY MS. PROSSER:
12          Q.     Now, I'm just skipping around
13   in my notes here to try to wrap things up.
14                 Are you familiar with the
15   term, state of the art?
16          A.     In a general sense, I think,
17   yeah.
18          Q.     Okay.  I just want to make
19   sure I've nailed down what you are and are
20   not going to be testifying to at trial.
21                 You have not been retained to
22   provide a state of the art opinion regarding
23   what Defendant Handschy should have known
24   about the dangers of benzene from 1960 to
```

Page 132

ROBERT F. HERRICK, Sc.D., CIH, FAI132

1        mean, if you think about the

2        technology, a lot of the inks that

3        were used, you know, were

4        benzene-containing themselves.  So it

5        makes sense that the material that

6        was used to clean the inks also was

7        benzene-containing.

8   BY MS. PROSSER:

9        Q.     Right.  I guess I'm not being

10  clear, and I apologize.  I'm just trying to

11  get to a very simple concept.  The term

12  general purpose cleaning solvent doesn't

13  tell you by that term whether benzene was

14  present as a contaminant or whether benzene

15  was present as an added ingredient.  You

16  would have to know what the constituents of

17  that solvent were to be able to answer the

18  question as to what percentage, if any, of

19  benzene was in that product. Is that

20  correct?

21             MR. DuPONT:  Form. Vague

22        content.

23             THE WITNESS:  Yeah, I think

24        that's a fair characterization. Yeah.

                                            Page 304

               ROBERT F. HERRICK, Sc.D., CIH, FAI304

 1         and answered.

 2                   THE WITNESS:  It was more of

 3         the latter.  There's other people who

 4         were going to speak to that point,

 5         and so that was the basis for my not

 6         engaging it.

 7   BY MS. PROSSER:

 8         Q.    All right, new topic.  On page

 9   32 of your report you have the cumulative

10   benzene exposure, 123.14 ppm years.  And

11   we've already established that it's total

12   benzene exposure from his work as a

13   pressman; correct?

14         A.    That's -- that's my

15   calculation, yeah.

16         Q.    So have you been asked to do a

17   Handschy or a Hanco specific cumulative dose

18   assessment for Mr. Coppage?

19         A.    No, I haven't been.

20         Q.    And based on everything you've

21   read and the questioning today, and any new

22   information that you learned about the Hanco

23   solvent or about Handschy products, do you

24   have any intention to do a Handschy or Hanco

                                        Page 305

                ROBERT F. HERRICK, Sc.D., CIH, FAI305
 1    specific cumulative exposure assessment?
 2                    MR. DuPONT:  Objection, form.
 3                    THE WITNESS: That's not my
 4        intention, no.
 5    BY MS. PROSSER:
 6        Q.      On the last page of your
 7    report, it says, on the second full
 8    paragraph, "I consider these to be
 9    underestimates of Mr. Coppage's total
10    benzene exposure." And then we don't need to
11    read the rest of the sentence.
12                    Is it your sworn testimony,
13    under oath, based on everything that you've
14    heard and reviewed, including the
15    questioning today, that you believe that you
16    have underestimated Mr. Coppage's total
17    benzene exposure?
18        A.      Yeah, I do because I didn't
19    try to account for any contribution that
20    might have been from an external exposure
21    source.
22        Q.      So based on information that
23    you reviewed today under questioning by
24    myself and Mr. Cairone regarding the Hanco

Page 307

ROBERT F. HERRICK, Sc.D., CIH, FAI307

1    been needed to accurately quantify

2    it.

3  BY MS. PROSSER:

4        Q.    Assuming hypothetically that

5  the Hanco solvent that is identified by Mr.

6  Stallings had only trace benzene as a

7  contaminant, and not benzene as an added

8  ingredient, would you agree that you have

9  over estimated Mr. Coppage's total benzene

10  exposure?

11            MR. DuPONT:  Objection, form,

12        incomplete hypothetical.

13            THE WITNESS:  Well, if any of

14        the ingredients, or any of the

15        materials that he handled had a

16        different benzene content than I used

17        in my calculations, then the result

18        of the calculation would, in fact, be

19        different, yeah.

20  BY MS. PROSSER:

21        Q.    And it would be an

22  overestimation; correct?

23            MR. DuPONT:  Objection, form,

24        incomplete hypothetical.

Page 308

ROBERT F. HERRICK, Sc.D., CIH, FAI308

1          THE WITNESS:  Well, you know,
2       in the hypothetical that you posed,
3       if the content in the solvent was
4       lower than the calculator, that his
5       actual exposure would, in fact, be
6       lower, yeah.
7  BY MS. PROSSER:
8       Q.      Now, at the bottom of your
9  last page, you say, "If additional
10 information becomes available, I reserve the
11 right to modify, amend or supplement this
12 report."
13          Do you have any intention to
14 modify, amend, or supplement this report
15 with respect to anything related to Handschy
16 or Hanco?
17          MR. DuPONT: Objection, lacks
18       foundation, form.
19          THE WITNESS: As I'm sitting
20       here today, I don't have any
21       intention to amend or modify this
22       report in any way.
23          MS. PROSSER:  Thank you,
24       that's all I have.